**EXHIBIT D**

# STATE OF SOUTH CAROLINA }

COUNTY OF LEXINGTON                          **Search Warrant**

Form approved by
S.C. Attorney General
Section 17-13-160
March 15, 1978

TO ANY BONDED LAW ENFORCEMENT OFFICER OF THIS STATE OR COUNTY OR OF THE MUNICIPALITY OF

LEXINGTON COUNTY

It Appearing from the attached affidavit that there are reasonable grounds to believe that certain property subject to seizure under provisions of Section 17-13-140, 1976 Code of Laws of South Carolina, as amended, is located on the following premises:

### DESCRIPTION OF PREMISES (PERSON, PLACE OR THING)
### TO BE SEARCHED

The Congaree Pharmacy at 3901 Edmund Highway, Suite D, West Columbia, South Carolina. A reddish brown brick building structure with brown shingles, beige/tan trim, with a sign that indicates Congaree Pharmacy near the glass door. The search area is to include the entire occupancy space and any common area space that is shared within the structure by the Congaree Pharmacy.

Now, therefore, you are hereby authorized to search the subject premises described below, and to seize such property if found:

### DESCRIPTION OF PROPERTY

## See Attached Sheet

This Search Warrant shall not be valid for more than ten days from the date of issuance.

A written inventory of all property seized pursuant to this Search Warrant shall be made to The Honorable *Wm. P. KEESLEY* within ten days from the date of this warrant, such inventory to be signed by the officer executing this warrant, and a copy of such inventory shall be furnished to the person whose premises are searched if demand for such copy is made.

A copy of this Search Warrant shall be delivered to the person in charge of the premises searched at the time of such search if practicable, and, if not, to such persona as soon thereafter as is practicable; in the event the identity of the person in charge is not known or if such person cannot be found after reasonable diligence in attempting to locate the person, a copy shall be attached to a prominent place on such premises.

EDGEFIELD ~~Lexington~~, S.C.

September 20, 2004
@ 10:17 a.m.
SCCA/513   (3-78)

_____ (L.S.)
Signature of Judge

/S/ WILLIAM P. KEESLEY

# STATE OF SOUTH CAROLINA
COUNTY OF LEXINGTON } **AFFIDAVIT**

Personally appeared before me, one   **Special Agent D. M. Lawrence** _____

who, being duly sworn, says that there is probable cause to believe that certain property subject to seizure under provisions of Section 17-13-140, 1976 Code of Laws of South Carolina, as amended, is located on the following premises in this County:

DESCRIPTION OF PROPERTY SOUGHT

See Attached Sheet

DESCRIPTION OF PREMISES (PERSON, PLACE OR THING)
TO BE SEARCHED

The Congaree Pharmacy at 3901 Edmund Highway, Suite D, West Columbia, South Carolina. A reddish brown brick building structure with brown shingles, beige/tan trim, with a sign that indicates Congaree Pharmacy near the glass door. The search area is to include the entire occupancy space and any common area space that is shared within the structure by the Congaree Pharmacy.

REASON FOR AFFIANT'S BELIEF THAT THE
PROPERTY SOUGHT IS ON THE SUBJECT PREMISES

SEE ATTACHED AFFIDAVIT

Sworn to and Subscribed before me
This 20th day of Sept. . 2004
@ 10.17 A.m.

_____
Signature of Judge                (L.S.)

/S/ WILLIAM P. KEESLEY

_____
Affiant
4400 Broad River Rd.
Columbia, South Carolina 29210
803.737-9000

09/27/2004 11:27 AM CD85B_2878

## Return

    I received the attached Search Warrant _____ , 20 \_\_\_\_\_ , And have executed it as follows:
On _____ , 20 _____ at _____ o'clock _____ M , I searched
(the person) described in the warrant and (the premises)

I left a copy of the warrant with _____

Name of the person searched or "at the place of search" with _____

Together with a receipt for the items seized.

    The following is an inventory of property taken pursuant to the warrant:

_____

    This inventory was made in the presence of _____
AND _____

I swear that this Inventory is a true and detailed account of all property taken by me on the warrant.

SWORN to before me this _____

day of _____, 2002

_____(L.S.)      _____
    Signature of Judge                 (Signature of Officer Executing Warrant)



**ATTACHMENT A**

**AFFIDAVIT**

Information contained herein is true to the best of my knowledge.

