**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **David W. Bibeau, as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **Katherine Ann Kurtz-Bibeau,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| **v.** | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| **James Michael Shortt, M.D.; Health** | ) | **AND** |
| **Dimensions, LLC; Congaree Pharmacy,** | ) | **MEMORANDUM IN OPPOSITION TO** |
| **Inc.; George Dawn, R.Ph. and J. H.** | ) | **DEFENDANTS CONGAREE PHARMACY,** |
| **"Buster" Phillips, Jr., R. Ph.,** | ) | **GEORGE DAWN AND J.H. "BUSTER"** |
| | ) | **PHILLIPS' MOTION FOR SUMMARY** |
| **Defendants.** | ) | **JUDGMENT** |

**INTRODUCTION**

This matter comes before the Court on cross motions for summary judgment involving Plaintiff's claims against Defendant pharmacists in the above-captioned action. This case involves the unlawful, improper and dangerous compounding and selling of hydrogen peroxide for intravenous use by Defendants Phillips, Dawn and Congaree Pharmacy (hereafter referred to collectively as "Defendant Pharmacists") upon an oral request by Defendant James Michael Shortt, an alternative medicine physician whose dubious methods were known by Defendant Pharmacists to be outside routine and customary medical practices.

As the direct and proximate result of the actions of Defendant Pharmacists in preparing and providing hydrogen peroxide for intravenous administration by Defendant Shortt, Ms. Katherine Ann Kurtz-Bibeau received this deadly drug, which devastated her body's blood clotting functions and lead to her death. Richland County's Coroner has declared Ms. Bibeau's death by intravenous hydrogen peroxide to be a "homicide". Copies of the death summary, autopsy report and certificate

of death, each of which confirm Ms. Bibeau's death to be the direct and proximate result of receiving injections of hydrogen peroxide into her bloodstream, are provided as Appendices A, B and C, respectively.

Despite the clear warnings on the approved label and Material Safety Data Sheets of hydrogen peroxide that ingestion of this product to be toxic to blood and other living tissue and the knowledge of Defendant Pharmacists that intravenous hydrogen peroxide was not approved by the FDA or commercially available in the marketplace, they, nonetheless, without a lawful prescription from a physician, prepared and sold to Defendant Shortt hydrogen peroxide with the full knowledge that he intended to infuse the drug into the veins of his patients.

The record before the Court establishes without question or dispute, multiple violations of federal and state law regulating the conduct of pharmacists designed to protect the public. Such violations of statutory legal standards and duties constitute multiple, independent acts of negligence per se under the common law of South Carolina. By way of illustration, these acts of negligence per se include:

1.      Compounding and delivering a drug requiring medical supervision without a written prescription, in violation of 21 U.S.C. § 353(b)(1);

2.      Compounding, delivering and selling a drug not approved by the FDA, in violation of 21 U.S.C. § 355(i);

3.      Compounding, delivering and selling a "misbranded" drug that fails to contain the requisite warnings, instructions and other label requirements, as required by 21 U.S.C. § 331(a) and 21 U.S.C. § 352(f);

4.     Compounding a drug not commercially available in the marketplace, in violation of S.C. Code Ann. §§ 40-43-86(CC)(2)(b) and 40-43-30(7);

5.     Compounding, delivering and selling a drug without a written prescription, in violation of S.C. Code Ann. §§ 40-43-86(CC)(2)(b) and 40-43-30(7);

6.     Engaging in the unlicensed and unauthorized manufacturing of a drug, in violation of S.C. Code Ann. § 40-43-86(CC)(2)(f) and 21 U.S.C. § 355(I);

7.     Issuing a prescription drug without a written order signed by the physician in violation of S.C. Code Ann. § 40-43-86(E)(7); and

8.     Compounding, delivering and selling a drug without a prescription order for a legitimate medical purpose by a practitioner acting within the course of legitimate, professional practice.  S.C. Code Ann. § 40-43-86(F).

Accordingly, Plaintiff seeks an order granting summary judgment on the issue of liability as to the Defendant Pharmacists, with the questions of compensatory and punitive damages only to be presented to the jury.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be rendered if the record shows that there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986)(if factual matters are clear because of the strength of movant's evidence or the weakness of non-movant's evidence, summary judgment for the claimant is appropriate) As set forth below, the facts before the Court are not disputed.  To the contrary, Plaintiff relies upon the admissions of the Defendants in seeking summary judgment.  The sole question in this case is whether these admissions establish negligence

per se under controlling South Carolina law. This is an issue within the exclusive province of the Court.

## STATEMENT OF FACTS

**I.    Testimony of James Horace "Buster" Phillips, Jr.**

Phillips is the owner, operator and pharmacist in charge of Congaree Pharmacy located in West Columbia, South Carolina. (Phillips dep. pp. 7, line 11 - 8, line 9)   As pharmacist in charge, Phillips was responsible for the policies and decisions in filling prescriptions at Congaree Pharmacy and accepts personal responsibility for preparation and delivery of hydrogen peroxide for intravenous administration to Defendant Shortt. (Phillips dep. p. 216, lines 7-16)  Neither Phillips nor Congaree Pharmacy is licensed as a manufacturer. (Phillips dep. p. 67, lines 22-24)

During his deposition, Phillips offered the following testimony regarding the standard of care which must be observed by a pharmacist:

1.    A pharmacist cannot manufacture a drug without Food and Drug Administration (FDA) approval. (Phillips dep. p. 68, lines 11-13) Nevertheless, Phillips never checked with the FDA prior to producing hydrogen peroxide for injection. (Phillips dep. p. 20, lines 15-18)

2.    In providing drugs to a physician, a pharmacist must comply with state law. (Phillips dep. pp. 27, lines 14 - 28, line 1) A pharmacist must also exercise due care. A part of this duty is to consider risks associated with his actions, including potential drug side effects. (Phillips dep. pp. 30, line 22 - 31, line 10)

3.    The Food, Drug and Cosmetic Act requires labeling for medications produced that are not pursuant to prescription. (Phillips dep. pp. 89, line 17 - 90, line 1; p. 92, line 2 - 17)

4

4.      For anything that is compounded, the pharmacist must consider potential adverse reactions and side effects.  (Phillips dep. p. 102, lines 6-16)

