IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A No. 3:04-22306-10

David W. Bibeau, as Personal        )
Representative of the Estate of     )
Katherine Ann Kurtz-Bibeau,         )
                                    )
    Plaintiff,                      )
                                    )
                                    )
v.                                  )
                                    )
James Michael Shortt, M.D.; Health  )
Dimensions, LLC; Congaree Pharmacy, )
Inc.; George Dawn, R.Ph. and J.H.   )
"Buster" Phillips, Jr., R.Ph.,      )
                                    )
    Defendants.                     )
----------------------------------  )

**COPY**

VIDEO DEPOSITION OF

# JAMES H. PHILLIPS, JR., R. PH.

\* \* \* \* \* \* \*

Friday, July 15, 2005
10:15 a.m. - 2:50 p.m.

The deposition of James H. Phillips, Jr., R. Ph., taken on behalf of the Plaintiff at the law offices of Gergel, Nickles & Solomon, P.A., 1519 Richland Street, Columbia, South Carolina, on the 15th day of July, 2005, before Margaret S. Smith, Court Reporter and Notary Public in and for the State of South Carolina, pursuant to Notice of Deposition.

*CREEL COURT REPORTING, INC.*
*1116 Blanding Street, Suite 1B / Columbia, SC 29201*
*(803) 252-3445 / (800) 822-0896*

JAMES HORACE PHILLIPS, JR.                              7

1         immediately reinstated it.

2    Q:   hat year was that?

3    A:   I don't remember.

4    Q:   Approximately, what year was it?

5    A:   I don't remember.

6    Q:   Was it in the decade of the nineties?

7    A:   I believe so.

8    Q:   What was the nature of the records that were

9         not available?

10   A:   Controlled drug invoices.

11   Q:   How long have you been associated with Congaree

12        Pharmacy?

13   A:   I believe it was 1986.

14   Q:   Did you found Congaree Pharmacy?

15   A:   No, sir.  I bought it, purchased it.

16   Q:   From whom?

17   A:   Wayne Sturkie.

18   Q:   And did you buy it by yourself or did you have

19        other people, other investors?

20   A:   Wayne Sturkie and I jointly owned it for a

21        while and then I bought him out.

22   Q:   Okay.  Does anyone else own Congaree Pharmacy,

23        other than yourself?

24   A:   It's owned by Congaree Pharmacy, Incorporated.

25   Q:   And who owns the stock in Congaree Pharmacy,

JAMES HORACE PHILLIPS, JR. 8

1      Incorporated?

2   A:   Myself and my wife.

3   Q:   Does Mr. Dawn have any ownership interest in

4      it?

5   A:   No, sir.

6   Q:   Are you the pharmacist in charge?

7   A:   Yes, sir.

8   Q:   Mr. Dawn is an employee?

9   A:   Yes, sir.

10   Q:   How long has he been an employee?

11   A:   About ten years.

12   Q:   To your knowledge, has he ever been disciplined

13      by any regulatory board concerning the

14      performance of his duties as pharmacist?

15   A:   Not to my knowledge.

16   Q:   Have you ever had any prior criminal charges,

17      either a misdemeanor or a felony?

18   A:   No, sir.

19   Q:   Have you been sued previously arising out of

20      your performance or duties as a pharmacist?

21   A:   No, sir.

22   Q:   Now, I see you have brought some documents here

23      with you and I think one of them is a statement

24      provided to you by your attorney; is that

25      correct?

JAMES HORACE PHILLIPS, JR.                    10

1           compound?

2    A:    I'm   not   sure   what   you   are   ...   I   mean

3          specifically, what are you looking for?

4    Q:    Well, for instance, do you have access to the

5          United States Pharmacopeia?

6    A:    I have a copy of the USP, yes, sir.

7    Q:    Okay.  And for today, we'll refer to the United

8          States Pharmacopeia as USP.  What is the USP?

9    A:    It's a compendium of standards for medications.

10   Q:    And are you supposed to follow those standards?

11   A:    There's  a  very  large  book.   Not  all  of  it

12         applies to dispensing pharmacy.

13   Q:    Yes, sir.  But the part that applies to drugs

14         you  dispense,  you  are  supposed  to  follow  the

15         USP, are you not?

16   A:    You would have to be more specific.

17   Q:    Well, for instance, if there is a requirement

18         ...  in  the  USP,  a  requirement  for  a  certain

19         type of labeling, are you required to following

20         the labeling, provide the cautions and the kind

21         of things required in the USP?

22   A:    Not everything that's in the USP, no, sir.

23   Q:    Okay.  How about ... have you looked at the USP

24         on hydrogen peroxide?

25   A:    I   don't   believe   that   it   specifically   has

JAMES HORACE PHILLIPS, JR.                    11

1     anything to do with what we produced.

2  Q:  Well, different question.  Have you looked at

3     the USP on hydrogen peroxide?

4  A:  In what part of it, specifically?

5  Q:  Anything to do with hydrogen peroxide, have you

6     looked at the USP?

7  A:  Not this week.

8  Q:  Have you ever looked at the USP on hydrogen

9     peroxide?

10 A:  Not that I can remember specifically.

11 Q:  Are there any resource books that you have

12    access to that address hydrogen peroxide and

13    the compounding of hydrogen peroxide?  I'm

14    talking about pharmacy books, professional ...

15    things a pharmacist would use?

16 A:  No, sir.

17 Q:  When you compound, you obviously use materials

18    in combination with each other, do you not?

19 A:  Yes, sir.

20 Q:  Do those materials generally have labels and

21    materials related to them that are provided and

22    available to you?

23 A:  Yes, sir.

24 Q:  For instance, I believe you have told us in

25    response to discovery that you used hydrogen

JAMES HORACE PHILLIPS, JR.    12

1    peroxide manufactured by a company called
2    Spectrum; is that correct?
3  A:  Yes, sir.
4  Q:  Now, when Spectrum delivered that produce to
5    you, did it have a label on the bottle or
6    container?
7  A:  Yes, sir.
8  Q:  Okay. Does that contain information about the
9    product?
10 A:  Yes, sir.
11 Q:  And does that container not also refer to a
12    material safety data sheet?
13 A:  Yes, sir.
14 Q:  Okay. And is that available to you?
15 A:  It is available.
16 Q:  Okay. And did you, prior to compounding
17    hydrogen peroxide, read the label on the
18    materials you received?
19 A:  Yes, sir.
20 Q:  Okay. And did you read the material safety
21    data sheet?
22 A:  I have read it.
23 Q:  When did you read it?
24 A:  I can't tell you specifically.
25 Q:  Do you have a specific recollection of reading

JAMES HORACE PHILLIPS, JR.                    13

1          it?

2     A:   Yes, sir.

3     Q:   Okay.  And tell me specifically when you recall

4          reading it.

