IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A No. 3:04-22306-10

**COPY**

David W. Bibeau, as Personal )
Representative of the Estate of )
Katherine Ann Kurtz-Bibeau, )
)
    Plaintiff, )
)
v. )
)
James Michael Shortt, M.D.; Health )
Dimensions, LLC; Congaree Pharmacy, )
Inc.; George Dawn, R.Ph. and J.H. )
"Buster" Phillips, Jr., R.Ph., )
)
    Defendants. )
--------------------------------- )

VIDEO DEPOSITION OF

# GEORGE DAWN

********

Tuesday, August 2, 2005
10:27 a.m. - 1:13 p.m.

    The video deposition of George Dawn, taken on behalf of the Plaintiff at the law offices of Gergel, Nickles & Solomon, P.A., 1519 Richland Street, Columbia, South Carolina, on the 2nd day of August, 2005, before Margaret S. Smith, Court Reporter and Notary Public in and for the State of South Carolina, pursuant to Notice of Deposition.

GEORGE DAWN                                        7

1    A:   That is correct.

2    Q:   Okay.   And you are an employee of Congaree

3         Pharmacy; is that correct?

4    A:   That's correct.

5    Q:   And do you have any previous disciplinary

6         actions against you related to your work as a

7         pharmacist?

8    A:   No, sir.

9    Q:   Have you had any issues before the Board of

10        Pharmacy related to ...

11   A:   No, sir.

12   Q:   Have you had any previous criminal involvement,

13        any charges of any type?

14   A:   No, sir.

15   Q:   Have you been sued before?

16   A:   No, sir.

17   Q:   Now, as I understand it, you are actually the

18        pharmacist who filled the order for hydrogen

19        peroxide that was delivered to Dr. Shortt on

20        March 9, 2004; is that correct?

21   A:   Yes, sir.

22   Q:   Had you frequently or previously prepared

23        hydrogen peroxide for IV injection?

24   A:   We had prepared it before, yes, sir.

25   Q:   And when did you first prepare it?

GEORGE DAWN 8

1   A:   I couldn't tell you.

2   Q:   How long ago, approximately?

3   A:   After coming to work full time at Congaree.

4   Q:   Sometime after 1990?

5   A:   1999.

6   Q:   1999. Oh, I'm sorry. You did not come to work

7       until 1999?

8   A:   That's correct.

9   Q:   Okay. And after 1999, sometime after 1999, you

10       first filled an order for hydrogen peroxide?

11   A:   Yes, sir.

12   Q:   And you understood it was going to be used to

13       be ingested by patients IV; is that correct?

14   A:   I understood it was to be used in Dr. Shortt's

15       office.

16   Q:   Yes, sir. But you understood it was going to

17       be injected into the bloodstream intravenously,

18       correct?

19   A:   Not straight, no. It was to be diluted.

20   Q:   Yes, sir. But once diluted, this what you were

21       preparing was going to go intravenously ...

22   A:   Yes, sir.

23   Q:   ... into the bloodstream?

24   A:   Yes, sir.

25   Q:   And how many occasions had you filled a

GEORGE DAWN                                    12

1   Q:   You may or may not have known that, correct?

2   A:   That's correct, sir.

3   Q:   You may have learned about it after you ...

4        March 9, 2004, correct?

5   A:   That's correct, sir.

6   Q:   Okay.    Now, tell me what research you did

7        before you prepared this compounded medication.

8        What did you do to investigate its safety, its

9        efficacy, et cetera?

10  A:   I talked with Buster.

11  Q:   And tell me about your conversation with

12       Buster.

13  A:   I asked him how it was used, why it was used.

14  Q:   And what did he tell you?

15  A:   He told me how Dr. Shortt used it and what it

16       was ... the theory behind how it works.

17  Q:   Had you ever heard of that before?

18  A:   No, sir.

19  Q:   And so you were asking Buster because you

20       didn't know anything about hydrogen peroxide?

21  A:   Yes, sir.    Being fairly new to pharmacy

22       compared to Buster.

23  Q:   Yes.   So you asked him, what do you know about

24       this because I don't know anything about

25       hydrogen peroxide?

GEORGE DAWN                                    17

```
 1          orders for individuals patients from Lexington
 2          Urology or anybody else in which there is not
 3          a written prescription written by the
 4          practitioner?
 5     A:   No, sir.
 6     Q:   Okay. You would acknowledge to me that if it's
 7          a prescription, it needs to be in writing,
 8          doesn't it?
 9     A:   Yes, sir.
10     Q:   Okay. Now, you have told me already that no
11          one, to your knowledge, no other physician, to
12          your knowledge, no other practitioner, has
13          ordered hydrogen peroxide for intravenous use
14          in which you have been involved; is that fair?
15     A:   That's fair.
16     Q:   Now, and you recognize that the use of hydrogen
17          peroxide is not the routine and customary way
18          in which say a condition like multiple
19          sclerosis is treated in the medical community;
20          is that fair?
21  MR. ELLIOTT: Object to the form.
22     A:   I can't answer that.
23     Q:   Well, to your knowledge ...
24     A:   I don't know.
25     Q:   Okay. Well, you certainly have some
```

GEORGE DAWN                                    19

1    A:   Not offhand.

2    Q:   Okay.   And if you had an order, you would look

3         that up, would you not?

4    A:   Yes, sir.

5    MR.  ELLIOTT: Object to the form.

6    Q:   For  instance,  if  somebody  came  in  and  wanted

7         Copaxone  or  Tegretol  for  multiple  sclerosis,

8         you would likely go to professional sources and

9         look up to determine dosage, proper dosage and

10        appropriate  use,  would  you  not?

11   A:   Possibly.

12   Q:   Yeah.   If you didn't know about it?

13   A:   If I didn't know about it.

14   Q:   Yes,  sir.   Now,  you didn't know about hydrogen

15        peroxide.   Tell me the  sources  you went to  to

16        learn  about  it,  other  than  talking  to  your

17        colleague.

18   A:   That's all.

19   Q:   Okay.   Did  you  look  at  the  label  for  the

20        Spectrum.

21   A:   Yes, sir.

22   Q:   Okay.   What did the label say?

23   A:   It said Hydrogen Peroxide, 35 percent.

24   Q:   Anything else?

25   A:   It has warnings, et cetera on it, corrosive, et

GEORGE DAWN                                    20

1      cetera.

2  Q:  Okay.  And so it says corrosive?

3  A:  Yes, sir.

4  Q:  What does corrosive mean?

5  A:  It means it can burn the skin.

6  Q:  I believe that means it is toxic to living

7      tissue, isn't that what it means?

8  A:  Could be, yes, sir.

9  Q:  I mean isn't that what corrosive means?

10 A:  Yes, sir.

11 Q:  So you knew it was toxic to living tissue?

12 A:  Yeah, 35 percent.  Yes, sir.

13 Q:  Yes, sir.  Did you check to see if any other

14     level it was toxic to living material?