_____
**Signature of Judge**
/S/ WILLIAM P. KEESLEY

_____
SEPTEMBER 20, 2004
**Date**
@ 10:17 A.m.

_____
**Signature of Affiant**

_____
September 20, 2004
**Date**

# ITEMS AND PROPERTY SOUGHT

1. Any and all books, documents and records related to transactions or relationships with Dr. James Shortt or any patient of Dr. James Shortt; including but not limited to prescriptions, compounding orders or requests, compounding formulas, insurance records, billing or payment information, receipts and receipt books and employment records.

2. Computer systems, including any electronic, magnetic, optical, or other high speed data processing device performing logical, arithmetic, or storage functions; data storage facilities such as magnetic tape, hard disk, floppy disk or drum, DVD, or CD Rom or scanner; communications facilities directly related to or in conjunction with such device; cellular wireless telephones, devices for printing records of data; and such records or data produced in various forms; manuals documents or instructional material relating to such device printers. As a result of the execution of this search warrant, a search for any and all information and/or data stored on any of the above listed systems or devices seized pertaining to this death investigation related to transactions or relationships with Dr. James Shortt or any patient of Dr. James Shortt; including but not limited to prescriptions, compounding orders or requests, compounding formulas, insurance records, billing or payment information, receipts and receipt books and employment records.

3. Any and all records related to suppliers of products used in the compounding any and all compounds for Dr. James Shortt or his patients. Any and all records related to the

09/27/2004 11:27 AM CD85B 2878

purchase, compounding, manipulation or distribution of any product containing Hydrogen Peroxide.

4. Address and/or telephone books, rolodex and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of Dr. James Shortt, any of Dr. Shortt's patients, or any financial institutions or other individuals or businesses with whom a financial relationship exists.

5. Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements and keys.

# SEARCH WARRANT AFFIDAVIT

I, David M. Lawrence, am a certified law enforcement officer for the State of South Carolina and employed with the South Carolina Law Enforcement Division (SLED) as a Special Agent. I have been in law enforcement for over 18 years with the Richland County Sheriff's Department and SLED. I have conducted numerous criminal investigations including but not limited to murder in various degrees, suicide, fraud and forgery, robbery and other drug related crimes. I have received various specialized training in the field of death investigations as well as on the job training from other experienced investigators and supervisors from local, state and federal authorities.

On September 10, 2004, the affiant received information from Gary Watts, Coroner of Richland County, and Dr. Clay Nichols, Pathologist at Palmetto Richland Memorial Hospital, that a suspicious death occurred in Richland County, South Carolina on March 14, 2004. The deceased, Katherine Ann Kurtz-Bibeau, was admitted to Providence Hospital in Richland County for abdominal pain and shortness of breath. Kurtz-Bibeau was diagnosed by Providence Hospital Dr. Eddie Williams with Shock and possible Sepsis, an infection of the blood. She thereafter began receiving treatment for such while she remained a hospital patient. On March 14, 2004 at 11:07 am Kurtz-Bileau was pronounced dead. An autopsy was performed by Dr. Clay Nichols on March 15, 2004 at Palmetto Richland Memorial Hospital. Dr. Nichols final anatomical diagnoses were:

1. History of death following treatment for Multiple Sclerosis by infusion of Hydrogen Peroxide. Terminal course consistent with Disseminated Intravascular Coagulopathy (DIC).

2. Heart with:
   A) Multiple Superficial Petechial Hemorrhages
   B) Left ventricular wall hemorrhage
   C) 30-50% Occlusion of left anterior descending coronary artery

3. Lungs with:
   A) Bilateral Pulmonary Congestion and Edema
   B) Findings consistent with Air Emboli

4. Early Hepatic Necrosis

5. Devitalized Kidneys consistent with Cortical Necrosis

6. Uterine Infarction secondary to Thrombosis

7. Serosal Hemorrhages on Gastrointestinal Tract

8. Approximately 700 cc bloody fluid in each chest cavity

9. Approximately 1500 cc of bloody ascites

10. Multiple Ecchymoses over entire body surface consistent with Disseminated Intravascular Coagulopath (DIC)

11. Status Post Cholecystectomy

12. Status Post Right Mastectomy

13. Status Post Bilateral Breast Implants

14. Brain with Plaques consistent with Multiple Sclerosis

Dr. Nichols' listed the cause of death as cardiac arrest due to systemic shock and DIC due to iatrogenic infusion of Hydrogen Peroxide. DIC is when an individual has bled internally from ruptured blood vessels and therefore causes clotting. Hydrogen Peroxide can cause can cause blood vessels to burst and then result in clotting.