5.      Independent of a doctor's responsibility to engage in safe medical practices, a pharmacist has a duty to consider the safety of products he produces.  (Phillips dep. p. 217, lines 20-24) Accordingly, when he prepared hydrogen peroxide for Defendant Shortt to administer to Ms. Bibeau,  Phillips had a duty to assess potential risks to the patient.  (Phillips dep. p. 199, lines 12-18)

In the context of these admissions,  Phillips offered the following testimony regarding his conduct in this matter:

1.      Over a period of years,  Phillips routinely provided 3% hydrogen peroxide solutions upon verbal request by Defendant Shortt for intravenous administration to patients at Health Dimensions, LLC located in the same building as Congaree Pharmacy.  (Phillips dep. p. 161, lines 13-20) Phillips never received a written prescription from Defendant Shortt for hydrogen peroxide. (Phillips dep. p. 85, lines 4-23)

2.      The hydrogen peroxide provided to Ms. Bibeau did not arise from a practitioner/patient/pharmacist relationship.  (Phillips dep. p. 46, lines 18-23) Additionally, there was no prescription for the hydrogen peroxide provided to Ms. Bibeau, even though  Phillips was aware that the solution was being administered intravenously by Defendant Shortt to his patients. (Phillips dep. pp. 46, line 24 - 48, line 16)

3.      The hydrogen peroxide provided to Defendant Shortt for intravenous administration to Ms. Bibeau was not commercially available.  (Phillips dep. pp. 54, line 24 - 55, line 2; p. 55, lines 9-12)

5

4.      At the time that  Phillips provided hydrogen peroxide to Defendant Shortt, he had never seen any approval for injection of this drug.  (Phillips dep. p. 67, lines 1-4)

5.      At the time he was providing hydrogen peroxide for injection,  Phillips was aware that it had not been approved for intravenous use by the FDA.  Even so, he provided no caution in writing on the label or orally to Defendant Shortt about potential side effects or risks of human injection of hydrogen peroxide.  (Phillips dep. pp. 104, line 15 - 105, line 9; p. 151, lines 5-19); See also Congaree Pharmacy label for hydrogen peroxide at Appendix D.  In fact,  Phillips had no discussions with Defendant Shortt concerning the risks of intravenous use of hydrogen peroxide. (Phillips dep. p. 164, lines 6-13)

6.      In providing this drug to Defendant Shortt,  Phillips never looked up hydrogen peroxide in the United States Pharmacopia (USP) which is a compendium of standards for medications.  (Phillips dep. pp. 10, line 7 - 11, line 16)   Phillips is not aware of anywhere in the USP that indicates internal use of hydrogen peroxide is appropriate at any strength. (Phillips dep. p. 20, lines 7-9)

7.      In providing hydrogen peroxide to Defendant Shortt,  Phillips did not consult Martindale, a recognized authoritative reference on drugs.  (Phillips dep. pp. 138, line 11 - 139, line 7; p. 140, lines 13-17)  Martindale warns that "It is dangerous to inject or instill hydrogen peroxide into closed body cavities from which the released oxygen has no free exit".  Martindale also provides notice that "Intravenous administration of hydrogen peroxide solutions as unconventional therapy for AIDS or cancer has resulted in severe acute haemolysis [profuse bleeding]".  It is established that this very condition caused Ms. Bibeau's death.  A copy of the Martindale hydrogen peroxide entry is provided as Appendix E.

6

8.     Material Safety Data Sheets are lists of possible reactions of drugs with other chemicals.  (Phillips dep. p. 13, lines 18-20)  Phillips could have obtained a Material Safety Data Sheet for 3% hydrogen peroxide solution from Spectrum[1] and could have consulted the FDA in preparing the solution.  (Phillips dep. 142, lines 5-23) During the course of providing hydrogen peroxide solutions to Defendant Shortt, however, Phillips never reviewed any Material Safety Data Sheet for hydrogen peroxide.  (Phillips dep. pp. 12, line 16 - 13, line 11) Additionally, Phillips did not communicate in any way with the manufacturer of hydrogen peroxide even though communication was available.  (Phillips dep. pp. 117, line 1 - 118, line 1)

9.     Having reviewed the Material Safety Data Sheet for 3% hydrogen peroxide solution, Phillips concedes that there is no indication that it is safe to ingest at any level.  (Phillips dep. 149, lines 7-10; 15-18)

10.     Phillips assumed the reason hydrogen peroxide was not available commercially for injection is because it has not gone through the required FDA testing.  Even so, he made no communication with the FDA. (Phillips dep. p. 131, lines 9-17)

11.     Phillips is not aware of any other pharmacy in Columbia or South Carolina that produced hydrogen peroxide at the request of a physician or for human injection. (Phillips dep. p. 126, line 1-12)

12.     Phillips understood that the use of hydrogen peroxide injections was not standard medical care.    (Phillips dep. p. 163, lines 17-24) He further acknowledged that the average

---

[1]Spectrum is a licensed drug manufacturer which produces hydrogen peroxide in 35% and 3% solutions.  Congaree Pharmacy used the Spectrum 35% solution in making the hydrogen peroxide for intravenous injection by Defendant Shortt.  Both the 35% and 3% solutions produced by Spectrum provide Material Safety Data Sheets which warn that hydrogen peroxide is hazardous to blood.  These Material Safety Data Sheets are provided as Appendices F and G.

physician would not use hydrogen peroxide intravenously to treat multiple sclerosis. (Phillips dep. p. 123, lines 20-25) Nevertheless, Phillips deferred completely to Defendant Shortt and indicated the doctor's oral order was "good enough". (Phillips dep. p. 119, lines 1-4).