5     A:   About two weeks ago.

6     Q:   Prior to reading it two weeks ago, do you have

7          any recollection you ever looked at it?

8     A:   Not specifically, no, sir.

9     Q:   But if you had wanted to, that was the kind of

10         material available to you, is it not?

11    A:   Yes, sir.

12    Q:   And you are aware that the container from

13         Spectrum actually recommended that you look at

14         the material safety data sheet, did it not?

15    A:   I don't remember that.

16    Q:   But it wouldn't surprise you, would it?

17    A:   No, sir.

18    Q:   What is a material safety data sheet?

19    A:   It's a list of possible reactions of the drug

20         with other chemicals.

21    Q:   And what does the materials ...

22    A:   And it's ...

23    Q:   I'm sorry.  I interrupted you.

24    A:   Well, that's fine.  Go ahead.

25    Q:   Well, I didn't want to interrupt you, sir, and

JAMES HORACE PHILLIPS, JR.                    20

1   Q:   And does it at any strength indicate that it's
2        appropriate for direct human administration?
3   A:   For direct human administration, yes, sir.
4   Q:   For ingestion?
5   A:   Putt on the skin, that's human administration.
6   Q:   No, I'm talking about direct ... how about
7        internal use?  Do you know anywhere where the
8        USP indicates that internal use is appropriate?
9   A:   No, sir.
10  Q:   Are you aware that the FDA has ever addressed
11       the issue where human ingestion is appropriate
12       for the ... for hydrogen peroxide at any
13       strength?
14  A:   No, sir.
15  Q:   Did you ever check to see what the FDA had done
16       prior to producing the hydrogen peroxide for
17       injection?
18  A:   No, sir.
19  Q:   Let's go in and talk about when you first
20       produced hydrogen peroxide for injection.  When
21       did you first do that?
22  A:   I don't specifically remember the date.
23  Q:   Approximately, when?
24  A:   It would have been after Dr. Short had
25       requested it.

JAMES HORACE PHILLIPS, JR.                    27

1    Q:    I want to compound hydrogen peroxide and make

2          it for human injection, 3 percent, using 35

3          percent hydrogen peroxide as one of my

4          compounding materials, and I want to sell it.

5          Can I do that?

6    A:    Well, I don't think it would be a good idea,

7          but it would be your option.

8    Q:    Yes, sir.  You think I have the right to sell

9          it under the laws of South Carolina?

10   A:    You didn't mention the law.

11   Q:    Yes, sir, that's what I meant.

12   A:    I think it would be illegal.

13   Q:    Why would it be illegal?

14   A:    Well, you would have to have the order from a

15         physician first.

16   Q:    Okay.  And then would I have to have a pharmacy

17         license?

18   A:    Yes, sir.

19   Q:    And would I have to compound it under the laws

20         of the Board of Pharmacy?

21   A:    Yes, sir.

22   Q:    Okay.  So you as a pharmacist, even though you

23         have a pharmacist's license, you still have to

24         obey the law about what you can compound and

25         what you can't compound, correct?

JAMES HORACE PHILLIPS, JR.                    28

1   A:   Yes, sir.

2   Q:   So you don't have a right to compound anything

3        a doctor asks you to compound, do you?

4   A:   Yes, sir.

5   Q:   Hold on a minute.  Let me understand this.  Is

6        it your testimony that anything a doctor asks

7        you to compound, you can, under the law of

8        South Carolina, compound that?

9   A:   If it's reasonable.

10  Q:   Well, who determines if it's reasonable?

11  A:   The doctor.

12  Q:   Okay.  So again, let me ask the question.  Any

13       doctor who asks you to compound anything, you

14       are telling me you have the right to do it

15       without any other consideration, other than you

16       received a request from the doctor?

17  A:   As far as the law goes, yes, sir.

18  Q:   Okay.  There's no limitation whatsoever on what

19       you can compound; is that correct?

20  A:   Well, it would have to be ordered by a doctor.

21  Q:   But once it's ordered by the doctor, anything

22       the doctor orders you have a right to compound;

23       is that your testimony?

24  A:   But again, the doctor is the one that's in

25       control here.

JAMES HORACE PHILLIPS, JR.                    30

1     associated.

2  Q:  Okay. Well, tell me do you have a duty ...

3     upon getting that request, do you have any

4     duties, other than to follow exactly what the

5     doctor asked you to do?

6  A:  Well, again, my own ... I mean I have my own

7     decisions to make, also.

8  Q:  Okay. And what are those decisions?

9  A:  Well, I can't specifically say, you know, what

10    they would be. It would depend on the

11    situation.

12 Q:  Well, my question is you had mentioned to me

13    you had potential legal liability, correct?

14 A:  Yes, sir.

15 Q:  And what would that liability arise out of? I

16    mean what would be ... do you have to exercise

17    due care?

18 A:  Yes, sir.

19 MR. COOKE:  Richard, do these questions all pertain

20    to compounding?

21 MR. GERGEL:  Yes.

22 Q:  And you have a duty to consider the risks

23    associated with it, do you not?

24 A:  Yes, sir.

25 Q:  And you have the duty to consider the potential

JAMES HORACE PHILLIPS, JR.                    31

1       side effects, do you not?

2   A:  Yes, sir.

3   Q:  And you have a duty to consider the potential

4       benefit that may come from the product,

5       correct?

6   A:  Yes, sir.

7   Q:  All those are things that you have a duty to

8       consider to exercise due care as a pharmacist;

9       isn't that right?

10  A:  Yes, sir.

11  Q:  Okay. Tell me when you filled the request for

12      hydrogen peroxide on March 9, 2004, what risks

13      you considered.

14  A:  If the physician used it in the manner he told

15      me he would use it, then there should be no

16      risk.

17  Q:  Well, how did you know that?

18  A:  Just from general knowledge.

19  Q:  And where did you acquire that general

20      knowledge?

21  A:  From reading over the past 20 years.

22  Q:  Well, you told me before 1999, you had never

23      ... that you had never compounded hydrogen

24      peroxide; is that correct?

25  A:  Not that I remember, no, sir.

JAMES HORACE PHILLIPS, JR.                    46

1  A:  For a prescription it does, but not for office

2      use.

3  Q:  Okay.  Your understanding is is that you don't

4      need to have a practitioner/patient/pharmacist

5      relationship to compound?

6  A:  There are two forms of compounding in the law.

7      There's another section that talks about making

8      it for a clinic or for institutional use, also,

9      and that doesn't require patient ...

10 Q:  Well, do the doctors ... when you are doing it

11     for a clinic, do they have patients

12 A:  Yes, sir.

13 Q:  Okay.  But you are asserting that it does not

14     have to be a practitioner/patient/pharmacist

15     relationship for you to compound, that's your

16     understanding?