15 A:  Other levels?

16 Q:  Yes, sir.

17 A:  Experience from the Poison Center says 3

18     percent is not a problem.

19 Q:  Okay.  Well, so you are telling me at 3

20     percent, it's not toxic?

21 A:  No.

22 Q:  That's your experience?

23 A:  That's the way it was treated at the Poison

24     Control Center, yes, sir.

25 Q:  Well, have you ever looked at the ... do you

GEORGE DAWN                                    22

1        Safety Data Sheet?

2   A:   Not that I'm aware of.

3   Q:   Okay.  And so when you went to fill this, you

4        knew that the 35 percent warned about it being

5        corrosive, but your impression was it was okay

6        to ingest it at 3 percent?

7   MR. ELLIOTT: Object to the form.

8   Q:   Go ahead and answer.

9   A:   Well, not straight 3 percent, no, sir.  You are

10       saying ingest or inject?

11  Q:   In either way, ingest by intravenously or by

12       swallowing.

13  A:   Ingestion is not a problem, other than it makes

14       you throw up.

15  Q:   Okay.  Now, you can ingest something by ...

16       into the veins as well, can you not?

17  A:   Well, I don't consider it ingesting, but ...

18  Q:   What is that?

19  A:   That's an injection.

20  Q:   Okay.  Now, did you look at the Material Safety

21       Data Sheet for 3 percent hydrogen peroxide to

22       see whether there were risks associated with

23       it?

24  A:   No, sir.

25  Q:   Have you ever looked at that?

GEORGE DAWN

23

1   A:   I don't think I've ever seen one.

2   Q:   Okay.  Did you make any inquiry about whether

3        one would be available to you?

4   A:   No, sir.

5   Q:   Would it surprise you that it says, do not

6        ingest?

7   MR. ELLIOTT: Object to the form.

8   A:   It wouldn't surprise me.

9   Q:   Would it surprise you to say that 3 percent

10       indicates that it is toxic to blood?

11  MR. ELLIOTT: Object to the form.

12  A:   I don't know.  I haven't seen that.

13  Q:   Okay.  Were you aware that Spectrum Chemical

14       also made a 3 percent hydrogen peroxide?

15  A:   No, sir.

16  Q:   That's news to you?

17  A:   I don't know if they make it or not.  It

18       wouldn't surprise me if they do.

19  Q:   But you didn't check?

20  A:   No, sir.

21  (PLAINTIFF'S  EXHIBIT  NUMBER  1  WAS  MARKED  FOR

22  IDENTIFICATION PURPOSES.)

23  Q:   I hand you Exhibit Number 1.  Does this appear

24       to be a hydrogen peroxide for 3 percent from

25       Spectrum Chemical?

GEORGE DAWN                                    25

1    Q:   And then it says in the next line, if ingested,

2         seek medical advice immediately.  Do you see

3         that?

4    A:   Yes, sir.

5    Q:   Okay.  Were you aware that was on the 3

6         percent?

7    A:   Since I've seen it, no.

8    Q:   I'm sorry.

9    A:   I am aware of it now.

10   Q:   But you were not aware until you just saw that;

11        is that correct?

12   A:   My under ... yes, sir, you are correct.

13   Q:   Okay.  And then if you will go to page 5.

14        Under Toxicological Information.  Do you see

15        that?

16   A:   Yes, sir.

17   Q:   The last lines there under, Chronic Effects on

18        Humans, contains material which may cause

19        damage to the following organs: blood.  Do you

20        see that?

21   A:   I'm sorry, where are you at?

22   Q:   Number 11, under Chronic Effects on Humans.

23   A:   Okay.

24   Q:   Contains material which may cause damage to the

25        following organs: blood.

GEORGE DAWN                                              26

1   A:   Uh-huh.

2   Q:   Do you see that?

3   A:   Uh-huh.

4   Q:   You need to say yes or no, sir.

5   A:   Yes, sir.

6   Q:   Okay.  I take it that you were not aware of

7        this either at the time you compounded the

8        medication and provided it to Dr. Shortt; is

9        that fair?

10  A:   I'm not aware of this sheet, no, sir.

11  Q:   And you weren't aware that the 3 percent was

12       toxic to blood and was not to be ingested, were

13       you?

14  A:   But my understanding is 3 percent was not

15       ingested.

16  Q:   We'll get to that in a minute.  I'm asking you

17       what you prepared.

18  A:   Okay.

19  Q    You were not aware that the 3 percent was toxic

20       and was not to be ingested, were you?

21  A:   That's correct.

22  Q:   And you were not aware it could damage blood

23       and other organs, were you?

24  A:   That is correct.

25  Q:   And you did not research whether at any level

GEORGE DAWN                                                    28

1          Material Safety Data Sheet for 3 percent, had

2          you?

3    A:    That's correct.

4    Q:    And you didn't remember in the 35 percent it

5          had these warnings, did you?

6    A:    I glanced over them, but no, I didn't.

7    Q:    Okay.    And  you  knew  that  it  wasn't  FDA

8          approved, but you did not call the FDA to

9          inquire  whether  it  was  appropriate  to  use

10         intravenously, did you?

11   A:    No, sir.

12   Q:    And  you  did  not  call  Spectrum  to  ask  them

13         whether  this  product  was  appropriate  to  use

14         intravenously, did you?

15   A:    No, sir.

16   Q:    Now, are you familiar with a ... with product

17         by  the  name  of  ...  a  book  source  called

18         *Martindale*?  Is that  a pharmacy text you are

19         familiar with?

20   A:    Yes, sir.

21   Q:    I'm sorry?

22   A:    Yes, sir.

23   Q:    Tell me what that is.

24   A:    It's a pharmacy reference.

25   Q:    Is it ... did you use it in your education?

GEORGE DAWN                                    29

1   A:   Very little.

2   Q:   It's available in the libraries and so forth?

3   A:   Yes, sir.

4   Q:   It's a resource material available to

5        pharmacists?

6   A:   Yes, sir.

7   Q:   Do you find it to be reliable?

8   A:   Yes, sir.

9   Q:   Okay. Is it among those sources of material

10       that you would consider authoritative?

11  A:   Yes, sir.

12  Q:   And even though it's a reliable and

13       authoritative source, did you look at

14       *Martindale* before you compounded the hydrogen

15       peroxide?

16  A:   No, sir.

17  (PLAINTIFF'S EXHIBIT NUMBER 2 WAS MARKED FOR

18  IDENTIFICATION PURPOSES.)

19  Q:   I'm going to hand you Exhibit Number 2. And if

20       you will go to the second page there on

21       Hydrogen Peroxide of that exhibit.. Do you

22       see under ... in the center column, Adverse

23       Effects and Precautions? Do you see where I am

24       there?

25  A:   Yes, sir.

GEORGE DAWN                                                    32

1  Q:  Go ahead and answer.

2  A:  No, sir, it doesn't say that.

3  Q:  Okay.  And have you since March 9, 2004,

4      attempted to research this at all?