After the death of Kurtz-Bileau, it was learned through her family members that she was a patient of Dr. James Shortt. Dr. James Shortt is registered as a licensed physician with the South Carolina Board of Medical Examiners and is licensed to practice medicine in South Carolina. Dr. Shortt's office is located at 3901 Edmund Highway, Suite A, West Columbia, South Carolina in Lexington County.

This affiant learned that Kurtz-Bibeau had presented as a patient to Dr. Shortt from Minnesota with a complaint related to her condition of Muscular Sclerosis.
Based upon this information, Dr. Nichols and Richland County Assistant Deputy Coroners Christine Benson and Robbie Rowe went to Dr. Shortt's office to further investigate this said death. Dr. Shortt supplied some written documentation regarding his treatment of Kurtz-Bileau to the above said parties. Dr. Shortt indicated to the said parties that he had administered IV infusions of Hydrogen Peroxide in combination with other fluids to Kurtz-Bileau. He also indicated that this is a very common procedure administered by him and his office staff. It was also detected during this visit that Dr. Shortt had administered, in combination with other drugs and/or fluids, Lipoic Acid, Potassium Chloride, 0.9% Sodium Chloride and Ammonium Molybdate that exceeded their expiration date to the deceased Kurtz-Bileau. Dr. Shortt directed the said parties attention to several IV bags that had been disposed of or in a prepared packaged state. The following listed IV solutions (drugs and and/or fluids) had been custom compounded by The Congaree Pharmacy: Glutahione, Reduced -30 ml, Magnesium Chloride (200 mg/ml) 50 ml, Procaine HCI 0.5%, Inj. 50 ml, Vitamin B Complex 30 ml, Thiamine HCI Injxn (100 mg/ml) 30 ml, Dexpanthenollnjxn. (250 mg/ml) 30 ml, Preservative Free Procaine HCL 2% 50 ml, DMSO for Injxn 50% 50 ml, and Hydrogen Peroxide 3% Injxn 30 ml. It

appeared that from this evidence collected at Dr. Shortt's office represented the drug and/or fluids were prepared by or manufactured by the Congaree Pharmacy for distribution to Dr. Shortt's patients.

It was noted in this documentation that Kurtz-Bibeau visited Dr. Shortt's office on or about October 21, 2003 and had her blood drawn for tests. On March 9, 2004, Kurtz-Bibeau visited and met with Dr. Shortt at his office. Kurtz-Bibeau was to receive what Dr. Shortt had claimed was an alternative therapy treatment, Hydrogen Peroxide administered intravenously (IV), that would cure her Muscular Sclerosis. She did receive the Hydrogen Peroxide IV and a separate IV of Dimethyl Sulfone (DMSO), an organic solvent that has been deemed as a nonconventional and unapproved type of therapy and is not for human consumption by liquid form according to the Food and Drug Administration (FDA). DMSO is commonly used topically in veterinarian medicine for the treatment of muscular problems in animals.

On March 11, 2004, Kurtz-Bileau returned to Dr. Shortt's office for a scheduled second infusion. Kurtz-Bileau had visible signs of what appeared to be severe bruising on her hands and arms and complained of leg and abdominal pains. According to Dr. Shortt's documentation, Kurtz-Bileau received an IV(s) that contained DMSO and electrolytes but did not receive any Hydrogen Peroxide during this visit. She was also provided with a salve to apply to the bruise like areas of her body and was sent home.

Based upon the documentation of Kurtz-Bileau treatments supplied by Dr. Shortt and information provided by Dr. Shortt to the Deputy Coroners and Dr. Nichols, a review of this case was conducted by Dr. Demi Garvin, RPh and Toxicologist with the Richland County Sheriff's Department and Dr. Nichols. This review and subsequent research conducted by both doctors concluded that the infusion therapy of Hydrogen Peroxide given to Kurtz-Bibeau was the cause of her death to a very reasonable degree of medical certainty. Additional research conducted by the same medical personnel has proven that other patients that have received the Hydrogen Peroxide infusions have died from this procedure.