## II.     Testimony of George Dawn

Dawn is an employee of Congaree Pharmacy and was responsible for filling orders for hydrogen peroxide which were delivered to Defendant Shortt. (Dawn dep. p. 7, lines 2-4; 17-21) Dawn first started filling hydrogen peroxide orders after coming to Congaree Pharmacy in 1999. He understood that following further dilution by Defendant Shortt, the hydrogen peroxide would be injected into the bloodstream. (Dawn dep. p. 8, lines 9-24) In preparing this solution, Dawn did not do any independent research, but relied exclusively on "Buster" ( Phillips). (Dawn dep. p. 12, lines 6-22)

Congaree Pharmacy is not a licensed manufacturer in South Carolina, even though the hydrogen peroxide label identifies Congaree Pharmacy as the manufacturer. (Dawn dep. p. 54, lines 4-23) Moreover, Congaree Pharmacy is not registered with the FDA to compound drugs which are not pursuant to a prescription. (Dawn dep. p. 96, lines 1-8)

During his deposition, Dawn offered the following testimony regarding the standard of care which must be observed by a pharmacist:

1.     A pharmacist must be familiar with the State Pharmacy Act. (Dawn dep. p. 69, lines 9-16)

2.     Good compounding practices are a part of the standard of care for pharmacists. (Dawn dep. p. 63, lines 18-20)

8

3.       If there is no prescription, there are federal requirements for labeling and a pharmacy must be registered to compound drugs.  (Dawn dep. p. 96, lines 18-25)

4.       Any order for a  prescription drug must be in writing. (Dawn dep. p. 17, lines 6-15)

5.       Any product prepared for intravenous use needs to be under medical supervision. (Dawn dep. p. 50, lines 21-24)

6.       Hydrogen peroxide could have been dispensed directly to Ms. Bibeau. In that case, she would have been entitled to counseling and warning.  (Dawn dep. p. 86, lines 9-25; p. 88, lines 6-20)

7.       The absence of a patient/practitioner/pharmacist (triangular) relationship makes the compounding of hydrogen peroxide inconsistent with good compounding practices.  (Dawn dep. p. 68, lines 2-17)

8.       Without the triangular relationship, the providing of compounded drugs constitutes manufacturing.  (Dawn dep. pp. 71, line 15 - 72, line 5)

9.       There was no triangular relationship in providing the compound for administration to Ms. Bibeau and no valid prescription.  The 3% hydrogen peroxide solution for intravenous use was not commercially available and did not meet the requirements for compounding.  (Dawn dep. pp. 70, line 23 - 71, line 14)

10.      Dawn is aware of no independent publication which recommends intravenous administration of hydrogen peroxide.  (Dawn dep. p. 103, lines 12-16)

11.       Dawn knew that intravenous administration of hydrogen peroxide was not standard in Columbia or nationally.  (Dawn dep. pp. 101, line 25 - 102, line 26)

12.     Defendant Shortt's use of hydrogen peroxide was unique, unconventional and to Dawn's knowledge, was not in the standard of routine and customary care in the medical community.  (Dawn dep. p. 65, lines 7-18; dep. p. 102, lines 22-24)

13.      Dawn knew that Defendant Shortt's treatment was "unconventional" and not FDA approved.  (Dawn dep. 106, lines 9-13)

14.     At the time  Dawn was providing hydrogen peroxide to Defendant Shortt, he was aware that it was being used intravenously with patients and aware this was not the normal practice for physicians.  (Dawn dep. p. 144, lines 5-22)

15.     As a licensed pharmacist,  Dawn has duties to perform before filling a prescription. These include assessing contraindications, complications and providing counseling.  (Dawn dep. p. 164, lines 8-22)

In the context of these admissions,  Dawn offered the following testimony regarding his conduct in this matter:

1.     Like  Phillips,  Dawn recognized <u>Martindale</u> as a reliable, authoritative pharmacy reference.  (Dawn dep. pp. 28, line 18 - 29, line 11) Also, like  Phillips,  Dawn did not consult <u>Martindale</u> regarding hydrogen peroxide. (Dawn dep. p. 29, lines 12-16) As stated above, <u>Martindale</u> warns against any closed cavity administration of hydrogen peroxide and specifically states that "severe acute haemolysis" (profuse bleeding) has resulted from unconventional intravenous administration of hydrogen peroxide to AIDS and cancer patients.

2.      Dawn  was  aware  that  the  Spectrum 35% hydrogen peroxide label contained warnings that it was corrosive at 35%.  (Dawn dep. pp. 19, line 19 - 20, line 12)  Dawn never saw

any information from Spectrum or any other source indicating that any level of hydrogen peroxide was safe for intravenous use.  (Dawn dep. pp. 46, line 25 - 47, line 9)

     3.    Dawn was not aware that Spectrum made a 3% hydrogen peroxide solution.  (Dawn dep. p. 23, lines 13-15)   Dawn did not look at a Material Safety Data Sheet for 3% hydrogen peroxide to see whether there were risks associated with its use.  (Dawn dep. p. 22, lines 20-24)

     4.    Having examined the Material Safety Data Sheet for 3% solution during his deposition,  Dawn acknowledged that there is a warning that the 3% solution may cause damage to blood.  (Dawn dep. pp. 25, line 24 - 26, line 5)

     5.    Dawn did not examine any independent source to determine if hydrogen peroxide solution at any strength is safe for intravenous use.  (Dawn dep. pp. 32, line 24 - 33, line 17)  Dawn concedes that the haemolysis is a breakdown of blood cells and this is what happened to Ms. Bibeau.  (Dawn dep. p. 35, lines 3-8)

     6.    Even though the label provided to Defendant Shortt indicates there was a prescription for hydrogen peroxide, there was never any prescription for the drug.  (Dawn dep. p. 49, lines 16-24)

     7.    Dawn delivered hydrogen peroxide without a prescription, was aware it was to be used intravenously, knew it was a drug and knew it would be administered by Defendant Shortt to his patients.  Nevertheless, he did not require a prescription.  (Dawn dep. pp. 52, line 15 - 53, line 6)

     8.    Dawn learned of the federal laws applicable to his conduct during the deposition and conceded that he did not counsel with Ms. Bibeau, did not review the regimen Defendant Shortt was planning or approve it,  did not determine the risks and side effects of the medication and did not properly label the medication in accordance with federal law.  (Dawn dep., p. 89, lines 4-21)

11

9.      Dawn did not give a dosage level for hydrogen peroxide even though he was aware of potential risks associated with intravenous administration of the drug.  (Dawn dep. pp. 93, line 18 - 94, line 1)

10.     Nothing on the label delivered to Defendant Shortt indicates risks associated with the administration of hydrogen peroxide or provides any directions for use.  This would not comply with FDA labeling requirements.  (Dawn dep. pp. 59, line 19 - 60, line 2)