17 A:  If we do it for office use.

18 Q:  Okay.  And you acknowledge here that you

19     produced this hydrogen peroxide that was

20     provided to Ms. Bibeau, there was not any

21     practitioner/patient/pharmacist  relationship;

22     is that your understanding?

23 A:  That's exactly right.

24 Q:  In fact, there wasn't a prescription, correct?

25 A:  Right.

JAMES HORACE PHILLIPS, JR.                    47

1    Q:   Okay.  And there is no claim here that what you

2         produced    here    was    not    pursuant    to    a

3         prescription,    correct?       There    was    no

4         prescription from Dr. Shortt for this product

5         you compounded?

6    A:   No, there was no prescription.

7    Q:   Okay.  Now, you understand that in Dr. Shortt's

8         office, this product you were compounding was

9         going    to    be    used    by    individual    patients,

10        correct?

11   A:   I knew he would use it in his office as he saw

12        fit.

13   Q:   And you knew he was going to be giving it to

14        patients, correct?

15   A:   That was my understanding.

16   Q:   And  he  was  going  to  inject  it  into  his

17        patients, correct?

18   A:   Well, I wasn't exactly sure how he would use

19        it, but that seems reasonable.

20   Q:   I  believe  it  says  on  the  label  that  it  was

21        injectable, correct?

22   A:   Yes, sir.

23   Q:   You knew it was going to be injected, didn't

24        you?

25   A:   We knew that it would be used to make a product

JAMES HORACE PHILLIPS, JR.                48

1              to be given to the patients.

2    Q:    Injected into the patient, correct?

3    A:    Not in its raw stage.

4    Q:    But in some state, you knew it was going to be

5          injected into the patient, correct?

6    A:    That was my understanding.

7    Q:    Yes, sir.  And you also understood that he did

8          it intravenously, did you not?

9    A:    Yes, sir.

10   Q:    You knew he was going to give this product by

11         some mixing he would do?  He would give it

12         intravenously to his patients, correct?

13   A:    That was my understanding.

14   Q:    And you supplied it to him with that

15         understanding, correct?

16   A:    Yes, sir.

17   (PLAINTIFF'S EXHIBIT NUMBER TWO WAS MARKED FOR

18   IDENTIFICATION PURPOSES.)

19   Q:    I want to hand you Exhibit Two, which is 40-43-

20         86 of the State Pharmacy Act, and I believe if

21         you will go back to page 20 of Exhibit Two, I

22         believe you will get back to the section of the

23         law that relates to compounding.  Am I correct

24         about that (CC)?

25   A:    Which part of (CC) are we looking for?

JAMES HORACE PHILLIPS, JR.                    54

1    A:   Not now.

2    Q:   And your understanding in 2004, it was not

3         available, correct?

4    A:   The 3 percent hydrogen peroxide is commercially

5         available, so that's available in the

6         marketplace.

7    Q:   Is your ... the way you did it for human

8         injection, available in the marketplace?

9    A:   Three percent hydrogen peroxide is commercially

10        available.

11   Q:   Is it available ...

12   A:   And I would say that would meet the

13        requirements here.

14   Q:   So you think that even though you produced it

15        for human injection and went through ... we

16        will go through the way you sterilized it and

17        diluted it. In that form, is it commercially

18        available in the marketplace?

19   A:   Three percent is commercially available.

20   Q:   Is it in the manner in which you compounded it

21        commercially available?

22   A:   I think my product was better quality, if

23        that's what you mean.

24   Q:   Is the product you compounded commercially

25        available in the marketplace in the form you

JAMES HORACE PHILLIPS, JR.                          55

1        compounded it?

2    A:  Not in the form I compounded it, no.

3    Q:  At  any  amount,  is  hydrogen  peroxide

4        commercially available for human injection?

5    A:  You mean with the labeling on it ...

6    Q:  Yes, sir.

7    A:  ... available?  Well, that's not what this says

8        though.

9    Q:  Let me finish, sir.  Is it labeled available

10       for human injection at any amount of hydrogen

11       peroxide, to your knowledge?

12   A:  Not currently, no, sir.

13   Q:  And it was not available in 2004, when you

14       compounded Ms. Bibeau's medication, correct?

15   A:  Not  that  specific  strength  labeled  for

16       intravenous ...

17   Q:  Yes, sir.

18   A:  ... injection, but 3 percent hydrogen peroxide

19       was commercially available.

20   Q:  Yes,  sir.  And that 3 percent says not for

21       human ingestion, correct, that's what the label

22       says?

23   A:  Well, there are lots of different products out

24       there.

25   Q:  Have you ever seen hydrogen peroxide, 3 percent

JAMES HORACE PHILLIPS, JR.                65

1    pharmacist would do, correct?

2  A:  Yes, sir.

3  Q:  Okay.  And would it require you to read the

4     manufacturer's information about he drugs?

5  A:  Not    if    there's    not    a    manufacturer's

6     information.

7  Q:  Well, obviously, when you ... there are ...

8     certain chemicals can have an effect on the

9     body at different  concentrations, it can still

10    have an adverse effect at any level, there are

11    certain drugs; isn't that correct?

12  A:  Well, all drugs can have adverse effects.

13  Q:  Yes, sir.

14  A:  And if they are not used properly, there are

15    potential risks.  But there's a risk to benefit

16    that has to be determined.

17  Q:  But what you are telling me is before you

18    filled the prescription on March 9, 2004, you

19    did not look at the material safety data sheet

20    . . .

21  A:  I didn't fill a prescription.

22  Q:  Let me finish.  When you compounded or you

23    produced the medication, when you produced the

24    medication, you did not look at the material

25    safety data sheet from Spectrum at any level

JAMES HORACE PHILLIPS, JR.                    67

1   Q:   But no ... you never had seen a label by a

2        manufacturer of an approved label that said it

3        was for human injection, did you?

4   A:   Not that I remember.

5   Q:   So your interpretation, going back to Exhibit

6        Two, page 21, that this language, your

7        interpretation is is as long as it's in an

8        institution or an office setting, there's no

9        limitation by law, other than what you and the

10       doctor might agree to be a limit voluntarily;

11       is that your understanding?

12  A:   That sounds reasonable.

13  Q:   Okay.  If you would, look at (f) below that.

14       You see it refers, it says ... it defines

15       things that will be manufacturing.  Now, I

16       understanding you are not a ... you do not have

17       a license to manufacture, do you?

18  A:   Where are you looking at now?  Page 21?

19  Q:   Page 21, right below (e) is (f).  Do you see

20       that?

21  A:   Okay.

22  Q:   Now, you are not a licensed manufacturer, are

23       you?

24  A:   No, sir.

25  Q:   You would have to have licenses from the state

JAMES HORACE PHILLIPS, JR.                    68

1      and federal government to manufacture drugs,

2      would you not?