5  A:  No, sir.

6  Q:  You haven't looked ... done any research

7      whatsoever?

8  A:  No, sir.

9  Q:  Would you today, if somebody asked you to

10     compound hydrogen peroxide for intravenous use,

11     would you prepare it?

12 A:  No, sir.

13 Q:  Why is that?

14 A:  It's not worth it.

15 Q:  What do you mean it's not worth it?

16 A:  It's not worth the time and effort for what

17     money we were paid for it.

18 Q:  Well, is there any risk associated with it?

19 A:  I don't know.

20 Q:  Well, obviously, we've put some materials in

21     front of you.  We've talked about ...

22 A:  If it was given at 3 percent, there may be, but

23     not the way I understand it was used.

24 Q:  Well, have you gone to any independent source

25     to determine if it's safe at any strength?

GEORGE DAWN                                    33

1   A:   I have not, no, sir.

2   Q:   Have you gone to the FDA to determine whether

3        the FDA approves it at any strength?

4   A:   No, sir.

5   Q:   Have you gone to Spectrum to see if they

6        recommend it at any ...

7   A:   No, sir.

8   Q:   ... strength?

9   A:   No, sir.

10  Q:   And whether it produces severe acute

11       haemolysis, you're not really in a position to

12       argue with that, are you?

13  A:   You are correct, sir.

14  Q:   And you don't know if it produces severe acute

15       haemolysis at any strength?  You don't even

16       know that, do you?

17  A:   That's correct.

18  Q:   Could be at a very diluted strength it could

19       still produce that?  You recognize that, don't

20       you?

21  A:   I don't believe it does that, but it could.

22  Q:   Yes, sir.  And you are aware there was an

23       autopsy done in this case in which the patient

24       was determined to have DIC?  You are aware of

25       that?

GEORGE DAWN                                    35

1        peroxide, isn't that true?

2    A:  I can't draw that conclusion.

3    Q:  Well, we talked here about ... what is
4        haemolysis?

5    A:  It's breakdown of the blood cells.

6    Q:  Yes, sir.  And that's what happened to Ms.
7        Bibeau, wasn't it?

8    A:  Yes, sir.

9    Q:  You recognize that she may well have had the
10       very complication warned of in *Martindale*,
11       correct?

12   A:  I recognize that several things can cause
13       haemolysis.

14   Q:  Well, my question is you recognize the hydrogen
15       peroxide may have caused it, don't you?

16   A:  That's a possibility.

17   Q:  Yes, sir.  And the truth is you didn't do any
18       research beforehand, such as looking at the
19       *Martindale* source, or looking at the package
20       insert, or calling the manufacturer, or calling
21       the FDA; isn't that correct?

22   A:  That's correct.

23   Q:  You didn't do anything but ask Buster, correct?

24   A:  That's correct.

25   Q:  Were you aware that Buster had not done any

GEORGE DAWN                                43

1       didn't provide for it to be used intravenously,

2       did it?  It wasn't an indicated use, was it?

3   A:  No, sir.

4   Q:  And you didn't think it was FDA approved, did

5       you?  You weren't operating on that assumption,

6       were you?

7   A:  No, sir.

8   Q:  You knew it wasn't FDA approved, didn't you?

9   A:  I don't know.  I don't know if it's

10      commercially available.

11  Q:  Well, you told me earlier, to your knowledge,

12      it was not commercially available, correct?

13  A:  That's to my knowledge, yes, sir.

14  Q:  Okay.  And to your knowledge, it was not FDA

15      approved, correct?

16  A:  To my knowledge.

17  Q:  Yes, sir.  And even though it wasn't

18      commercially available and not FDA approved for

19      intravenous use, you made no inquiry to the FDA

20      about the safety of this, did you?

21  A:  I did not.

22  Q:  And is the FDA a source for information for you

23      as a pharmacist?

24  A:  Not necessarily.

25  Q:  Can be, can it not?

GEORGE DAWN                                    44

1   A:  Possibly, yes, sir.

2   Q:  They have a website, do they not?

3   A:  Yes, sir.

4   Q:  Okay.   And  do  they  ...  and  there  are  phone

5       numbers you can call, correct?

6   A:  I expect there are.

7   Q:  And Spectrum has phone numbers on its Material

8       Safety Data Sheet to call, does it not?

9   A:  Yes, sir.

10  Q:  Okay.    So   you   had   sources   of   potential

11      information for you, did you not?

12  A:  Yes, sir.

13  Q:  You could have gone to *Martindale* and done the

14      research yourself, could you not have?

15  A:  I suspect I could.

16  Q:  Okay.   Now, did you talk to Dr. Shortt about

17      the safety and efficacy of hydrogen peroxide?

18  A:  No, sir.

19  Q:  You never had a discussion with him about it?

20  A:  No, sir.

21  Q:  And  the  order  came  in  orally,  not  even  in

22      writing?

23  A:  I can't answer that.

24  Q:  Well, you never saw a written order?

25  A:  Well,  they  write  notes  that  we  want  this,

GEORGE DAWN                                                46

1         have the right to write a prescription.

2    Q:   And how do they do that?  If they are the

3         doctor's agent, who signs it?

4    A:   Well, the doctor would still sign it.

5    Q:   Okay.  And to your knowledge, did you ever see

6         ... sitting here today, do you ever recall if

7         there was ever an order from Dr. Shortt for a

8         ... for hydrogen peroxide that was in writing?

9    A:   No, sir, I don't recall.

10   Q:   Okay.  Let's keep on the 35 percent here if we

11        could just for a moment.  If you would go to

12        page 4.  Under 7, Handling and Storage, do not

13        ingest.   If  ingested,  seek  medical  advice

14        immediately.  That was on that 35 percent as

15        well, wasn't it?

16   A:   This is 35 percent.

17   Q:   Yes, sir.  That was on the 35 percent as we had

18        looked earlier at the 3 percent?

19   A:   Yes, sir.

20   Q:   And then if you will go to page 5.  Under

21        Toxicological Information, it indicates it may

22        cause  damage  to  organs,  including  blood,

23        correct?

24   A:   Yes, sir.

25   Q:   now, did you at anytime ever see, from

GEORGE DAWN                                        47

1    Spectrum, any materials that indicated that at

2    any level of dilution hydrogen peroxide was

3    safe for intravenous use?

4    A:   No, sir.

5    Q:   Have you seen any independent information from

6    the government or from the manufacturer,

7    indicating that hydrogen peroxide was

8    appropriate for intravenous use?

9    A:   No, sir.

10   Q:   Now, you indicated you were the pharmacist who

11   compounded the hydrogen peroxide on March 9,

12   2004, correct?

13   A:   My technician or myself.

14   Q:   Yes, sir.  If it was the technician, she was

15   doing it under your direction ...