During the course of this investigation, it was determined that Investigator Adam Roberson of the Drug Enforcement Administration (DEA) had also received information regarding illegal activities of Dr. James Short and his medical practice. On May 4, 2004 Diversion Investigator Adam Roberson along with Task Force Officer, Kyle Taylor interviewed a Confidential Source (CS) regarding Dr. James Shortt. The CS stated that he/she has been involved with fitness and body building for many years and has used injectable steroids to obtain desired muscle enhancing results. The CS stated that he/she was informed by other steroid users and/or abusers that a local physician would prescribe injectable steroids to anyone who presented themselves as a patient, if you were willing to spend nearly $1,000.00 for the initial testing. The CS then was presented to Dr. Shortt as a patient in hopes of receiving steroids for abuse.

The CS stated that in 2002 he/she presented as a new patient to Dr. James Shortt at his office on Edmund Highway in West Columbia, South Carolina. The CS stated that Dr.

Shortt took samples of hair, urine and blood to run a testosterone screen. The initial visit cost the CS approximately $1,000.00. Within about one (1) week, the CS received a call that the test results were back and the CS could come in to the office for his/her next appointment.

The CS arrived at the office and was advised that his/her test results were back. The CS stated that he/she was never told by Dr. Shortt what his test results were. The CS stated that Dr. Shortt asked the CS "what are your goals?" The CS explained that he/she wanted to get bigger and more muscular. Dr. Shortt never told the CS that his/her testosterone levels were low or that Dr. Shortt was going to try and get the CS to a normal testosterone level. The CS does not know what his/her test results were; only that Dr Shortt willingly prescribed him/her Testosterone and Deca-Durabolin to "get big".

The CS was found to be a very fit and muscular individual at the time the CS presented as a patient to Dr. Shortt. The CS owns a Gym and works out on a daily basis. The CS stated he/she weighed approximately 215 pounds when first presenting to Dr. Shortt to "get bigger". The CS continued going to Dr. Shortt every three (3) months for a total of nine (9) months. The CS stated that during the nine (9) months he/she gained nearly 30 pounds in muscle mass. The CS added that the injectable steroids prescribed by Shortt were prescribed with no directions given by Dr. Shortt. The CS stated Dr. Shortt never explained how, where or how often to inject the drugs. The CS informed Investigator Roberson that once he/she received the written prescriptions for steroids from Dr. Shortt, he/she would get them filled at the Congaree Pharmacy that was located within the same building as Dr. Shortt's office. The CS stated that he/she was not concerned with Dr. Shortt's failure to instruct in the use of the drugs, or the syringes, since the CS had used illegal injectable steroids in the past.

The CS also advised Investigator Roberson that while visiting Dr. Shortt's office, the CS observed several people receiving intravenous therapy. The CS relayed that he/she regularly saw people sitting in the office "hooked up" to IV bags. Investigator Roberson has also reviewed documents/medical records provided by the CS notating that Dr. Shortt's therapies and treatments are considered "experimental" and are not covered by any insurance; thus, all payments for services are the patient's responsibility and are to be paid by cash, check or credit card.

Based on this affiant's review and information received of Dr. Shortt's medical practices and his use of "alternative medical practices" such as IV infusion of Hydrogen Peroxide and dispensing of steroids, it is the affiant's belief that evidence related to the death of Kurtz-Bileau and other victims who have been infused by Dr. Shortt with Hydrogen Peroxide or illegal distribution of steroids, and that the compounded drugs and/or fluids are prepared by and at the Congaree Pharmacy are maintained at Congaree Pharmacy located at 3901 Edmund Highway, West Columbia, South Carolina.

Based upon my experience and information obtained from other experienced Investigators with whom I am associated, it has been shown:
(a) That medical offices and pharmacies normally retain dispensing and administration

09/27/2004 11:27 AM CD85812878

records reflecting controlled and non-controlled substances administered, dispensed and prescribed.

(b) That medical records reflect patient and payment information and are kept in medical offices and pharmacies during the normal course of business.