11.     In preparing hydrogen peroxide for Defendant Shortt,  Dawn was covered by Code Section 40-43-30(7) and did not have the practitioner/patient/pharmacist relationship required by law.  (Dawn dep. pp. 80, line 13 - 82, line 10)  Dawn concedes there is only one place in the Pharmacy Act where compounding is defined and that his conduct did not meet that requirement. (Dawn dep. p. 84, lines 11-17)

12.     Even though the hydrogen peroxide prepared for Defendant Shortt was not commercially available and not FDA approved for intravenous use,  Dawn made no inquiry to the FDA about safety.  (Dawn dep. p. 43, lines 17-21)  Additionally,  Dawn did not talk with Defendant Shortt about safety or usefulness of hydrogen peroxide.  (Dawn dep. p. 44, lines 16-20)

## SOUTH CAROLINA PHARMACY PRACTICES ACT

Defendant Pharmacists admit that they are required to comply with the South Carolina Pharmacy Practices Act in carrying out their duties as pharmacists.  The provisions of this Act include:

1.      A pharmacist may not engage in "conduct likely to deceive, defraud or harm the public, or demonstrating a wilful or careless disregard for the health, welfare, or safety of a patient, or [engage] in conduct which substantially departs from the

12

standards of care ordinarily exercised by a pharmacist.  S.C. Code Ann. § 40-43-86(DD)(5)

2.    A pharmacist may not sell "a drug for which a prescription order from a practitioner is required without having received a prescription drug order for the drug."  S.C. Code Ann. § 40-43-86(DD)(6)

3.    In order to compound a drug, three elements are required: (1) there must be a pharmacist/patient/practitioner relationship; (2) there must be the presentation of a valid prescription; and (3) the prescription must be for medications that are commercially available in the marketplace.  S.C. Code Ann. §§ 40-43-86(CC)(2)(f); 40-43-30(7)(defining "compounding")  See also, Good Compounding Practices, Subpart A provided as Appendix H

4.    Distribution of compounded products without a patient/practitioner/pharmacy relationship is considered manufacturing.  S.C. Code Ann. § 40-43-86(CC)(2)(f); See also, Good Compounding Practices, Subpart A provided as Appendix H

5.    A prescription drug order must be based on a written order signed by a practitioner and must contain, among other information, the name, strength, dosage form and directions for use.  S.C. Code Ann. § 40-43-86(E)(7)

6.    A prescription drug order must be issued for a legitimate medical purpose by a practitioner acting within the course of legitimate professional practice.  S.C. Code Ann. 40-43-86(F)

7. When dispensed pursuant to a practitioner's prescription, even non-prescription drugs must be treated in all respects as prescription drugs including drug counseling and labeling requirements. S.C. Code Ann. § 40-43-86(U)

## FEDERAL FOOD, DRUG AND COSMETIC ACT

Defendant Pharmacists produced hydrogen peroxide for intravenous administration upon oral request by Defendant Shortt. This conduct violates the Federal Food, Drug and Cosmetic Act in numerous respects. For example, the Act:

1. Requires a written prescription of a practitioner where "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, it is not safe for use except under the supervision of a practitioner." 21 U.S.C. § 353(b)(1)

2. Prohibits compounding finished drugs from bulk active ingredients that are not components of FDA approved drugs without an FDA sanctioned investigational new drug application in accordance with 21 U.S.C. § 355(i) and 21 CFR 312. See, Compliance Policy Guide for Pharmacy Compounding (Appendix I)

3. Requires written instructions on all manufactured drug labels. 21 U.S.C. § 352(f)(1).

4. Requires warnings of risks associated with the use of the drug on the label. 21 U.S.C. § 352(f)(2)

5. Prohibits selling a drug without FDA approval and without an investigational new drug application in accordance with 21 U.S.C. § 355(i) and 21 CFR 312

6. Requires submission of a list of drugs compounded. 21 U.S.C. §§ 360 and 331(t)

14

7.    Defines a "new drug" as "[a]ny drug...the composition of which...is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(p)(1)

8.    Provides that the newness of a drug may arise from "[t]he newness of a dosage or method or duration of administration or application, or other condition of use prescribed, recommended or suggested in the labeling of such drug, even though such drug when used in other dosage, or other method or duration of administration or application, or different condition, is not a new drug".  21 CFR § 310.3(h)(5)

9.    Provides that general recognition of safety and effectiveness shall ordinarily be based on published studies which may be corroborated by unpublished studies and other data and information.  21 CFR § 314.200

10.   Applies a two step "general recognition" test which requires: first, that there is a general recognition in fact, i.e. that there is an expert consensus that the product is effective; and second, that the expert consensus is based upon substantial evidence as defined in the Act and FDA regulations.  United States v. An Article of Drug Consisting of 4,680 Pails, More or Less, Each Pail Containing 60 Packets, etc., 725 F.2d 976, 987 (5th Cir. 1984)

11.   Requires substantial evidence of "general recognition of safety and effectiveness" which consists of adequate and well controlled studies that must be generally available to the scientific community.  Id.

15

12.  Prohibits the introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded.  21 U.S.C. § 331(a)

13.  Provides that a product is misbranded if it fails to include adequate directions for use. 21 U.S.C. § 352 (f)(1)

14.  Requires adequate directions for use means directions under which a layman can use a drug safely and for the purposes for which it is intended.  21 CFR § 201.5

15.  Where non-prescription drugs are involved, adequate directions for use requires full disclosure to the layman purchasing the drug for self treatment.  United States v. Evers, 643 F.2d 1043, 1052 (5th Cir. 1981)

## PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT

### I.     The Negligence per Se Doctrine Supports Summary Judgment.

Under the South Carolina negligence per se doctrine, a statute may create a legal duty or standard of care.  Violation of the applicable statute constitutes negligence per se which is a form of ordinary negligence.  Seals by Causey v. Winburn, 314 S.C. 416, 445 S.E.2d 94 (Ct. App. 1994)(negligence per se established by showing a statute created a duty to the plaintiff and the defendant breached the duty by violating the statute)[2]

Negligence per se removes from the jury the responsibility of deciding whether the defendant acted in a reasonable fashion.  The statute fixes the standard of conduct required of the defendant, leaving as the sole issue whether the defendant's conduct constituted a breach.  Rayfield v. South

---

[2]Negligence per se does not assume, create or require a private cause of action based upon statute.  Instead, the statute relied upon forms a basis of the duty to which negligence standards apply.