3   A:  I'm not sure.

4   Q:  But you know you are not licensed to

5      manufacture, don't you?

6   A:  Yes, sir.

7   Q:  And you know you can't manufacture a drug in

8      America if you don't have the FDA approval of

9      that drug? You know that, don't you?

10  A:  Sir?

11  Q:  You cannot manufacture a drug without FDA

12     approval. You are aware of that, are you not?

13  A:  Well, it sounds reasonable.

14  Q:  Yes, sir.

15  A:  Now, let's look at (f). It says, the

16     compounding of drugs in anticipation of

17     receiving prescriptions without a historical

18     basis or the distribution of compounded

19     p r o d u c t s   w i t h o u t   a

20     patient/practitioner/pharmacist relationship is

21     considered manufacturing.

22  Q:  Yes, sir.

23  Q:  You do not ... you did not have, according to

24     you, a patient/practitioner/pharmacist

25     relationship, did you?

JAMES HORACE PHILLIPS, JR.                    69

1    A:   We had a pharmacist/practitioner relationship

2         and the section above it allows us to do it for

3         physician's office use.

4    Q:   I'm asking you, sir, the question ... first of

5         all, did you distribute compounded products?

6    A:   I'm not sure what you mean by distribute.

7    Q:   Well, let's look back at Exhibit One and look

8         at number (15). Distribute means the delivery

9         of a drug or device other than by administering

10        or dispensing. Did you administer the drug

11        yourself?

12   A:   No, sir.

13   Q:   Did you dispense?

14   A:   No, sir.

15   Q:   So did you deliver the drug?

16   A:   I took it to the ... well, I took it to the

17        doctor's office.

18   Q:   Okay. So distribute means the ... so you did

19        distribute it, did you not?

20   A:   I suppose I did, yes, sir.

21   Q:   Okay. The distribution of compounded products,

22        and was yours a compounded product?

23   A:   Yes, sir.

24   Q:   Without a patient/practitioner/pharmacist

25        relationship ... you admit that didn't exist,

JAMES HORACE PHILLIPS, JR.                    70

1            correct?

2    A:     Yes, sir.

3    Q:     Is considered what?

4    A:     In    this    line    here,    it's    considered
5            manufacturing.  Again, the one above it allows
6            us to compound for office use.

7    Q:     Well, if you compound it for office use, you
8            can do it for the patients in the office, can't
9            you?  You can compound it for office use and
10           provide it to individual patients, can you not,
11           in the office?

12   A:     We don't give it to individual patients.  In
13           that condition, we would just ... the patient
14           would    come    down,    pick    up    their    own
15           prescription, and it would be labeled and we
16           would discuss the medicine with them.  But if
17           we give it to the doctor to use in the office,
18           then he would use it in the office.

19   Q:     Well, he can do ... he can get it for his
20           individual patients in the office, can he not?

21   A:     I'm not sure I understand what you are talking
22           about now.

23   Q:     Well ...

24   A:     I mean we will provide it to his office and
25           then he can use it as he sees fit.

JAMES HORACE PHILLIPS, JR.                    85

1   A:   No, sir.  We used this for office use ...

2   Q:   Yes, sir.

3   A:   ... products, also.

4   Q:   Did Dr. Shortt ever write you a prescription

5        for hydrogen peroxide?

6   A:   No, sir.

7   Q:   Did he ever give you anything in writing

8        relating to the compounding of hydrogen

9        peroxide?

10  A:   I don't know.  We don't keep that sort of

11       thing.

12  Q:   You have no record of any prescription or other

13       written document requesting the compounding of

14       hydrogen peroxide; is that correct?

15  A:   No, sir.

16  Q:   You just did it on an oral request from him?

17  A:   Yes, sir.

18  Q:   And you are telling me that was not a

19       prescription?

20  A:   No, sir.

21  Q:   Okay.  He just said, I want you to produce this

22       product, and you agreed to do it, correct?

23  A:   Yes, sir.

24  Q:   And even though it says original prescription,

25       that wasn't really true because it wasn't a

JAMES HORACE PHILLIPS, JR.                    89

1  A:  Again, it's not a prescription.

2  Q:  Yes, sir.  But I'm asking a different question.

3      It's labeled that way, isn't it?

4  A:  The label is a form label that we used for our

5      own internal tracking.

6  Q:  But the label does also leave the office, does

7      it not?

8  A:  Yes, sir.

9  Q:  Okay.

10                  (OFF THE RECORD.)

11  Q:  Mr. Phillips, are you aware of requirements for

12      labeling under the Food, Drug and Cosmetic Act

13      of 1937, for materials that are compounded that

14      are not pursuant to a prescription?  Are you

15      aware of any of those federal requirements?

16  A:  1936?

17  Q:  1937.  The federal act.  Are you aware there's

18      a Food, Drug and Cosmetic Act provides for

19      certain labeling requirements for medications

20      that are produced that are not pursuant to a

21      prescription?  Are you aware of that?

22  A:  There's a ten point labeling, if that's what

23      you are talking about.

24  Q:  Well, you have told me that there's no

25      prescription, correct?

JAMES HORACE PHILLIPS, JR.                    90

1   A:   Yes, sir.

2   Q:   Okay.  Are you aware of federal law regarding

3        the   labeling   of   products   that   are   not

4        prescription drugs?  Are you aware of those

5        requirements?

6   A:   I'm sure they ... there's what's called a ten

7        point label, I believe, if that's what you

8        mean.

9   Q:   And what are the elements of the ten point

10       label?

11  A:   The medication ... and this is for over-the-

12       counter use.  Is that what you are talking

13       about?  Are you talking about the ...

14  Q:   I'm talking about any medication.

15  A:   The ten point labeling refers to over-the-

16       counter medications.

17  Q:   Okay.

18  A:   That are used without the ... without a

19       physician.

20  Q:   Okay.  And what are those, as you understand?

21  A:   The name of the medication, lot number,

22       expiration date, instructions for use,

23       precautions, need, the name of the ... the name

24       of the manufacturer, I believe, the ... maybe

25       it's a six point label.

JAMES HORACE PHILLIPS, JR.                    92

1          It was for him to use in his office.

2    Q:    Okay.    And   are   there   any   federal   labeling

3          requirements you understand for drugs sold in

4          that manner?

5    A:    Not for me to sell to a physician to use in his

6          office, no, sir.

7    Q:    You're not aware of any?

8    A:    No, sir.

9    Q:    And if there were some, such requirements, you

10         did  not  know  about  them  at  the  time  you  sold

11         this product for use for Ms. Bibeau on March 9,

12         2004, correct?

13   A:    Yes, sir.

14   Q:    Now, when you delivered they hydrogen peroxide

15         on March 9, 2004, you were delivering it to the

16         physician for use by the patient, correct?