16   A:   Yes.

17   Q:   ... and control, correct?

18   A:   Yes, sir.

19   Q:   And you understand that you have to exercise

20   your own professional judgment and discretion

21   and you can't rely on someone else's as a

22   pharmacist; isn't that correct?

23   A:   yes, sir.

24   Q:   You can't say just because Buster said it was

25   okay, it's okay.  You hold a license, don't

GEORGE DAWN                                        49

1   Q:   Okay.  So it's telling us on the label prepared
2        by Congaree that the original prescription was
3        August 7, 2003; is that correct?
4   A:   The order, yes, sir.
5   Q:   Well, it doesn't say original order, it says
6        original prescription.
7   A:   We don't have a label that says order, but this
8        is just a common label used in the pharmacy.
9   Q:   Well, you don't have to use this form, you
10       could use ... you could use your own form,
11       could you not?
12  A:   This is convenient, so we can bill it.
13  Q    I'm ... you know, you understand that one of
14       your duties is for your label to be accurate;
15       isn't that one of your duties?
16  A:   The label is accurate.
17  Q    Okay.  Was there ever a prescription?
18  A:   No, sir.
19  Q:   You are sitting here today and telling me never
20       was there a prescription for hydrogen peroxide
21       intravenous ...
22  A:   No, sir.
23  Q:   ... from Dr. Shortt or anybody else, correct?
24  A:   That's correct.
25  Q:   And what you are telling me when it says

GEORGE DAWN                                    50

1        original prescription, August 7, 2003, to your

2        knowledge, there never was a prescription,

3        correct?

4    A:  That's correct, no prescription.

5    Q:  And when it says previous, there was never a

6        previous prescription?

7    A:  Not a prescription.

8    Q:  okay.  Now, was hydrogen peroxide the type of

9        medication in which you would want, if you were

10       going to administer it intravenously, you would

11       want that under medical supervision?

12   A:  Yes, sir.

13   Q:  Why is that?

14   A:  It's a risk for everything.

15   Q:  Yes, sir.  And it would be the kind of product

16       that as a ... because of the risk of toxicity

17       ... is that one of the risks you would worry

18       about?

19   A:  Just anytime an IV is being done, it should be

20       done under supervision.

21   Q:  so anytime you are preparing any product for

22       intravenous use, your opinion is it needs to be

23       under medical supervision because of risk?

24   A:  Yes, sir.

25   Q:  Okay.  And are you aware that the federal

GEORGE DAWN                                    52

1   Q:  Well, listen to my question.

2   A:  It's an order, it's not a prescription.

3   Q:  Right.  I'm saying to you ...

4   A:  I don't know the law on the federal laws, so I

5       can't answer that.

6   Q:  But assume for a minute that the federal law

7       requires that because it's an IV medication

8       requiring medical supervision, requires to be

9       a prescription, if that is in fact the law ...

10      assume for purposes of this that that is

11      correct, then you broke the law because it

12      wasn't a prescription; is that fair?

13  MR. ELLIOTT: Object to the form.

14  A:  No, sir.  I didn't dispense this to any person.

15  Q:  Well, you delivered this product, this

16      compounded product, without a prescription,

17      correct?

18  A:  That's correct.

19  Q:  And you knew it was going to be used

20      intravenously, didn't you?

21  A:  That's one of the ways I understand I to be

22      used, yes.

23  Q:  And you knew it was a drug, didn't you?

24  A:  Yes, sir.

25  Q:  Okay.  And you knew that Dr. Shortt intended to

GEORGE DAWN                                        53

1       use it intravenously for his patients?  You

2       knew that, didn't you?

3   A:  Yes, sir.

4   Q:  But you didn't have a prescription for it,

5       correct?

6   A:  That's correct.

7   Q:  Now, it goes onto say, it says, CPD-H202.  What

8       does CPD stand for?

9   A:  Compound.

10  Q:  Okay.  So it's a compounded medication?

11  A:  Yes, sir.

12  Q:  And it's not ... you explained to me this

13      compounded medication, H202, 3 percent, #180

14      INJ.  What does INJ mean?

15  A:  Injection.

16  Q:  And what does the 180 mean?

17  A:  Number of milliliters.

18  Q:  Okay.  That product as described, compounded

19      hydrogen peroxide, 3 percent, #180 injection,

20      that, to your knowledge, was not commercially

21      available on March 9, 2004, correct?

22  A:  That's correct.

23  Q:  You compounded a product that was not

24      commercially available, correct?

25  A:  That's correct.

GEORGE DAWN                                        54

1   Q:  And then it identifies who the manufacturer of

2       this product is, does it not?

3   A:  It identifies who made it, yes, sir.

4   Q:  Well, what does Mfg stand for?

5   A:  I guess manufacturer.

6   Q:  Okay.  To your knowledge, was Congaree Pharmacy

7       licensed as a manufacturer in South Carolina?

8   A:  No, sir, we are not manufacturer.

9   Q:  Well, what does the label say?

10  A:  That's what the ... the label says Mfg.

11  Q:  Okay.  And you told me that meant manufacturer.

12  A:  Well.

13  Q:  And was the ... was Congaree Pharmacy licensed

14      under federal law as a manufacturer?

15  A:  No, sir.

16  Q:  Has this establishment been listed with the

17      Health and Human Services Secretary as a

18      manufacturer?

19  A:  No, sir.

20  Q:  Had the drug H202, 3 percent, #180 injection,

21      been listed with the Secretary of HHS as a drug

22      you were producing?

23  A:  No, sir.

24  Q:  Are you aware of the labeling requirements

25      under federal law for non prescription

GEORGE DAWN                                          59

1          risk of this product?

2     A:   I assume the label on the bottle.

3     Q:   Assume the label on what ...

4     A:   I don't know.   I would have to look at the

5          label on the hydrogen peroxide bottle.

6     Q:   You're talking about the one you produced?

7     A:   Yes, sir.

8     Q:   Okay.

9     (PLAINTIFF'S   EXHIBIT   NUMBER   5   WAS   MARKED   FOR

10    IDENTIFICATION PURPOSES.)

11    Q    I'm going to hand you Exhibit 5, which was

12         provided by Dr. Shortt to the Richland County

13         Coroners Office shortly after Ms. Bibeau's

14         death, and was represented by Dr. Shortt to the

15         coroner to be the bottle utilized that was

16         administered to Ms. Bibeau.   Do you have any

17         reason to question that?

18    A:   No, sir.

19    Q:   At any point there on that bottle label, is

20         there any description of the risks associated

21         with its administration?

22    A:   No, sir.

23    Q:   Is there any directions for use?

24    A:   No, sir.

25    Q:   Under the FDA labeling requirements, this does

GEORGE DAWN                                    60

1   not meet those requirements, does it?