(c) That prescriptions are normally kept in pharmacies, offices, exam rooms and laboratories of medical practices that prescribe controlled substances.

(d) That medical records are maintained on file that reflect exam results, test results, possible diagnosis and treatment.

(e) That office and pharmacies documents kept in the normal course of business reflect daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books and sign in sheets.

(f) That computers are used in medical offices and pharmacies to record patient information, billing and payment records, and other information needed to operate a medical practice or pharmacy.

(g) That unused controlled and non-controlled substances may be returned by patients and kept in offices, exam rooms and/or drop boxes of medical offices and pharmacies.

The affiant is asking for the compound protocols (recipes) which will assist in determining how the medicines were prepared and administered. Medical authorities have determined that DMSO in liquid form is not for human consumption. A Registered Pharmacist should be aware that DMSO is this form is not for human consumption. The compounding Pharmacist bears an equal responsibility for the safety and well being of the patients to whom the medicine is delivered. In light of this, it is the affiant's belief that records from Congaree Pharmacy will reflect present and additional patients whom have already received Hydrogen Peroxide and DMSO infusions and they should be identified immediately for the safety and proper care thereafter.

## Specifics of Search of Computer Systems

Based upon your Affiant knowledge, training, and experience, and the experience of other law enforcement personnel, your Affiant knows that searches and seizures of evidence from computers commonly require law enforcement officers to seize most or all computer items (hardware, software, and instructions) to environment.

This is true because of the following:

Computer storage devices (hard disks, diskettes, tape, removable drives) can store the equivalent of thousands of pages of information. When users desire to conceal criminal evidence, they often store the information in random order with deceptive file names. Directories and subdirectories that contain these files can be hidden from normal view.

Special forensic software is required to detect these hidden directories. This requires that searching authorities examine all the stored data to determine whether it is included in the search warrant.

09/27/2004 11:27 AM CD85 2878

This sorting process can take weeks or months, depending on the volume of data stored. This would make it impractical to attempt this kind of forensic analysis on site at the time of search warrant execution.

Searching computer systems for criminal evidence is a highly technical process requiring expert skill in a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. It is difficult to predict before a search which expert should analyze the system and its data. The search of a computer is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, and/or encrypted files.

Since computer evidence is extremely vulnerable to tampering or destruction from both external sources or from destructive code imbedded in the system in the form of a "booby trap", the controlled environment of a forensic laboratory is essential to its complete and accurate analysis.

In order to fully retrieve data from a computer system, the forensic analyst needs all magnetic storage devices, as well as the central processing unit (CPU). In some cases, where the evidence may consist of graphic files, the monitor and printer are also essential to show the nature and quality of any graphic images, which the system could produce. In addition, the forensic analyst needs all the system software (operating system, applications, and hardware drivers), which may have been used to retrieve, store, create, or transmit the data.

In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, modem, printer, as well as all internal and external storage devices are all instrumentalities of this crime.

Computer evidence is extremely vulnerable to tampering or to destruction through error, electrical outages and other causes, and that removal of the systems(s) will assist in retrieving the records authorized to be seized, while avoiding accidental destruction or deliberate alteration of the records. It would be extremely difficult to secure the system on the premises during the entire period of the search. A precise examination of the computer system requires the seizure of related peripheral equipment, including but not limited to printers, external memory storage devices; modems; etc.

In order to conduct a forensic analysis of the computer system, the seizure of software documentation, diskettes, manuals, and any related materials, whether paper or other forms of record must also be seized to accurately obtain and copy the records authorized.

Based upon the totality of the circumstances, such being the Congaree Pharmacy supplying the compounded drugs and/or fluids to Dr. Shortt, the death of Kurtz-Bileau, the illegal distribution of steroids, the administering of drugs not approved for human consumption, and in the interest of public safety of any other known or unknown present patients of Dr. Shortt or Congaree Pharmacy or any other potential patients of Dr. Shortt

or Congaree Pharmacy that has received or may receive infusions of the said drugs or fluids, the property and information sought is warranted to continue the criminal investigation as well to deter any further type of negligence of a criminal, unethical or unsafe manner that could be performed by Dr. Shortt and/or his staff and/or the Congaree Pharmacy staff.