Carolina Department of Corrections, 297 S.C. 95, 374 S.E.2d 910 (Ct. App. 1988), cert denied 298 S.C. 204, 379 S.E.2d 133 (1989) To establish negligence per se, the plaintiff must show: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that plaintiff is a member of the class of persons that the statute is intended to protect. Norton v. Opening Break, 313 S.C. 508, 443 S.E.2d 406 (Ct. App. 1994) aff'd. 319 S.C. 469, 462 S.E.2d 861 (1995) The causative violation of a statute constitutes negligence per se and is evidence of recklessness and wilfulness, requiring submission of the issue of punitive damages to the jury. Wise v. Broadway, 315 S.C. 273, 443 S.E.2d 857 (1993)

     As in any negligence claim, it is incumbent upon the plaintiff asserting liability under negligence per se to establish that violation of the statute is causally linked to the injury. This is ordinarily a question for the jury. Whitlaw v. Kroger Co., 306 S.C. 51, 410 S.E.2d 251 (1991) As set forth above, however, Defendants Phillips and Dawn have admitted providing injectable hydrogen peroxide solutions in violation of state and federal law. There is no question that Ms. Bibeau's death resulted from the intravenous administration of these same hydrogen peroxide solutions. See, death summary, autopsy report and certificate of death provided as Appendices A, B and C. Indeed, neither Defendant Phillips nor Defendant Dawn contest Ms. Bibeau's cause of death. (Phillips dep. p. 201, lines 7-14) (Dawn dep. pp. 159, line 10- p.160, line15) In this context, there is no factual issue for the jury to resolve regarding the proximate cause of Defendants' negligence in Ms. Bibeau's death. Accordingly, summary judgment is appropriate.

     **II.   Defendants Violated the State Pharmacy Act.**

     In evaluating Defendants' conduct, it is important to place hydrogen peroxide in its proper context. Hydrogen peroxide is a drug that has never been approved by any regulating body for

17

intravenous use. Even it its most diluted forms, hydrogen peroxide is recognized as creating serious risks if taken internally. <u>See</u>, <u>Martindale</u> (Appendix E); <u>see also</u>, Material Safety Data Sheets for 35% and 3% hydrogen peroxide manufactured for external use by Spectrum (Appendices F and G)

Pharmacists in South Carolina are required to use a high standard of care in dispensing drugs. As stated by the South Carolina Supreme Court in <u>Evans v. Rite Aid Corporation</u>, 324 S.C. 269, 275, 478 S.E.2d 846, 849 (1996) pharmacists fall into the category of professions which furnish skilled services for compensation. Accordingly, pharmacists can be held liable for failure to conform to the practices of their profession.

**A.    Defendants violated state "compounding" requirements**.

Both Defendant Pharmacists admit that they did not have a patient/practitioner/pharmacist (triangular) relationship in providing hydrogen peroxide for intravenous administration by Defendant Shortt. State law requires this relationship as an essential criteria for preparing a lawful drug compound. State law further requires that there must be a prescription and that the prescription must be for medications that are commercially available in the marketplace. Here, however, it is admitted that Defendant Shortt never presented a prescription for injectable hydrogen peroxide and this product is not commercially available in the marketplace. For each of these reasons, Defendants are in violation of S.C. Code Ann. § § 40-43-86(CC)(2)(b); 40-43-30(7) and Good Compounding Practices, incorporated as elements of the standard of care for pharmacists in South Carolina.

**B.    Defendants violated state law in manufacturing hydrogen peroxide for intravenous administration.**

Because the Defendant Pharmacists' conduct does not fall within the explicit state compounding requirements, they are held to standards imposed upon "manufacturers" in preparing hydrogen peroxide for intravenous administration.  In fact, state law explicitly provides that distribution of compounded products without a patient/practitioner/pharmacist relationship is considered manufacturing.  Code § 40-43-86(CC)(2)(f); See also, Good Compounding Practices at Appendix H.  As set forth below, manufacturers have strict duties under federal law to test and obtain approval of a drug **before**  making it available for sale. Moreover, manufacturers cannot rely upon a "learned intermediary" defense when they fail to provide adequate warning to a physician. See generally, Tobin v. Astra Pharmaceutical Products, Inc., 993 F.2d 528 (6th Cir. 1993)(affirming liability of drug manufacturer) In this case, Defendant Pharmacists have admitted that they provided no warning to Defendant Shortt regarding the possible adverse effects of administering hydrogen peroxide intravenously.  Accordingly, Defendants cannot rely upon a learned intermediary defense and must be held accountable for their own misconduct.

**C.     Defendants violated safety standards established in state law in  preparing hydrogen peroxide for intravenous administration.**

South Carolina law defines "prescription drug" to include drugs which are required by any applicable state or federal law to be dispensed only pursuant to a prescription order or restricted to use by practitioners only.  S.C. Code Ann. § 40-43-30(46)(b) This definition specifically includes compounded drugs.  S.C. Code Ann. § 40-43-30(46)(d)[3]  State law requires any prescription drug

---

[3]By contrast, a "nonprescription drug" sold without prescription must be labeled for use by the consumer in accordance with the requirements of state and federal law.  S.C. Code Ann. § 40-43-30(32) Accordingly, even if injectable hydrogen peroxide qualified as a "nonprescription drug", Defendant Pharmacists violated state and federal law by failing to meet labeling requirements.

order to be signed by the prescriber.  S.C. Code Ann. § 40-43-86(E)(7) The order must also designate, among other information, the strength, quantity prescribed, and directions for use.  S.C. Code Ann. §40-43-86(E)(4)(5)

Defendant Pharmacists clearly violated state law in providing hydrogen peroxide for intravenous administration without a written prescription.  Perhaps the most compelling evidence of liability, however, is the Defendant Pharmacists' complete deference to Defendant Shortt in producing and delivering hydrogen peroxide for intravenous administration to his patients.  Indeed, state law specifically requires that a prescription drug order must be issued for a **legitimate medical purpose.**  S.C. Code Ann. § 40-43-86(F) Accordingly, a pharmacist may not sell a drug for which a prescription order is required without having received a prescription from a practitioner.  S.C. Code Ann. § 40-43-86(DD)(6); See also, 21 U.S.C. § 351(b)(1) discussed below.