17   A:    No, sir.   The physician uses it.

18   Q:    Right.    But  you  knew  that  it  was  being

19         delivered  to  the  physician  so  he  could

20         administer it to the patient?

21   A:    That would be my assumption.

22   Q:    Yes,  sir.    And  you  knew  that  you  weren't

23         delivering it to him for his own personal use,

24         were you?

25   A:    He may have used it personally.   I don't know.

JAMES HORACE PHILLIPS, JR.                    101

```
 1        of dispensing, the dispenser shall before the
 2        actual physical possession ... I'm sorry,
 3        actual physical transfer, interpret and assess
 4        the prescription order for potential adverse
 5        reactions or side effects, interactions,
 6        allergies, dosage, and regimen.  Do you see
 7        that?
 8   A:   Yes, sir.
 9   Q:   Now, I believe you told me earlier that one of
10        your duties as a pharmacist was to consider the
11        side effects and potential reactions of any
12        medication, correct?
13   MR. COOKE: Objection to the form of the question.
14   Q:   Go ahead and answer.
15   A:   Can you repeat that again?
16   Q:   Yes, sir.  You told me earlier when I was
17        asking you what were your duties as a
18        pharmacist, you explained to me that because
19        there was potential liability you had to
20        exercise judgment yourself and that one of the
21        things that you had to consider were side
22        effects and reactions to anything you
23        compounded.  Do you recall talking to me about
24        that?
25   MR. COOKE: Objection to the form of the question.
```

JAMES HORACE PHILLIPS, JR.                    102

1    A:    Potential side effects ...

2    Q:    Yes, sir.

3    A:    ... and reactions.

4    Q:    Yes, sir.  And ...

5    A:    Not all side effects and reactions occur.

6    Q:    Yes, sir.  But potential adverse reactions you
7          had to consider, correct?

8    A:    Yes, sir.

9    Q:    So you recognized as the first part of this
10         thing, as an element of dispensing, you need to
11         consider the potential adverse reactions and
12         side effects, correct?

13   A:    Yes, sir.

14   Q:    And that's for anything that you compound for
15         human use, correct?

16   A:    Well, yes, sir.

17   Q:    In this case, what investigation did you
18         undertake to  determine the potential adverse
19         side effects or reactions of hydrogen peroxide
20         to be injected into the bloodstream of the
21         patient?

22   A:    I think we've answered this earlier.  You know,
23         I had done some reading and I had read that
24         hydrogen peroxide was used as a treatment for
25         many years in a .03 percent solution.

JAMES HORACE PHILLIPS, JR.                    104

1          than what you produced?

2    A:   The bottle that was in that doctor's office,

3         but I don't specifically remember all the

4         labeling on it.

5    Q:   Okay. You understood that bottle in Dr. Ghen's

6         office was for human injection?

7    A:   Uh-huh.

8    Q:   You understand that, correct?

9    A:   Yes, sir.

10   Q:   But you don't know if it, in fact, was labeled

11        that way, do you?

12   A:   No, sir.

13   Q:   And you don't know how produced it, do you?

14   A:   No, sir.

15   Q:   Other than that one vial, have you ever seen

16        hydrogen peroxide in any shape or form labeled

17        for human injection, other than what you

18        produced?

19   A:   No, sir.

20   Q:   And was your understanding at the time that the

21        FDA had not approved the use of hydrogen

22        peroxide for human injection; isn't that

23        correct?

24   A:   Yes, sir.

25   Q:   Did you provide any caution, in writing, on the

JAMES HORACE PHILLIPS, JR.                    105

1    label, orally to Dr. Shortt, about the

2    potential risks or side effects of the human

3    injection of hydrogen peroxide?

4 A: No, sir.

5 Q: And you did not provide that to Ms. Bibeau?

6 A: I didn't meet Ms. Bibeau, that I remember.

7 Q: We looked earlier at the label. The label did

8    not contain any caution or warning, did it?

9 A: No, sir.

10 Q: That was Exhibit Three.

11 (PLAINTIFF'S EXHIBIT NUMBER FIVE WAS MARKED FOR

12 IDENTIFICATION PURPOSES.)

13 Q: I hand you Exhibit Number Five. Could you

14    identify what Exhibit Five is?

15 A: That's a label from a bottom of hydrogen

16    peroxide 3 percent preservative-free injection.

17 Q: And this is the bottle that was compounded on

18    or about March 9, 2004?

19 A: The date on this is July the 7th, 2004.

20 Q: Well, it just says expires July 7, 2004. Do

21    you see that?

22 A: Yeah, you're right. I believe that one was

23    made January the 9th of 2004.

24 Q: Why do you think that?

25 A: Because of the lot number on it. Where did

JAMES HORACE PHILLIPS, JR.                     106

1           that come from?

2    Q:    My understanding is that was provided by Dr.

3          Shortt to SLED as the bottle utilized by Ms.

4          Bibeau.  That came from SLED.

5    A:    Okay.

6    Q:    So you really don't know ... you indicated ...

7          show me the indication that you think it was

8          January.

9    A:    The lot number we use is the date that it was

10         made and then two digits after that.

11   Q:    Okay.  But whether this was done in January or

12         March, you don't really know?

13   A:    Yes, I do know.

14   Q:    Okay.

15   A:    That was done in January.

16   Q:    Okay.  But is it possible that what was

17         provided to Ms. Bibeau in March was actually

18         ... came from a lot done in January or

19         February?

20   A:    I mean again, this would have come from his

21         office, so I don't know what occurred down

22         there.

23   Q:    Okay.  Would the one that was compounded ...

24         the one that was reflected on Exhibit Number

25         Three, when was that ... can we tell from that

JAMES HORACE PHILLIPS, JR.                    117

1   Q:   Okay.    You    did    not    communicate    with    the
2        manufacturer    of    the    hydrogen    peroxide,
3        Spectrum, about its potential use in the manner
4        you were proposing or Dr. Shortt was proposing
5        to use it for, did you?
6   A:   No, sir.
7   Q:   You could have called Spectrum and asked them,
8        could you not have?
9   A:   I could have, yes, sir.
10  Q:   You could have requested or sought out material
11       safety data sheets for different strengths of
12       hydrogen peroxide, couldn't you?
13  A:   I could have.
14  Q:   Were you aware that the 3 percent hydrogen
15       peroxide was actually manufactured by Spectrum?
16       Are you aware of that?  Were you aware that 3
17       percent hydrogen peroxide was manufactured by
18       Spectrum?
19  A:   Yes, sir.
20  Q:   Okay.  Did you check the material safety data
21       sheets since at least the strength of hydrogen
22       peroxide was the same, for the 3 percent?
23  A:   Not Spectrum's, no, sir.
24  Q:   Okay.   Did you check out anybody's material
25       safety data sheet for 3 percent?