2 A: It does not.

3 (PLAINTIFF'S EXHIBIT NUMBER 6 WAS MARKED FOR

4 IDENTIFICATION PURPOSES.)

5 Q: For purposes of this exhibit, I have Hydrogen

6   Peroxide 30 Percent. I happen to have the

7   label. I'm told the same is for 35 percent,

8   but I don't have that with me. So I'm going to

9   hand you Exhibit 6, with that caveat. And this

10   appears to be the label from Spectrum, does it

11   not?

12 A: Yes.

13 Q: And it says ... what's the first thing it says

14   on that label in bold letters?

15 A: Danger.

16 Q: And the 35 percent also has the same label,

17   does it not?

18 A: Yes, sir.

19 Q: And then it identifies it as corrosive, does it

20   not?

21 A: Yes, sir.

22 Q: And if you will go to the second page of it, it

23   says, for manufacturing or laboratory use only.

24   Read and understand the label and the Material

25   Safety Data Sheet prior to use. Is that

GEORGE DAWN                                    63

1      they?

2  A:    No, sir.

3  Q:    And they do not disclose risks, do they?

4  A:    No, sir.

5  Q:    And the label discloses the manufacturer to be

6        Congaree, correct?

7  A:    Yes, sir.

8  Q:    Now, are you aware of the Good Compounding

9        Practices that are put out by the National

10       Association of Boards of Pharmacists?

11 A:    Yes, sir.

12 Q:    Okay.  Tell me about what that ... what those

13       Good Compounding Practices are.  What does that

14       document reflect?

15 A:    Well, just I'm not real sure, other than it

16       gives proper techniques, practices for

17       compounding drugs.

18 Q:    And the Good Compounding Practices reflect the

19       standard of care for pharmacy, do they not?

20 A:    Yes, sir.

21 Q:    Okay.

22 (PLAINTIFF'S EXHIBIT NUMBER 7 WAS MARKED FOR

23 IDENTIFICATION PURPOSES.)

24 Q:    Let me hand you Exhibit 7, Good Compounding

25       Practices, and let's look at the definition

GEORGE DAWN                                65

1  A:  No, sir.

2  Q:  You had never ... to your recollection, had

3      never heard of anybody doing it before, but you

4      didn't ask the physician about the treatment,

5      did you?

6  A:  No, I did not talk to Dr. Shortt.

7  Q:  But you knew it was sort of unconventional, did

8      you not?

9  A:  Yes, sir.

10 Q:  And it was, to your knowledge, unique?  You had

11     never heard of it before, correct?

12 A:  Correct.

13 Q:  And you knew that Dr. Shortt was not ... that

14     this treatment was not the standard routine and

15     customary practices in the medical community,

16     to your knowledge, correct?

17 MR. ELLIOTT: Object to the form.

18 A:  Yes, sir.

19 Q:  Okay.  Now, you see on ... so we are down here

20     to the definition of compounding under Good

21     Compounding Practices. It says, as a result of

22     a practitioner's prescription drug order or

23     initiative.    Was  there  a  practitioner's

24     prescription, drug order or initiative?

25 A:  There was an order, yes, sir.

GEORGE DAWN                                68

1   A:   Correct.

2   Q:   Now, under this definition, you wouldn't fall

3        into this definition for compounding under the

4        Good Compounding Practices, would you?

5   A:   I think we do.

6   Q:   Well, is it based upon ... is your prescription

7        drug   order   initiative   based   upon   the

8        practitioner/patient/pharmacist relationship?

9   A:   It's   based   on   the   practitioner/pharmacist

10       relationship.

11  Q:   Yes, sir.  I'm asking you ... take it literally

12       to what it says.

13  A:   Okay.  Then, no, sir.

14  Q:   So under the Good Compounding Practices, you

15       did not meet the requirements for compounding,

16       did you?

17  A:   Not under this one, no, sir.

18  Q:   And this one being Exhibit Number ...

19  MR. HOWARD: Seven.

20  Q:   ... 7; is that correct?

21  A:   That's correct, sir.

22  Q:   Okay.  Now, do you know whether the Good

23       Compounding Practices are actually consistent

24       with state law?

25  A:   No, sir I don't know that.

GEORGE DAWN

69

1   Q:   Okay.

2   MR. GERGEL: Gentlemen, I have one of these if you

3        all want to share this.

4   MR. ELLIOTT:  Is that the statute?

5   MR. GERGEL: The statute.  I think you all have

6        probably got it here.

7   (PLAINTIFF'S  EXHIBIT  NUMBER  8  WAS  MARKED  FOR

8   IDENTIFICATION PURPOSES.)

9   Q:   I'm going to hand you Exhibit Number 8, which

10       is 40-43-86 from the State Pharmacy Act.  I

11       take it you are familiar with the State

12       Pharmacy Act?

13  A:   Yes, sir.

14  Q:   Okay.  And you are charged as a pharmacist to

15       being familiar with that act, are you not?

16  A:   Yes, sir.

17  Q:   And I'm referring you to (CC) under that

18       relating to compounding.  Are you familiar with

19       that section?

20  A:   Yes, sir.

21  Q:   Okay.  And you see under ©)(2) on page 20

22       there, ©)(2) ... let's make sure we are in the

23       right place.  Are you there?  Are you there,

24       Mr. Dawn?

25  A:   Yes, sir.

GEORGE DAWN

70

1   Q:   Okay.   Under  ⓔ)(2), the following are the
2        minimum current good compounding practices for
3        the preparation of medications.  Do you see
4        where I am, sir?
5   A:   Yes, sir.
6   Q:   And it says under (a) pharmacists engaged in
7        the compounding of drugs shall operate in
8        conformance with applicable laws regulating the
9        practice of pharmacy.  You understand that,
10       don't you?
11  A:   Yes, sir.
12  Q:   And then it authorizes in (b) based on the
13       existence of a pharmacist/patient/practitioner
14       relationship and the presentation of a valid
15       prescription, or in anticipation of
16       prescription medication orders based on
17       routine, regularly observed prescribing
18       patterns, pharmacists may compound, for an
19       individual patient medications that are
20       commercially available in the market place.  Do
21       you see that?
22  A:   Yes, sir.
23  Q:   Okay.  First of all, you are telling me the
24       triangular relationship between
25       pharmacist/patient/practitioner is not present,

GEORGE DAWN                                    71

1          correct?

2     A:   That's correct.

3     Q:   In regard to Ms. Bibeau, correct?

4     A:   That's correct.

5     Q:   You did not have a valid prescription, correct?

6     A:   Not for Ms. Bibeau.

7     Q:   And the hydrogen peroxide, 3 percent, for

8          intravenous use, was not commercially available

9          in the market place, correct?

10    A:   That's correct.

11    Q:   Under this authorization for compounding, you

12         don't meet any of those three requirements, do

13         you?

14    A:   No, sir.

15    Q:   Then if you will go to the next page, under

16         (f), under (2)(f) the compounding of drugs in

17         anticipation of receiving prescriptions without

18         a historical basis or the distribution of

19         compounded products without a

20         patient/practitioner/pharmacist relationship is

21         considered what?