Even though Defendants Phillips and Dawn were aware that the intravenous administration of hydrogen peroxide was outside the standard of medical care, and even though both had access to information indicating hydrogen peroxide to be dangerous to blood, and even though both knew that hydrogen peroxide had not been approved for intravenous administration by the FDA, and even though both had knowledge that the medical and pharmaceutical communities do not generally recognize the safety and effectiveness of injecting hydrogen peroxide, they provided this dangerous product to Defendant Shortt without any independent evaluation, without any written prescription, without any warning to Defendant Shortt or his patients, and without any regard for the safety and well being of the public.  These acts violate clear safety standards established in the Pharmacy Practices Act and each supports a separate finding of negligence per se by this Court.

III.    **Defendants Violated the Federal Food, Drug and Cosmetic Act.**

The Federal Food, Drug and Cosmetic Act has one overriding purpose: protecting the public health.  United States v. Bacto-Unidisk, 394 U.S. 784, 798 (1969)  Section 355 of the Act states "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug".  The Act defines "new drug" at 21 U.S.C. § 321(p) as:

> (1)     Any drug...the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof...; or

> (2)     Any drug...the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

**A.     Defendants provided hydrogen peroxide for intravenous use without a prescription required by federal law.**

It is stipulated that the hydrogen peroxide produced by Defendant Pharmacists was intended for intravenous administration and that they received no prescription for hydrogen peroxide from Shortt.  It is further stipulated that any drug to be administered intravenously requires medical supervision.  (Dawn dep. p. 50, lines 21-24) In light of these facts, Defendants' conduct is in clear violation of 21 U.S.C. § 353(b)(1) which requires a prescription for providing any drug which,

because of its components or method of use, is not safe except under supervision of a practitioner. This same statute provides that dispensing any drug contrary to its provisions "shall be deemed and act which results in the drug being misbranded while held for sale".

Defendant Pharmacists apparently believed that the absence of a prescription from Shortt relieved them of any duties or liabilities in delivering hydrogen peroxide for intravenous use. In fact, the opposite is true. In providing this dangerous drug for intravenous administration, Defendants not only materially altered hydrogen peroxide otherwise "commercially available" for external application, they circumvented federal and state safety standards. Furthermore, for reasons set forth below, Defendants assumed liability in producing a "new drug" without proper testing, approval, or warning to the public. See, T-UP, Inc. v. Consumer Protection Division, 801 A.2d 173, 195 (Md. App. 2002)(finding the preparation of sterile T-UP for intravenous use to be a "new drug" requiring FDA approval pursuant to 21 U.S.C. § § 355(a) and 321(p)(1))

**B.     Defendants produced a "new drug" in violation of federal law.**

Whether a compound is a "new drug" is determined by the product as a whole, complete with active and inactive ingredients. United States v. Generix Drug Corp., 460 U.S. 453, 459 (1983) Any compound that has not been approved by the FDA for a specified use is considered "misbranded" under § 352(l) of the Act so that production and sale violates §§ 331(a) and (k) of the Act. United States v. Baxter Health Care Corp., 712 F.Supp. 1352, 1359 (N.D. Ill. 1989) Even an otherwise available drug requires FDA approval if its form of administration, such as by way of injection, is altered. Id. at 1360 citing 21 U.S.C. § 321(p) and 21 CFR § 310.509(a) Similarly, even an otherwise available drug requires FDA approval if it is to be put to a new use or to treat different conditions.

United States v. Articles of Drug Consisting of the Following: 5,906 Boxes, etc., 745 F.2d 105 (1st Cir. 1984)

**C.     The "new drug" produced by Defendants violated federal testing requirements.**

Federal law prohibits compounding drugs from components that are not FDA approved through an FDA sanctioned investigational new drug application.  21 U.S.C. § 355(I); 21 CFR § 312; See also, Compliance Guide for Pharmacy Compounding (Appendix I) These same provisions prohibit selling a new drug without FDA approval and review.

More than a decade before Ms. Bibeau's death, the United States brought an action to enjoin the sale of hydrogen peroxide solutions which were being marketed as cure alls.  United States v. Vital Health Products, 786 F.Supp. 761 (E.D. Wis. 1992) affirmed as U.S. v. LeBeau, 985 F.2d 563 (7th Cir. 1993) enforced a permanent injunction which prohibited the marketing of hydrogen peroxide solutions that had not been approved by the FDA.  In an exhaustive opinion, the district court noted that there were no controlled studies to determine the effectiveness of the products, no evidence that there is a responsible body of qualified opinion about the benefits of the ingestion of hydrogen peroxide and overwhelming evidence that hydrogen peroxide was **not** generally recognized as safe and effective for internal use.

**D.     The "new drug" produced by Defendants violated federal warning and label requirements.**

The defendant in U.S. v. Vital Health Products claimed that its compounds should be "grandfathered" because hydrogen peroxide was on the market before 1962, the date established for

testing in the Food and Drug Act. The Court correctly rejected this argument, finding that while the ingredients may have been used and sold before 1962, there was no evidence that the combinations marketed by the defendant were commercially used or sold before 1962 or that they were generally recognized as safe and effective for the proposed use before that date. Accordingly, the Court held, as a matter of law, that the compounds constituted "misbranded" drugs.

The <u>U.S. v. Vital Health Products</u> case establishes beyond dispute that the Defendant Pharmacists in this action violated federal law in providing hydrogen peroxide for intravenous administration by Defendant Shortt. There is simply no evidence to support a claim that the Defendants were operating within the confines of acceptable pharmaceutical practices or that they had the right to rely upon a verbal order by a physician known to be operating outside the standard of care. To the contrary, Defendants attempt to place themselves beyond the reach of the state Pharmacy Practices Act and the federal Food, Drug and Cosmetics Act based upon the illogical assertion that a pharmacist can prepare and provide any product, regardless of its known risks, upon the mere verbal request of a physician. This argument completely ignores the safeguards established by the South Carolina General Assembly and the Congress of the United States which require that drugs be recognized as safe and effective **before** they are authorized for delivery to physicians for use by patients or for delivery to the public.