JAMES HORACE PHILLIPS, JR.     118

1   A:   No, sir.

2   Q:   Okay. Would it surprise you that such a

3       material safety data sheet at 3 percent

4       indicates that it could be potential internal

5       damage, severe injury associated with the

6       ingestion of hydrogen peroxide? Would that

7       surprise you?

8   A:   No, sir.

9   Q:   Okay.

10   A:   But that's not what we ... the way it was going

11       to be administered.

12   Q:   Well, you had not gone to any ... the

13       manufacturer to determine whether it was safe

14       at .03 percent, had you?

15   A:   No, sir.

16   Q:   You had not gone to the FDA to determine if it

17       was safe at that level; is that correct?

18   A:   No, sir.

19   Q:   You had not gone to any independent source to

20       determine that it was safe at that amount?

21   A:   What's your definition of an independent

22       source?

23   Q:   You had not gone to, for instance, anybody who

24       had done studies at .03 percent, independent

25       studies?

JAMES HORACE PHILLIPS, JR.                    119

1   A:   Well, a physician asked me to produce this so

2        he could use it in his office for his patients.

3   Q:   And that for you was good enough?

4   A:   Yes, sir.

5   Q:   Okay. And did you ... why didn't you dilute it

6        to .03 percent?

7   A:   The doctor didn't ask me to.

8   Q:   And what actually happened when it left you and

9        how it got diluted, you don't really know?

10  A:   No, sir.

11  Q:   Whether they did it right or wrong, you don't

12       have a clue?

13  A:   No, sir.

14  Q:   Now, is there skill associated with diluting

15       medicines?  I mean is that a skilled exercise

16       or can just anybody ... would you normally let

17       anybody do it, trained or untrained, to do

18       that?

19  A:   No.  I would prefer to have a pharmacist do it.

20  Q:   Yes, sir.  Was a pharmacist doing it in Dr.

21       Shortt's office?

22  A:   No, sir, a physician was.

23  Q:   Well, do you know that a physician was doing it

24       or was somebody else doing it?

25  A:   My assumption is if it wasn't the physician,

JAMES HORACE PHILLIPS, JR.                    123

1       and other hormones for these patients.  I know

2       Dr. Shortt does lab testing and evaluates each

3       patient for his or her individual status.  I

4       have filled prescriptions and made a good faith

5       effort to be certain the medications used for

6       a legitimate medical condition of low hormone

7       levels, menopause for women and andropause for

8       men.  I compound medications when the specific

9       dosage form is not available or the strength is

10      not available.

11  Q:  You mentioned that Dr. Shortt had a unique

12      practice?

13  A:  Yes.

14  Q:  Your understanding was that Dr. Shortt

15      undertook methods that were not what your

16      ordinary, competent physician would undertake

17      for treating certain conditions; is that fair?

18  A:  I'm not sure I understand the word competent

19      there.

20  Q:  Well, let me ask you this.  For the average

21      physician treating multiple sclerosis, your

22      understanding is that that average physician

23      would not ... would not administer intravenous

24      hydrogen peroxide; is that fair?

25  A:  That sound reasonable.

JAMES HORACE PHILLIPS, JR.                    126

1          our own knowledge.  In your own knowledge,

2          today, you know of no other pharmacy in the

3          Columbia area that has produced hydrogen

4          peroxide at the request of a physician?

5     A:   Not to my knowledge.

6     Q:   Okay.  And I should add for human injection.

7          You are not aware of that, correct?

8     A:   No, sir.

9     Q:   Are you aware of any ... specifically aware of

10         any pharmacy in South Carolina who has produced

11         hydrogen peroxide for human injection?

12    A:   Not specifically, no, sir.

13    Q:   Are you specifically aware of any pharmacy

14         anywhere in America that has hydrogen peroxide

15         for human injection?

16    A:   I have been told that it has been made in the

17         past and it's been used on patients, so I

18         assume that somebody made it.

19    Q:   But you don't know whether that person who made

20         it was a pharmacist, do you?

21    A:   No, sir.

22    Q:   So my question specifically ... are you

23         specifically aware of any pharmacist who has

24         produced hydrogen peroxide for human injection

25         at anytime?

JAMES HORACE PHILLIPS, JR.                          131

1   A:   No, sir.

2   Q:   You knew at the time that one reason it might

3        not be produced anymore though was that the

4        government wouldn't allow it to be produced?

5        You understood that was one potential

6        explanation, didn't you?

7   A:   Well, probably, it hadn't been through the

8        FDA's testing procedures.

9   Q:   Yes, sir. So you thought that the reason it

10       may no longer be available is that the ... it

11       has not gone through the required testing

12       procedures for the FDA, correct?

13  A:   Yes, sir.

14  Q:   Okay. But did you call the FDA to ask the FDA

15       whether there were any problems with producing

16       this drug that clearly wasn't FDA approved?

17  A:   No, sir.

18  Q:   Is it hard to contact the FDA?

19  A:   I don't know.

20  Q:   You never tried?

21  A:   I've sent them e-mails before, but not called

22       them on the telephone.

23  Q:   And did you get a response from your e-mail?

24  A:   Yes, sir.

25  Q:   So prior to compounding hydrogen peroxide, you

JAMES HORACE PHILLIPS, JR.                    138

1  A:  No.

2  Q:  To your knowledge, you don't know what the

3      strength was, do you?

4  A:  Huh-uh.

5  Q:  If it's not in the article, you wouldn't have

6      a way of knowing it, would you?

7  A:  We could call the author, if you would like.

8  Q:  Yeah.  But you didn't do that before March 9,

9      2004, did you?

10 A:  No, sir.

11 Q:  Are you familiar with the pharmacy book,

12     *Martindale*?

13 A:  Yes, sir.

14 Q:  Tell me about it.  What is that?

15 A:  It's a drug compendium that has short articles

16     about lots of different medicines.

17 Q:  You have seen it before?

18 A:  Yes, sir.

19 Q:  Is it a reliable reference material?

20 A:  It's reliable, yes, sir.

21 Q:  All right.  Is it used by professional

22     pharmacists and consulted with from time to

23     time?

24 A:  From time to time, I'm sure it is.

25 Q:  Yes, sir.  And have you from time to time

JAMES HORACE PHILLIPS, JR.                    139

1          consulted it?

2    A:    I don't have a copy of it of my own.

3    Q:    Yes, sir.  But have you ...

4    A:    But I have looked at it.

5    Q:    Yes, sir.  And it's considered, in your view,

6          authoritative?