22    A:   It says manufacturing.

23    Q:   Yes, sir. So were you aware until you just

24         read that that if you distributed compounded

25         products and you didn't have the triangular

GEORGE DAWN                                      72

```
 1        relationship  with  patient,  practitioner  and

 2        pharmacist,    that    that    was    considered

 3        manufacturing?

 4   A:   No, sir.

 5   Q:   That's news to you?

 6   A:   Well, there are other sections here that cover

 7        that.

 8   Q:   Well, you are assuming they cover that?   You

 9        think there's an ...

10   A:   There's a section that says we may compound for

11        a doctor's office.

12   Q:   But  does  that  exclude  your  duty  to  have  the

13        triangular  relationship,  even  though  you  are

14        compounding for the doctor's office?

15   A:   Yes, sir.

16   Q:   You think that excludes that?

17   A:   That   particular   case,   we   are   allowed   to

18        compound for a doctor's office.

19   Q:   Even  though  you  don't  have  the  triangular

20        relationship?

21   A:   That's correct.

22   Q:   Okay.   That's your understanding?

23   A:   Yes, sir.

24   Q:   And you don't have a prescription?

25   A:   That's correct.
```

*CREEL COURT REPORTING, INC.*
*1116 Blanding Street, Suite 1B / Columbia, SC 29201*
*(803) 252-3445 / (800) 822-0896*

GEORGE DAWN                                              80

1       correct?

2    A:    Yes, sir.

3    Q:    Now, we talked earlier about that definition of

4          Good Compounding Practices or the definition of

5          compounding.  Do you remember that?

6    A:    Yes, sir.

7    Q:    And you acknowledge under that definition that

8          it  appears  that  you  had  not  met  those

9          requirements.  I'm now going to hand you the

10         definition under South Carolina law.

11   (PLAINTIFF'S  EXHIBIT  NUMBER  9  WAS  MARKED  FOR

12   IDENTIFICATION PURPOSES.)

13   Q:    This is 40-43-30 and it is Exhibit Number 9.

14         And if you will see number (7) there, there's

15         a definition for compounding; is there not?

16   A:    Yes, sir.

17   Q:    And it defines it as it means the preparation,

18         propagation,  conversion,  or  processing  of  a

19         drug or device, and you did that, did you not?

20   A:    Yes, sir.

21   Q:    On March 9, 2004, the conversion you did and

22         the dilution and so forth met that requirement,

23         did it not?

24   A:    Yes, sir.

25   Q:    Either  directly  or  indirectly,  by  extraction

GEORGE DAWN                                          81

1       from   substances   or   natural   original   or
2       independently   by   means   of   chemical   or
3       biological   synthesis,   or   the   preparation,
4       mixing, assembling, packaging, or labeling of
5       a drug or device.  You did that, didn't you?
6   A:  Yes, sir.
7   Q:  As the result of a practitioner's drug order or
8       i n i t i a t i v e     b a s e d     o n     a
9       practitioner/patient/pharmacist relationship in
10      the   course   of   professional   practice.   You
11      didn't meet that requirement, did you?
12  A:  Yes, sir.
13  Q:  You did not, did you?
14  A:  Oh, no, sir.
15  Q:  You did not meet the definition because you
16      didn't have the triangular relationship between
17      practitioner, patient and pharmacist, correct?
18  A:  Well, I believe that we had a relationship and
19      it   was   the   patient/practitioner   and   the
20      pharmacist/practitioner.
21  Q:  Yes, sir.  But the triangular relationship, you
22      did not have, did you?
23  A:  No, sir.  We did not have it.
24  Q:  And   to   be   clear,   you   did   not,   as   the
25      pharmacist, did not have the relationship with

GEORGE DAWN                                    82

1       the patient, correct?

2   A:  That's correct.

3   Q:  So under this definition and state law, you did

4       not meet the requirements for compounding, did

5       you?

6   MR. ELLIOTT: Object to the form.

7   Q:  Go ahead and answer.

8   A:  Yes, sir.

9   Q:  You did or did not?

10  A:  Did not. I did not.

11  Q:  You did not, did you?

12  A:  No, sir.

13  Q:  Now, if you are not authorized under state law

14      to compound because you don't have the

15      triangular relationship ... we've looked at the

16      definition here.  We've looked at the Good

17      Compounding Practices.  Where is your authority

18      to compound just for Dr. Shortt without having

19      the patient involved?

20  A:  We have a section that says we can compound for

21      office use.

22  Q:  But isn't compounding already defined under

23      state law?

24  A:  There's   other   ...   there   are   several

25      definitions.

*CREEL COURT REPORTING, INC.*
*1116 Blanding Street, Suite 1B / Columbia, SC 29201*
*(803) 252-3445 / (800) 822-0896*

GEORGE DAWN        84

1   Q:   Now, but it's compounding is what you are

2       doing, isn't it?

3   A:   Yes, sir.

4   Q:   And doesn't compounding have a definition under

5       state law?

6   A:   That's the one definition.

7   Q:   Well, yes, sir.

8   A:   I'm just ...

9   Q:   The only place ...

10   A:   Okay. This is what we were going by.

11   Q:   Yes, sir. But my point to you is there's only

12       one place where compounding is defined and

13       that's under the earlier section, the section

14       we just cited, isn't it?

15   A:   Yes, sir.

16   Q:   You didn't meet that requirement, did you?

17   A:   No, sir.

18   Q:   And if you will go right below (e), where we

19       were just reading, you go to (f), it makes it

20       very clear that you must have that triangular

21       relationship with the patient, the practitioner

22       and the pharmacist, or you are considered a

23       manufacturer; isn't that true?

24   A:   I don't believe that to be true, but ...

25   Q:   That's what it says, isn't it?

GEORGE DAWN        86

1        you? You could do that?

2   A:   Yes, sir.

3   Q:   I mean you could have ... you can prepare

4        compound for office use and know the names of

5        the patients?

6   A:   Not necessarily.

7   Q:   But you could, couldn't you?

8   A:   Possibly, yes, sir.

9   Q:   Yes, sir. Let's take Ms. Bibeau. On the day

10       in question, March 9, she's in the office. You

11       understand that, do you not?

12   A:   Dr. Shortt's office?

13   Q:   Yes.

14   A:   Yes, I assume she was.

15   Q:   Okay. If you wanted to dispense to her, you

16       could have gotten her name, could you not have?

17   A:   I suspect I could.

18   Q:   Yes, sir. And if you were going to determine

19       whether the hydrogen peroxide was appropriate

20       for her, you could have gotten some medical

21       history from her, could you not have?

22   A:   I could have, I guess.

23   Q:   And if there was counseling or warnings to her,

24       you could have counseled her, couldn't you?