**E.    Defendants violated federal law in producing hydrogen peroxide for intravenous use without approval of the FDA, without a finding that it is generally accepted as safe and effective and without providing appropriate warnings.**

In evaluating the Defendant Pharmacists' admitted conduct in this case, the Court cannot ignore the purpose of the state Pharmacy Practices Act and the federal Food, Drug and Cosmetics

24

Act to protect the public from the risks of untested, unproven drugs. For example, federal law establishes that a product is "misbranded" if it fails to include adequate directions for use. 21 U.S.C. § 352(f)(1) Similarly, state law provides that a prescription drug must contain the name, strength, dosage, form and directions for use. S.C. Code Ann. § 40-43-86(E) A prescription drug order must also be issued for a legitimate medical purpose by a practitioner acting within the course of legitimate, professional practice. S.C. Code Ann. § 40-43-86(F)

As addressed below, the Court must reject the Defendants' myopic and absurd position that regardless of FDA approval and regardless of any general acceptance of the safety and effectiveness of hydrogen peroxide for intravenous administration, they may hide behind the verbal request of a physician known to them to be practicing in an unconventional manner not consistent with the standard of care in South Carolina. The South Carolina Supreme Court has repeatedly held that an interpretation of a statute leads to an absurd result must be rejected. <u>Kennedy v. South Carolina Retirement System</u>, 345 S.C. 339, 351, 559 S.E.2d 243, 249 (2001) citing <u>Gentry v. Yonce</u>, 337 S.C. 1, 522 S.E.2d 137 (1999); <u>Kiriakides v. United Artists Communications, Inc.</u>, 312 S.C. 271, 440 S.E.2d 364 (1994) In this case, Defendants' numerous violations of safety standards established in the Food, Drug and Cosmetic Act constitute multiple independent grounds for finding of negligence per se. Accordingly, Plaintiff is entitled to an award of summary judgment on the issue of liability.

## **DEFENDANTS' MOTION IS NOT SUPPORTED BY STATE OR FEDERAL LAW**

In support of their Motion for Summary Judgment, Defendant Pharmacists argue that in providing Defendant Shortt hydrogen peroxide for intravenous administration, they complied with the South Carolina Pharmacy Practices Act. In making this argument, however, Defendants ignore

25

the plain language of the Pharmacy Practices Act and "cherry pick" isolated provisions in a manner which is inconsistent with its legislative purpose.

As set forth above, the Pharmacy Practices Act specifically authorizes "compounding" only in limited, explicit circumstances. The complete statutory definition of "compounding" provided in S.C. Code Ann. § 40-43-30(7) states:

> "Compounding" means the preparation, propagation, conversion, or processing of a drug or device, either directly or indirectly, by extraction from substances of natural origin or independently by means of chemical or biological synthesis, or the preparation, mixing, assembling, packaging, or labeling of a drug or device as the result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice, or for the purpose of, or as an incident to, research, teaching, or chemical analysis and not for sale or dispensing. Compounding also includes the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns. The term compounding does not include mixing, reconstituting, or other such acts that are performed in accordance with directions contained in approved labeling provided by the product's manufacturer and other manufacturer directions consistent with that labeling.

As evident in this definition, compounding must be the **"[1] result of a practitioner's prescription drug order or initiative [2] based on the practitioner/patient/pharmacist relationship in the course of professional practice, or [3] for the purpose of, or as an incident to, research, teaching, or chemical analysis and not for sale or dispensing."** These same requirements are stated in the <u>Good Compounding Practices Applicable to State Pharmacies</u> provided as Appendix H. Defendant Pharmacists admit that "good compounding practices" is a component of their standard of care. Furthermore, Defendants admit that they produced injectable hydrogen peroxide to Defendant Shortt "for sale" and that they did not have a practitioner/patient/pharmacist relationship. Accordingly, Defendants' conduct does not fall within

26

the definition of lawful "compounding" established by the Pharmacy Practices Act. Additionally, this conduct subjects Defendant Pharmacists to the duties and responsibilities of manufacturers. See, S.C. Code Ann. § 40-43-86(CC)(1) and (2)(f); See also, Good Compounding Practices Applicable to State Pharmacies provided as Appendix H.

Defendants isolate S.C. Code Ann. § 40-43-86(CC)(2)(e) in an attempt to legitimize their conduct. This section provides, in relevant part: "Pharmacists may not offer compounded medications to other pharmacies for resale; however, pharmacists may compound products based on an order from a practitioner for use by practitioners for patient use in institutional or office settings." Based upon this language, Defendants argue that a pharmacist may provide any combination of ingredients to a physician for use in his office, even if the pharmacist knows that the product is dangerous. There are several problems with this argument.

First, the definition of compounding in S.C. Code Ann. § 40-43-30(7) controls as a matter of law. Purvis v. State Farm Mutual Auto Insurance Company, 304 S.C. 283, 288, 403 S.E.2d 662, 665 (Ct. App. 1991)(General Assembly has power to prescribe legal definitions by statute and those definitions are binding on courts); Goldston v. State Farm Mutual Auto Insurance Company, 358 S.C. 157, 177, 594 S.E.2d 511, 522 (Ct. App. 2004) Having established specific circumstances under which a pharmacy may compound drugs, the General Assembly clearly prohibited pharmacists from preparing drugs for sale by a physician without the required practitioner/patient/pharmacist relationship.