7    A:    Yes, sir.

8    (PLAINTIFF'S  EXHIBIT  NUMBER  SEVEN  WAS  MARKED  FOR

9    IDENTIFICATION PURPOSES.)

10   Q:    Okay.  I'm going to hand you Exhibit Seven and

11         it  is  from  *Martindale,  The  Complete  Drug*

12         *Reference*; is that correct?

13   A:    Yes, sir.

14   Q:    Okay.  And if you will look, hydrogen peroxide,

15         there's  actually  a  section  on  hydrogen

16         peroxide; is that correct?

17   A:    Yes, sir.

18   Q:    And it refers to it, in the second column, that

19         using  it  in  closed  body  cavities  and  then  in

20         intravascular  administration;  is  that  correct?

21   A:    Where would that be?

22   Q:    Yes, sir.  Thank you for ...

23   A:    Adverse effects, closed body cavities, okay.

24   Q:    Do you see that?

25   A:    Yes, sir.

JAMES HORACE PHILLIPS, JR.                    140

1   Q:   And then you see intravenous administration, a
2        little bit further down?

3   A:   Yes, sir.

4   Q:   Okay.   Let's   first   look   at   intravascular
5        administration.   That was what you understood
6        was going to occur, correct?

7   A:   Yes, sir.

8   Q:   Intravenous administration of hydrogen peroxide
9        solutions as unconventional therapy for AIDS or
10       cancer has resulted in severe haemolysis.   Do
11       you see that?

12  A:   Yes, sir.

13  Q:   First of all, if you had wanted to investigate
14       when you prepared this product, *Martindale* was
15       a   source   you   could   have   consulted;   is   that
16       correct?

17  A:   Yes, sir.

18  Q:   Okay.   And had you received before March 9,
19       2004,   the   information   that   there   had   been
20       severe   acute   haemolysis   as   a   result   of
21       intravascular   administration   of   hydrogen
22       peroxide?

23  A:   Could you state the question again, please?

24  Q:   Yes, sir.

25  A:   Before March 9, 2004, were you aware that the

JAMES HORACE PHILLIPS, JR.                    142

1        or gas emboli would not be produced that could
2        be life threatening?
3   A:   No, sir.
4   Q:   So if you had wanted ... let's talk about the
5        things you could have done and did not do.  You
6        could have gone and gotten the material safety
7        data sheet at 3 percent from Spectrum, that's
8        one thing you could have done, correct?
9   A:   Yes, sir.
10  Q:   You could have called Spectrum and asked,
11       correct?
12  A:   Yes, sir.
13  Q:   You could have consulted and contacted the FDA,
14       correct?
15  A:   Yes, sir.
16  Q:   You could have gone to *Martindale* and looked,
17       correct?
18  A:   Yes, sir.
19  Q:   You could have gone to other resources and
20       consulted on this question, correct?
21  A:   Yes, sir.
22  Q:   You did none of those, did you?
23  A:   No, sir.  I had general knowledge that it had
24       been used in the past as an effective treatment
25       and the physician that was going to do the

JAMES HORACE PHILLIPS, JR.                    144

1   Q:   Have you gone and looked?

2   A:   No, sir.

3   MR. GERGEL: Take a break for a moment here.

4                    (OFF THE RECORD.)

5   (PLAINTIFF'S   EXHIBIT   NUMBER   EIGHT   WAS   MARKED   FOR

6   IDENTIFICATION PURPOSES.)

7   Q:   Mr. Phillips, I'm going to hand you Exhibit

8        Number Eight, which is the Spectrum Material

9        Safety Data Sheet for hydrogen peroxide, 3

10       percent.  Now, I take it before I put this in

11       your hands, to your recollection, you have

12       never seen this document, correct?

13  A:   No, sir.

14  Q:   But it would have been presumably available to

15       you had you sought it out, correct?

16  A:   Yes, sir.

17  Q:   And it indicates on the material safety data

18       sheet at the top that there's a potential

19       health hazard associated with this product; is

20       that correct?  You see it says Health Hazard

21       number 2?

22  A:   Health Hazard ... yes, sir.

23  Q:   Okay.  And if you would turn to the second page

24       of the document, under Potential Chronic health

25       Effects, it says at the bottom there, the

JAMES HORACE PHILLIPS, JR.                    149

1      could have provided you some information on the

2      potential effects of ingesting this product,

3      correct?

4    A:   Yes, sir.

5    Q:   But you did not consult such material?

6    A:   No, sir.

7    Q:   And until I handed it to you, you had never

8      seen the Spectrum 3 percent hydrogen peroxide

9      solution, correct?

10   A:   No, sir.

11   Q:   And is there anything on this document that you

12     saw that indicated that at some lower level

13     than 3 percent it was safe to ingest?

14   A:   There was no indication that it's not either.

15   Q:   A different question.  Is there any indication

16     on this document that it's safe to ingest at

17     any level?

18   A:   It's no indication that it's safe, no, sir.

19   Q:   And when it says do not ingest, did it say do

20     not ingest at this level, but it's okay at a

21     lower level?

22   A:   No, but it doesn't say that it's harmful at a

23     lower level either.

24   Q:   It just simply says do not ingest, correct?

25   A:   Yes, sir.

JAMES HORACE PHILLIPS, JR.    151

1   supervision of a physician, is my thoughts.

2   Q: Why is that?

3   A: Because a physician is the one that is most

4   able to use it properly.

5   Q: Well, you recognize that the product could be

6   potentially dangerous, correct?

7   A: Yes, sir.

8   Q: But you didn't warn anybody on the label that

9   it was dangerous, did you?

10  A: No, sir. I gave it to a physician.

11  Q: And you feel like once you give this product to

12  a physician, you have washed your hands of any

13  responsibility?

14  A: Yes, sir.

15  Q: You don't need to warn or caution anybody,

16  correct?

17  A: No, sir.

18  Q: You don't need to label it in any way?

19  A: No, sir.

20  Q: And you are generally unfamiliar with the

21  necessity to label products under the federal

22  law that are not prescriptions? You are

23  generally unfamiliar with that, aren't you?

24  A: I believe those laws refer to over-the-counter

25  products that will be taken by consumers, not

JAMES HORACE PHILLIPS, JR.                    161

1   A:   You are talking about for the intravenous?

2   Q:   Intravenous hydrogen peroxide.

3   A:   Yes, sir.

4   Q:   Not one of them ever was accompanied or was

5        later documented by writing to you, correct?

6   A:   No, sir.

7   Q:   All oral?

8   A:   Yes, sir.

9   Q:   So the only paper trail we really have of Dr.

10       Shortt requesting this product is your delivery

11       of it; is that fair?

12  A:   That would be reasonable.

13  Q:   So to the best of your recollection, for a

14       number of years every couple of months you

15       would prepare this hydrogen peroxide when he

16       orally would ask you for it and then you would

17       deliver it over there, delivering it with a

18       label, with the kind of labels we have looked

19       at today, correct?