25   A:   If it was a prescription for her.

```
                         GEORGE DAWN                    88

1            . . .

2    A:      Yes, sir.

3    Q:      ... the  medication  is  appropriate.   You could

4            have gotten that information, couldn't you?

5    A:      if we had a prescription, yes, sir.

6    Q:      And   you   could   have   made   an   independent

7            determination  about  whether  it  was  safe  and

8            appropriate, correct?

9    A:      We could have done that, yes, sir.

10   Q:      And you could have counseled the patient and

11           insisted  on  counseling  the  patient,  couldn't

12           you?

13   A:      If there was a prescription.

14   Q:      Yes, sir.  All of that could have been done in

15           this  setting  because  literally  Dr.  Shortt's

16           office is next door, correct?

17   A:      It is, yes, sir.

18   Q:      Yes, sir.  So you interpreted the law as not

19           requiring that, correct?

20   A:      That's correct.

21   Q:      But  you  weren't  aware  of  these  federal  laws

22           that presented other problems for you?

23   A:      Yes, sir.

24   MR. ELLIOTT: Object to the form.

25   Q:      Go ahead and answer.
```

GEORGE DAWN                                    89

1    MR. ELLIOTT: Object to the form.

2    Q:   I couldn't hear your answer.

3    A:   I said yes, sir.

4    Q:   Yes.  And you learned ... you have learned of

5         these federal laws sitting here today; is that

6         fair?

7    A:   Yes, sir.

8    Q:   You did not counsel Ms. Bibeau, did you?

9    A:   No, sir.

10   Q:   You did not review the regimen Dr. Shortt was

11        planning and approve it, did you?

12   A:   No, sir.

13   Q:   You did not determine the risks or side effects

14        of the medication he was proposing, did you?

15   A:   No, sir.

16   Q:   You did not properly label the medication, did

17        you?

18   MR. ELLIOTT: Object to the form.

19   A:   I believe we did, but ...

20   Q:   Well, if federal law requires ...

21   A:   According to federal law, I did not.

22   Q:   Yes, sir.  Have you ever heard of misbranding

23        a drug?  Have you ever heard that term?

24   A:   Yes, sir.

25   Q:   What does it mean?

GEORGE DAWN                                        93

1    Q:   You recognize that if there were certain

2        warning requirements, you didn't provide them,

3        correct?

4    A:   That's correct.

5    Q:   And if there was required to have directions

6        for use, you didn't provide those, correct?

7    A:   Correct.

8    Q:   Now, whether this particular drug you

9        compounded was safe in the dosage you

10       compounded, you didn't really investigate, did

11       you?

12    A:   Other than speaking with Buster and discussing

13       it with him.

14    Q:   Right. Other than that, you made no

15       independent determination that the medication

16       was safe, correct?

17    A:   That's correct.

18    Q:   And you didn't provide for a particular dosage

19       level, so you didn't really know directly what

20       regimen Dr. Shortt was actually planning, did

21       you?

22    A:   That's correct.

23    Q:   And you knew that there was some potential risk

24       associated with the intravenous administration

25       of any drug?

GEORGE DAWN                                              94

1    A:   Yes, sir.

2    Q:   Correct?

3    A:   Yes, sir.

4    Q:   And you knew enough to say certainly at some

5         level the intravenous use may be risky,

6         correct?

7    A:   Yes, sir.

8    Q:   And you knew enough to say I wouldn't give this

9         if it didn't have medical supervision, correct?

10        I mean you were counting on the medical

11        supervision, correct?

12   A:   Yes, sir.

13   Q:   But you didn't really know whether ... what the

14        regimen was by Dr. Shortt and whether it was

15        really safe or not, did you?

16   A:   I knew a little bit about the regimen, just

17        there was a small amount used.

18   Q:   But how much and whether that was risky or not,

19        you really didn't know, did you?

20   A:   It was my opinion that it wasn't risky.

21   Q:   But you didn't know that really because you had

22        not done any independent work on that, had you?

23   A:   That is correct.

24   Q:   It was kind of a guess it wasn't risky at some

25        level?

GEORGE DAWN                                    96

1   Q:   To your knowledge, Congaree Pharmacy is not an

2        establishment   registered   with   the   FDA   to

3        compound drugs, is it?

4   A:   It   is   not   registered   with   the   FDA   to

5        manufacture, no, sir.

6   Q:   And   to   compound   drugs   which   are   not

7        prescriptions, correct?

8   A:   They are not registered with the FDA ...

9   Q:   Yes, sir.

10  A:   ... if that's what you ...

11  Q:   I'm trying to make it clear.

12  A:   If that's what you are asking.

13  Q:   Yes, sir.  You understand that if you have a

14       prescription drug order, you don't have to meet

15       the   labeling   requirements   of   the   FDA.   You

16       understand that, don't you?

17  A:   Yes, sir.

18  Q:   But   if   you   don't   have   a   prescription,   you

19       understand that there are federal requirements

20       for labeling, don't you?

21  A:   Yes, sir.

22  Q:   And for being registered as an establishment to

23       compound   drugs.   You   understand   that,   don't

24       you?

25  A:   Yes, sir.

GEORGE DAWN                              101

1   A:  The same, same sort of things.

2   Q:  And are Dr. Ghen and Dr. Rozema also

3       alternative medicine doctors?

4   A:  Yes, sir.

5   Q:  Where is Dr. Ghen now?

6   A:  Dr. Ghen?

7   Q:  Ghen.

8   A:  I think he's in Florida now.

9   Q:  Did he have any disciplinary problems here

10      before he left?

11  A:  Not that I'm aware of, sir.

12  Q:  How about Dr. Rozema, did he?

13  A:  No, sir.

14  Q:  He hadn't had any?  Where is he?

15  A:  He's here in ... he works at Biogenesis or he

16      owns Biogenesis.

17  Q:  Uh-huh.  But neither one of them order hydrogen

18      peroxide?

19  A:  Not that I'm aware of.

20  Q:  Not that you are aware.  In fact, Dr. Shortt is

21      the only practitioner you have ever heard of to

22      provide this unconventional treatment of

23      intravenous hydrogen peroxide?

24  A:  Yes, sir, in our area.

25  Q:  and you certainly knew the use of hydrogen

GEORGE DAWN                                              102

1        peroxide wasn't standard of care in Columbia?

2        You knew that, didn't you?

3    A:  Yes, sir.

4    Q:  And you knew it wasn't standard of care

5        nationally when you did that, didn't you?

6    A:  No.  It was different, yes.

7    Q:  Yes, sir.  You knew Dr. Shortt was not

8        practicing within the standards of care when he

9        was using intravenous hydrogen peroxide, didn't

10       you?

11   A:  What do you mean by standards of care?

12   Q:  The routine and customary practice of dealing

13       with medical conditions.

14   A:  Then it ...

15   MR. HOWARD: I'm going to object to the form of the

16       question.

17   Q:  Go ahead and answer.

18   MR. ELLIOTT: Same objection.

19   A:  Yes, sir, you are correct, not ...

20   Q:  Just so the record ...

21   MR. GERGEL: And these objections are continuing.

22   Q:  You recognize that Dr. Short was not operating

23       within the standards of care, correct?