Second, the argument advanced by Defendants would lead to an absurd result. For example, Defendant Phillips testified that he is authorized to provide "any compound" requested by a physician and is limited only by the physician's judgment. (Phillips dep. p. 28, lines 5-20)

27

Accordingly, a pharmacist could provide even lethal combinations of drugs to a physician without fear of prosecution or liability. Clearly, the purpose of the Pharmacy Practices Act is to protect the public from such conduct. As recently confirmed by the South Carolina Supreme Court in <u>Garvin v. State</u>, 365 S.C. 16, 21-22, 615 S.E.2d 451, 453-454 (2005), a statute must be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute. A statute will not be construed in a manner which could not have been intended by the Legislature. In this context:

> All rules of statutory construction are subservient to the one that the legislative intent must prevail if it reasonably can be discovered in the language used, and the language must be construed in the light of the intended purpose of the statute. <u>City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck (VIN# JM2UF1132n0294812)</u>, 330 S.C. 371, 375, 498 S.E.2d 894, 896 (Ct. App. 1998). Statutes, as a whole, must receive practical, reasonable, and fair interpretation, consonant with the purpose, design, and policy of lawmakers. <u>TNS Mills, Inc. v. South Carolina Dep't of Revenue, 331 S.C. 611, 624, 503 S.E.2d 471, 478 (1998)</u>. If a statute's language is plain, unambiguous, and conveys a clear meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning. <u>Hodges v. Rainey</u>, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. <u>Hitachi Data Sys. Corp. v. Leatherman</u>, 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992). Our goal in construing statutes is to prevent an interpretation that would lead to a result that is plainly absurd. <u>In re Timothy C.M.</u>, 348 S.C. 653, 655-56, 560 S.E.2d 452, 453 (Ct. App. 2002)(citing <u>Florence County v. Moore,</u> 344 S.C. 596, 601, 545 S.E.2d 507, 509 (2001); <u>Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Lic., & Reg.</u>, 337 S.C. 476, 492, 523 S.E.2d 795, 803 (Ct. App. 1999)

The plain language of controlling legislation and simple logic refute the Defendants' claim that upon request by a physician, pharmacists may provide any combination of products for administration to a patient. Defendants' remaining arguments are equally ineffective. For example,

Defendants contend that they are relieved of liability by the learned intermediary doctrine. The limited immunity provided by this doctrine requires that the pharmacist rely in good faith upon a physician's prescription. In this case, there is no prescription and Defendants were aware that Shortt was operating outside the scope of standard medical practice in administering hydrogen peroxide intravenously. (Phillips dep. p. 163, lines 17-24; Dawn dep. p. 65, lines 7-18; pp. 101, line 25 - 102, line 26; p. 106, lines 9-13; p. 144, lines 5-22)

Because the Defendants were not "acting within the rules and regulations set forth by state and federal governments for the practice of pharmacy", they are subject to liability for their negligent conduct. See, Madison v. American Home Products Corp., 358 S.C. 449, 454, 595 S.E.2d 493, 496 (2004)(quoting from Schaerrer v. Stewart's Plaza Pharmacy, Inc., 79 P.3d 922, 932 (Utah 2003) finding no strict liability where pharmacy acts within compounding guidelines) None of the authorities relied upon by Defendants extend the learned intermediary doctrine to acts of independent negligence by a pharmacist. To the contrary, it is clear that a pharmacist may not ignore risks even in filling lawful prescriptions. Happel v. Wal-Mart Stores, Inc., 319 F.Supp.2d 883 (N.D. Ill. 2004)(Pharmacy liable for filling lawful prescription where known side effects were potentially fatal); Dee v. Wal-Mart Stores, Inc., 878 So.2d 426 (Fla. Dist. Ct. App. 1st Dist. 2004)(Pharmacy liable for filling lawful prescription which was unreasonable on its face) Moreover, because Defendants' preparation of hydrogen peroxide did not comply with "compounding" requirements, they were bound by federal law to inform the recipient of any risks or contraindications. See, for example, Brooks v. Medtronic, Inc., 750 F.2d 1227, 1231 (4th Cir. 1984)(addressing duty of manufacturer of "ethical" (prescription) drugs to warn physicians only)

In their memorandum, Defendants argue that their hydrogen peroxide product was "commercially available" and that no prescription was necessary. (Defendants' Memorandum, p. 2) This is an incorrect statement of fact and law. For example, both Defendant Pharmacists admitted under oath that hydrogen peroxide is not commercially available for intravenous use. (Phillips dep. pp. 54, line 24 - 55, line 12; Dawn dep. p. 53, lines 8-25) Defendants also admitted that any drug administered intravenously must be under a doctor's supervision. (Dawn dep. p. 50, lines 21-24) Finally, if preparing the injectable hydrogen peroxide as a non-prescription product, Defendants were required by federal law to have FDA approval and to issue warnings to the ultimate consumers. Defendants admit that they made no warnings to anyone regarding their hydrogen peroxide compound. (Phillips dep. pp. 68, line 11- 70, line 6; pp. 89, line 17 - 90, line 1; p. 92, lines 2-7; pp. 104, line 15 - 105, line 9; Dawn dep. pp. 59, line 19 - 60, line 2)

In summary, Defendant Pharmacists' argument completely subverts the comprehensive state and federal regulatory system intended to protect the public from unproven drugs. Reduced to its essential elements, Defendants' conduct is no more or less than unauthorized drug dealing. As the record establishes, Defendant Pharmacists did not provide Defendant Shortt an otherwise "commercially available" hydrogen peroxide drug for intravenous administration, did not have the required patient/practitioner/pharmacist relationship which is necessary to compound commercially available drugs, and did not have FDA approval to manufacture hydrogen peroxide for intravenous use. Finally, Defendant Pharmacists did not seek or obtain a prescription as a condition of providing hydrogen peroxide to Defendant Shortt for intravenous administration to his patients. These facts establish beyond dispute that Defendant Pharmacists were operating far outside the narrow scope

of the authorized practice of pharmacy and are liable for the foreseeable injuries and death suffered by Ms. Bibeau.

## CONCLUSION

For the reasons set forth above, uncontested facts establish that Defendant Pharmacists violated safety standards enacted in the state Pharmacy Practices Act and federal Food, Drug and Cosmetic Act which render Defendants liable as a matter of law under the controlling South Carolina negligence per se doctrine. Accordingly, Rule 56(c) of the Federal Rules of Civil Procedure entitles Plaintiff to an order granting summary judgment on the issue of liability, with the questions of compensatory and punitive damages to be submitted to the jury as to these Defendants.

GERGEL, NICKLES & SOLOMON, P.A.


BY:   s/Richard Gergel
          Richard Mark Gergel
          Fed. I.D. #1027
          W. Allen Nickles, III
          Fed. I.D. #2541
          P. O. Box 1866
          1519 Richland Street
          Columbia, South Carolina 29202
          (803) 779-8080

ATTORNEYS FOR PLAINTIFF

Columbia, South Carolina
October 19, 2005