20  A:   Yes, sir.

21  Q:   And to the best of your recollection, each time

22       you did it, you used Spectrum?

23  A:   I don't know specifically.

24  Q:   Okay.  That's the only one you can come up with

25       now in terms of the product?

JAMES HORACE PHILLIPS, JR.                          163

1    Q:    Are you aware of any other physician in South

2          Carolina giving his patients hydrogen peroxide,

3          other than Dr. Shortt, and I believe you

4          thought you saw a bottle of it in Dr. Ghen's

5          office; is that correct?

6    A:    Ghen.

7    Q:    Ghen.

8    A:    Yes, sir.

9    Q:    Thank you, sir.  Any other physician you ever

10         heard of that ...

11   A:    Not that I know of, specifically.

12   Q:    It  would  be  fair  to  say  it's  a  very

13         unconventional treatment; is that fair?

14   A:    It's different.

15   Q:    Yes, sir.  Unconventional; is that fair?

16   A:    Unconventional can mean lots of things.

17   Q:    Non standard; is that a fair word?

18   A:    Yes, sir.

19   Q:    Unusual?

20   A:    Unique.

21   Q:    Rare?

22   A:    Yes, sir.

23   Q:    They are all fair terms, correct?

24   A:    Uh-huh.

25   Q:    And in your own personal knowledge, it is ...

JAMES HORACE PHILLIPS, JR.                    164

1      you are unique in having prepared it for human

2      injection as a pharmacist?

3   A:  I mean I don't know the names of other people

4      that do it, other than what I've already told

5      you.

6   Q:  Yes, sir.  Did you ever discuss with Dr. Shortt

7      the risks associated with the intravenous use

8      of hydrogen peroxide?

9   A:  No, sir.

10  Q:  You never warned him in any way, correct?

11  A:  No, sir.

12  Q:  You never asked him about it, correct?

13  A:  No, sir.

14  Q:  Never asked him ... even though you knew that

15      it was not approved by the FDA for human

16      injection, you never asked him about the

17      potential risk; is that fair?

18  A:  I don't remember discussing any potential risk.

19  Q:  Now, when did you first meet James Michael

20      Shortt?

21  A:  I think it was about 1997.

22  Q:  And how did you meet him?

23  A:  He went to work at Biogenisis Medical Center.

24  Q:  What is that?

25  A:  It's a physicians office near Lizard's Thicket

JAMES HORACE PHILLIPS, JR.                    199

1   Q:   But  as  a  professional  pharmacist,  you  have  an

2        independent  duty  yourself  to  assess  the  risks

3        and  benefits  to  the  patient  of  any  medication,

4        right?

5   A:   All  medications  have  potential  risks.

6   Q:   But  you  have  a  duty  as  a  pharmacist  to  exercise

7        your  own  professional  knowledge  and  judgment

8        regarding  risks  and  benefits,  don't  you?

9   A:   I  do.    And  there  are  risks  and  benefits  to

10       everything.    That  doesn't  mean  they  will  happen

11       every  time.

12  Q:   And  when  you  prepared  that  hydrogen  peroxide

13       for  Ms.  Bibeau  or  for  Dr.  Shortt  that  was  going

14       to  be  administered  to  Ms.  Bibeau.    You  have  the

15       duty  to  assess  the  potential  risks  to  any

16       patient  who  might  get  this  by  IV  injection,

17       correct?

18  A:   Yes,  sir.

19  MR.  COOKE:  Object  to  the  form  of  the  question.

20  Q:   Has  Dr.  Shortt  ever  talked  to  you  about  what

21       happened  to  Ms.  Bibeau?

22  A:   Well,  you  mean  like  specifically  what  happened?

23  Q:   Yes.

24  A:   I  mean  we  discussed  it  a  few  times,  yes,  sir.

25  Q:   And  did  he  tell  you  that  she  had  bruising  when

JAMES HORACE PHILLIPS, JR. 201

1   A: No, sir.

2   Q: Okay. And you understand that the Coroner of

3       Richland County has issued an official death

4       certificate as to the death ... cause of death

5       of Ms. Bibeau?

6   A: I'm sure he has.

7   Q: Yes, sir. And are you aware that he indicated

8       the cause of death to be the use of hydrogen

9       peroxide?

10  A: Yes, sir.

11  Q: Okay. Are you in a position to question the

12      conclusions of the Coroner of Richland County

13      as to the cause of death?

14  A: No, sir.

15  Q: Today if someone ... a physician asks you to

16      prepare hydrogen peroxide, 3 percent, for human

17      injection, would you do that?

18  A: No, sir.

19  Q: Why is that?

20  A: Because this has been a very difficult time and

21      I don't want to repeat it.

22  Q: Well, what have you learned from this

23      experience?

24  MR. COOKE: Objection to the form.

25  Q: Go ahead and answer.

JAMES HORACE PHILLIPS, JR.                216

1           was a result of the medication you provided,
2           correct?
3   A:      Yes, sir.
4   Q:      And you're not in a position to question that,
5           correct?
6   A:      Yes, sir.
7   Q:      As a pharmacist in charge, you are responsible
8           ultimately for policies and decisions made
9           about filling the prescriptions within your
10          pharmacy, correct?
11  A:      Yes, sir.
12  Q:      And you personally accept responsibility for
13          the preparation and delivery of the hydrogen
14          peroxide that went to Dr. Shortt on March 9,
15          2004; is that correct?
16  A:      Yes, sir.
17  Q:      And if there was a mistake and there is
18          liability, you share in that liability,
19          correct?
20  A:      I'm not sure I understand the question.
21  MR. COOKE: Object to the form.
22  Q:      If there was legal responsibility, negligence
23          associated with that preparation and delivery
24          of that medicine, you have ... you share some
25          of that responsibility, correct?

JAMES HORACE PHILLIPS, JR.                217

1   MR. COOKE: Objection to the form.

2   A:   If there was ...

3   Q:   Go ahead and answer. If there was legal

4        liability for the pharmacist involved in the

5        preparation and delivery ...

6   A:   There should be no legal liability for the

7        pharmacist because the physician is the one

8        that administered. We provided what he wanted

9        and we gave him exactly what he asked for, and

10       he gave it in his office.

11  Q:   So it's his fault?

12  A:   It's his responsibility if the treatment was

13       improper.

14  Q:   And if the preparation of the material was

15       improper, that would be your responsibility,

16       correct?

17  A:   If there was a problem with what we made, not

18       ... but what we made was exactly what was

19       requested.

20  Q:   Independent of what a doctor's responsibility

21       might do to engage in safe medical practices,

22       a pharmacist has a duty to consider the safety

23       of the products he produces as well, correct?

24  A:   Yes, sir.

25  Q:   And to exercise do care and investigating those