24   A:  Yes, sir.

25   Q:  Now, you mentioned this Micromedics source of

GEORGE DAWN                                   103

1       information.   How   would   you   get   access   to

2       Micromedics information?

3   A:  It's ... subscribed to it.

4   Q:  You have to subscribe to it?

5   A:  Yes, sir.

6   Q:  Okay.  Does it have hydrogen peroxide on there?

7   A:  It's listed on there, yes, sir.

8   Q:  And does it provide for intravenous use?

9   A:  I can't answer that.  I don't ...

10  Q:  You have never looked?

11  A:  I'd have to look, yes, sir.

12  Q:  Have you ever seen anywhere on any independent

13      publication,   professional   publication,   that

14      actually    recommends    intravenous    hydrogen

15      peroxide?

16  A:  No, sir.

17  Q:  And did you disclose to anyone any anxiety you

18      had   about   this   unknown   medication   for   this

19      unconventional treatment before you delivered

20      the medication?

21  A:  No, sir.

22  Q:  And you didn't warn the patient, did you?

23  A:  No, sir.

24  Q:  You   didn't   disclose   it   to   anyone   you   hadn't

25      done the research to know whether it was really

GEORGE DAWN                               106

1   Q:   Yes, sir.  And meeting your own standards here,

2        this is probably ... you probably had the least

3        knowledge about this drug before you dispensed

4        it   than   anything   you   can   really   think   of

5        sitting here; is that fair?

6   A:   Not of anything, no, sir.  I mean ...

7   Q:   Well, certainly, this was ...

8   A:   ... I've known of those who have used it so.

9   Q:   Well,  you  knew  this  was  very  unconventional

10       treatment, correct?

11  A:   Yes, sir, that's ...

12  Q:   And you knew it wasn't FDA approved, correct?

13  A:   Yes, sir.

14  Q:   And I guess when all this has arisen, in your

15       heart  of  hearts,  you  kind  of  kicked  yourself

16       for not having done a little more work before

17       you compounded it; is that fair?

18  MR. ELLIOTT: Object to the form.

19  A:   Would you repeat that, please?

20  Q:   Yes, sir.  Knowing all that has happened here

21       ...

22  A:   Yeah.

23  Q:   ... you have kind of kicked yourself a little

24       bit for having not done more independent work

25       before  you  compounded  and  dispensed  this;  is

GEORGE DAWN                              144

1        a Cease and Desist Order, Respondent regularly

2        infused patients with intravenous hydrogen

3        peroxide.  Do you see that?

4    A:  Uh-huh.

5    Q:  Now, first of all, you were aware that he was

6        regularly infusing patients with intravenous

7        hydrogen peroxide, correct?

8    A:  Yes, sir.

9    Q:  And you are also aware, as stated here, that it

10       was outside the standard of care, correct?

11   MR. ELLIOTT: Objection.

12   MR. HOWARD: Objection.

13   Q:  Go ahead and answer it.

14   A:  It's not a normal type of care.

15   Q:  Yes, sir.  And you knew that at the time,

16       didn't you?

17   A:  I don't ... that it was different, yes, sir.

18   Q:  Yes, sir.  And you knew it wasn't the normal

19       standard of care practice for physicians? You

20       knew that, didn't you?

21   MR. ELLIOTT: Objection.

22   A:  Yes, sir.

23   Q:  And then it goes onto say, on at least one

24       occasions, Respondent prescribed testosterone

25       for a terminally ill prostate cancer patient.

GEORGE DAWN                                                    159

1         professional football players?

2    A:   No, sir.

3    Q:   We earlier discussed the issue of the cause of

4         death of Ms. Bibeau and I think you have told

5         me that it's really outside of your area of

6         expertise; is that fair?

7    A:   Yes, sir.

8    (PLAINTIFF'S  EXHIBIT  NUMBER  11  WAS  MARKED  FOR

9    IDENTIFICATION PURPOSES.)

10   Q:   But as Exhibit 11 sets forth, the pathologist,

11        Dr. Clay Nichols, reached a conclusion that the

12        cause of death was secondary to shock from the

13        administration of hydrogen peroxide; is that

14        correct?

15   A:   I don't know.  Is that what ...

16   Q:   Have you ever seen this document before?

17   A:   No, sir.

18   Q:   If you will turn to the second page of the

19        document under Cause of Death, cardiac arrest

20        due to systemic shock and DIC due to iatrogenic

21        infusion of hydrogen peroxide.  Do you see

22        that?

23   A:   I see that, yes, sir.

24   Q:   Okay.  Is that the first time you have learned

25        that,  that  Dr.  Nichols  had  reached  that

GEORGE DAWN                                         160

1          conclusion as to the cause of death?

2     A:   No, sir, I've heard that.

3     Q:   Yes, sir.   And I take it that as a forensic

4          pathologist, Dr. Nichols would have expertise

5          in areas beyond yours as to the cause of death;

6          is that correct?

7     A:   Possibly.

8     Q:   Yes, sir.   But, well, you told me you are not

9          ...

10    A:   It would certainly be more than mine.

11    Q:   Yes, sir.

12    A:   I didn't do any ...

13    Q:   And you are not in a position to challenge Dr.

14         Nichols' conclusions here, are you?

15    A:   No, sir.

16    Q:   Were you aware that he found air emboli in the

17         pulmonary arteries?   Were you aware of that?

18    A:   No, sir.

19    Q:   Are you aware that air emboli are one of the

20         complications associated with the intravenous

21         administration of hydrogen peroxide?

22    A:   No, sir, I wasn't.

23    Q:   Okay.   But we did look earlier at *Martindale*

24         and it talked about emboli being a risk of

25         hydrogen peroxide?

GEORGE DAWN                                          164

1          86(k).  A pharmacist shall review the pharmacy

2          patient record in each prescription drug order

3          for   dispensing   for   purposes   of   promoting

4          therapeutic appropriateness by identifying, and

5          it lists various things you are supposed to do;

6          is that correct?

7     A:   That's correct.

8     Q:   So though you are a licensed pharmacist and not

9          a medical doctor, you do have duties before you

10         fill a prescription drug order, do you not?

11    A:   A prescription, yes, sir.

12    Q:   Yes, sir.  And those include assessing the drug

13         disease contraindications, correct?

14    A:   Yes, sir.

15    Q:   And if there are potential complications, you

16         are  supposed  to  take  steps  to  resolve  the

17         problem,   including   consultation   with   the

18         practitioner; isn't that correct?

19    A:   Yes, sir.

20    Q:   Okay.    And   you   are   supposed   to   offer

21         counseling, aren't you?

22    A:   Yes, sir.

23    Q:   Now,   you   mentioned   that   it   was   your

24         understanding what Dr. Shortt was going to do

25         was   to   dilute   further   this   compounded