# Transcript of the Testimony of
# **GEORGE DAWN**

### **Date:** August 2, 2005

## CREEL COURT REPORTING, INC.
## Condensed Transcript and Word Index

1116 Blanding Street, Suite 1B
Columbia, SC 29201
Phone:  (803) 252-3445 / (800) 822-0896
Fax: (803) 799-5668
Email: contact@creelreporting.com
Internet: www.creelreporting.com

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A No. 3:04-22306-10

David W. Bibeau, as Personal        )
Representative of the Estate of     )
Katherine Ann Kurtz-Bibeau,         )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
James Michael Shortt, M.D.; Health  )
Dimensions, LLC; Congaree Pharmacy, )
Inc.; George Dawn, R.Ph. and J.H.   )
"Buster" Phillips, Jr., R.Ph.,      )
                                    )
        Defendants.                 )
_____     )

VIDEO DEPOSITION OF
GEORGE DAWN
********
Tuesday, August 2, 2005
10:27 a.m. - 1:13 p.m.

The video deposition of George Dawn, taken on
behalf of the Plaintiff at the law offices of Gergel,
Nickles & Solomon, P.A., 1519 Richland Street,
Columbia, South Carolina, on the 2nd day of August,
2005, before Margaret S. Smith, Court Reporter and
Notary Public in and for the State of South Carolina,
pursuant to Notice of Deposition.

---

**Page 2**

```
 1          APPEARANCES:
 2   Richard Mark Gergel, Esquire
     Michele Dreher, Nurse Paralegal
 3   Gergel, Nickles & Solomon, P.A.
     1519 Richland Street
 4   Columbia, South Carolina 29201
     Attorney for the Plaintiff
 5
     William L. Howard, Esquire
 6   Young, Clement & Rivers, LLP
     28 Broad Street
 7   Post Office Box 993
     Charleston, South Carolina 29402-0993
 8   Attorney for the Defendant James Michael Shortt, M.D.
     James H. Elliott, Jr., Esquire
 9   Barnwell, Whaley, Patterson & Helms, LLC
10   Post Office Drawer H
     Charleston, South Carolina 29402
11   Attorney for the Defendant Congaree Pharmacy, Inc.,
     George Dawn, R.Ph. and J.H. "Buster" Phillips, Jr.,
12   R.Ph.
13   Also Present:
     William Bunch, Videographer
14
15          INDEX
16   MR. DAWN:              PAGE
17   MR. GERGEL......EXAMINATION................4
     MR. ELLIOTT     EXAMINATION.............162
18   MR. GERGEL      RE-EXAMINATION...........163
     Signature Sheet....................167
19   Videographer's Certificate..............168
     Certificate ........................169
20
            EXHIBITS
21
     Plaintiff's #1 (HP 3% Safety Data Sheet)..........23
22   Plaintiff's #2 (Martindale)................29
     Plaintiff's #3 (HP 35% Safety Data Sheet)........36
23   Plaintiff's #4 (Label)...............48
     Plaintiff's #5 (Hydrogen Peroxide
24   3% Label)........................59
     Plaintiff's #6 (Hydrogen Peroxide
25   35% Label)........................60
     Plaintiff's #7 (Good Compounding Practice)..........63
```

---

**Page 3**

1   Plaintiff's #8 (40-43-86 Statute). . . . . . . . . . . . . . . 69

2   Plaintiff's #9 (SC 40-43-30 Statute) . . . . . . . . . . . . 80

3   Plaintiff's #10 (Dr. Shortt's License

4   Suspension) . . . . . . . . . . . . . . . . . . . . . . . . .142

5   Plaintiff's #11 (Pathologist Report) . . . . . . . . . . . .159

6

7               STIPULATIONS

8

9       It is stipulated and agreed that this

10   deposition is being taken pursuant to the Federal

11   Rules of Civil Procedure.

12

13       It is stipulated by and between counsel and the

14   witness that the reading and signing of the following

15   deposition be, and the same are, hereby not waived.

16   Signature sheet is attached to the deposition at page

17   167.

---

**Page 4**

1   GEORGE DAWN, having been duly sworn, deposes and
2       testified as follows:
3   MR. GERGEL: I'm Richard Gergel.  I represent the
4       plaintiff in this action.
5   MS. DREHER: I am Michele Dreher, paralegal to
6       Richard Gergel.
7   MR. HOWARD: I am William L. Howard and I represent
8       Dr. Shortt.
9   MR. ELLIOTT: I'm James Elliott and I represent
10      Congaree Pharmacy, George Dawn and Buster,
11      excuse me, J.H. "Buster" Phillips.
12   MR. DAWN - EXAMINATION BY MR. GERGEL:
13   Q:   Mr. Dawn, my name is Richard Gergel.  We met
14      briefly before the deposition.  I represent the
15      plaintiff in this matter and I will be asking
16      you questions here today.
17   A:   Okay.
18   Q:   To the extent you do not understand a question
19      I ask you, Mr. Dawn, would you ask me to repeat
20      it, please?
21   A:   Certainly.
22   Q:   And you are going to need to answer questions
23      yes or no.  Even though I understand a nod...
24   A:   Yes, sir.
25   Q:   ... it may be ambiguous to the court reporter

1  (Pages 1 to 4)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

**Page 5**

1  when we do a transcript. Is that fair?
2  A:  That's fair, sir.
3  Q:  And if I ask you about something and you would
4  like to look at anything, this is not a memory
5  contest.
6  A:  Right.
7  Q:  If you will ask me for whatever document it
8  might be, I'll be glad to look for it for you.
9  Okay?
10  A:  Okay.
11  Q:  And if you need a break, if you will simply
12  tell me, I'm glad to try to accommodate you.
13  A:  Okay.
14  Q:  Is that fair?
15  A:  Yes, sir.
16  Q:  Do you have any other questions for me before
17  we start?
18  A:  No, sir.
19  Q:  Okay. Mr. Dawn, tell me where you were raised.
20  A:  I was raised in Chattanooga, Tennessee.
21  Q:  And how did you get your way to South Carolina?
22  A:  Graduated, took a job with Allied Chemical as
23  a chemist.
24  Q:  And where did you go to college?
25  A:  University of Tennessee at Chattanooga and then

**Page 6**

1  the University of South Carolina.
2  Q:  And where did you get your pharmacy degree?
3  A:  University of South Carolina.
4  Q:  And what year was that?
5  A:  1990.
6  Q:  And where have you been employed as a
7  pharmacist since earning your degree in 1990?
8  A:  Employed by ... well, I guess at Congaree
9  Pharmacy and we did work for Poison Control
10  Center, but that was considered as an
11  instructor and not as a pharmacist. It was a
12  title.
13  Q:  And where did you work and who ... what is the
14  Poison Control Center?
15  A:  Poison Control Center with the University of
16  South Carolina, College of Pharmacy.
17  Q:  And what did you do there?
18  A:  I was a poison control expert.
19  Q:  Okay. And is that an area of expertise for
20  you, poison control?
21  A:  Well, yes, up to ... well, for that point, yes,
22  sir.
23  Q:  And what years were you an instructor?
24  A:  From 1991 through '99.
25  Q:  And you no longer do that?

**Page 7**

1  A:  That is correct.
2  Q:  Okay. And you are an employee of Congaree
3  Pharmacy; is that correct?
4  A:  That's correct.
5  Q:  And do you have any previous disciplinary
6  actions against you related to your work as a
7  pharmacist?
8  A:  No, sir.
9  Q:  Have you had any issues before the Board of
10  Pharmacy related to ...
11  A:  No, sir.
12  Q:  Have you had any previous criminal involvement,
13  any charges of any type?
14  A:  No, sir.
15  Q:  Have you been sued before?
16  A:  No, sir.
17  Q:  Now, as I understand it, you are actually the
18  pharmacist who filled the order for hydrogen
19  peroxide that was delivered to Dr. Shortt on
20  March 9, 2004; is that correct?
21  A:  Yes, sir.
22  Q:  Had you frequently or previously prepared
23  hydrogen peroxide for IV injection?
24  A:  We had prepared it before, yes, sir.
25  Q:  And when did you first prepare it?

**Page 8**

1  A:  I couldn't tell you.
2  Q:  How long ago, approximately?
3  A:  After coming to work full time at Congaree.
4  Q:  Sometime after 1990?
5  A:  1999.
6  Q:  1999. Oh, I'm sorry. You did not come to work
7  until 1999?
8  A:  That's correct.
9  Q:  Okay. And after 1999, sometime after 1999, you
10  first filled an order for hydrogen peroxide?
11  A:  Yes, sir.
12  Q:  And you understood it was going to be used to
13  be ingested by patients IV; is that correct?
14  A:  I understood it was to be used in Dr. Shortt's
15  office.
16  Q:  Yes, sir. But you understood it was going to
17  be injected into the bloodstream intravenously,
18  correct?
19  A:  Not straight, no. It was to be diluted.
20  Q:  Yes, sir. But once diluted, this what you were
21  preparing was going to go intravenously ...
22  A:  Yes, sir.
23  Q:  ... into the bloodstream?
24  A:  Yes, sir.
25  Q:  And how many occasions had you filled a

2 (Pages 5 to 8)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

Page 9

1    prescription for hydrogen peroxide for
2    intravenous use?
3  MR. ELLIOTT: Object to the form.
4  Q:   Go ahead and answer.
5  A:   I couldn't tell you.  I don't know.
6  Q:   I mean hundreds?
7  A:   No.  A few times.
8  Q:   A few times.  Three, perhaps?
9  A:   Maybe.
10 A:   Maybe a few more either way, I mean ...
11 A:   Either way, yeah.  Considering I've been there
12       five years, I guess.
13 Q:   So you are saying maybe three to five times,
14       would that be fair?
15 A:   Possibly, yes, sir.  I can't tell you.  I don't
16       recall.  It wasn't very many.
17 Q:   Okay.  And did anybody ... did you fill the
18       prescription for anybody other than Dr. Shortt?
19 MR. ELLIOTT: Object to the form.
20 Q:   Go ahead and answer.
21 A:   No, sir, not that I recall.
22 Q:   Are you aware of any other pharmacist filling
23       a prescription or compounding in any way
24       hydrogen peroxide for intravenous use, other
25       than what you personally did at Congaree

Page 10

1        Pharmacy?
2  A:   I know of one.
3  Q:   Who is that?
4  A:   Marty Jones.
5  Q:   Okay.  And you know of that by statements he
6        has made subsequent to this; is that correct?
7  A:   Well, I ...
8  Q:   Subsequent to this event, correct?  Subsequent
9        to filling ... subsequent to March 9 ...
10 A:   No.
11 Q:   ... 2004?  Go ahead.
12 A:   You mean after this?
13 Q:   Yes.
14 A:   No.  I think I knew it before that.
15 Q:   Tell me how you knew it beforehand.
16 A:   Knowing from just meeting him in meetings.
17 Q:   And tell me what you knew about him filling
18       hydrogen peroxide.
19 A:   Other than he did it, that's all.
20 Q:   How did you happen to discuss it with him?
21 A:   I can't recall.
22 Q:   When did you learn this?
23 A:   I can't tell you that either.  I don't know.
24 Q:   Did he personally tell you he was filling
25       prescriptions for hydrogen peroxide?

Page 11

1  A:   I believe so, but I don't ... I don't recall.
2        I know he ... I know I read it in his
3        statement, but I don't remember if he told ...
4        we discussed it.  I can't recall, sir.
5  Q:   Well, let me be clear.  I've read a statement
6        that he's filed since this lawsuit has been
7        filed.
8  A:   Yes, sir.
9  Q:   That said that he at some point in the past
10       filled ... compounded hydrogen peroxide.  You
11       read that statement, correct?
12 A:   Yes, sir.
13 Q:   Prior to reading that statement, were you aware
14       that he had done that?
15 A:   I'm not sure.
16 Q:   Sitting here today, you do not have a specific
17       recollection of knowing this before you read
18       the statement; is that correct?
19 A:   I know that he's done compounding and it
20       probably ... I probably did not hear it from
21       him.  I suspect I heard it from Buster.
22 Q:   Okay.  But whether in fact before March 9,
23       2004, you knew Marty Jones had done this,
24       you're not sure of that, are you?
25 A:   That's correct, sir.

Page 12

1  Q:   You may or may not have known that, correct?
2  A:   That's correct, sir.
3  Q:   You may have learned about it after you ...
4        March 9, 2004, correct?
5  A:   That's correct, sir.
6  Q:   Okay.  Now, tell me what research you did
7        before you prepared this compounded medication.
8        What did you do to investigate its safety, its
9        efficacy, et cetera?
10 A:   I talked with Buster.
11 Q:   And tell me about your conversation with
12       Buster.
13 A:   I asked him how it was used, why it was used.
14 Q:   And what did he tell you?
15 A:   He told me how Dr. Shortt used it and what it
16       was ... the theory behind how it works.
17 Q:   Had you ever heard of that before?
18 A:   No, sir.
19 Q:   And so you were asking Buster because you
20       didn't know anything about hydrogen peroxide?
21 A:   Yes, sir.  Being fairly new to pharmacy
22       compared to Buster.
23 Q:   Yes.  So you asked him, what do you know about
24       this because I don't know anything about
25       hydrogen peroxide?

3  (Pages 9 to 12)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 13

1  MR. ELLIOTT: Object to the form.
2  Q:  Is that fair?
3  MR. ELLIOTT: Object to the form.
4  Q:  Go ahead and answer.
5  A:  I just asked him what it was ... what it's used
6      for.
7  Q:  Right. Because you didn't know, did you?
8  A:  That's correct.
9  Q:  Now, a professional pharmacist often relies on
10     professional materials and sources of
11     information as a pharmacist to reach certain
12     professional judgments and conclusions; is that
13     fair?
14 A:  Yes, sir.
15 Q:  And one of the things you do is look at the
16     label, correct?
17 A:  Right.
18 Q:  Okay. Is that something a pharmacist is
19     supposed to do, is look at the label? If he's
20     going to compound something, to look at the
21     label of the materials he's going to use, to
22     look at any risks or dangers associated with
23     that? Is that fair?
24 A:  Yes, sir.
25 Q:  Okay. Did you ... now, when you compounded the

Page 14

1      hydrogen peroxide, tell me the ... where the
2      hydrogen peroxide you were utilizing came from.
3      What was ... who manufactured it?
4  A:  Spectrum Chemical.
5  Q:  Okay. And what was the strength that you were
6      ...
7  A:  Thirty-five percent.
8  Q:  And you were making ... you were mixing and
9      diluting that solution, were you not?
10 A:  Yes, sir.
11 Q:  And you were also sterilizing it or filtering
12     it, were you not?
13 A:  Yes, sir.
14 Q:  Okay. Now, that product you produced, that
15     sterilized, diluted hydrogen peroxide for
16     intravenous use, was that then commercially
17     available, to your knowledge?
18 A:  Well, not to my knowledge.
19 Q:  You never heard about it being ... you couldn't
20     go somewhere and buy that, to your knowledge?
21 A:  Not that I was aware of.
22 Q:  Okay. And to your knowledge, it was not FDA
23     approved, was it?
24 A:  Not to my knowledge.
25 Q:  Okay. Did you ... so you had this material.

Page 15

1      You were asked to fill this order from Dr.
2      Shortt. Was it from Dr. Shortt?
3  A:  Yes, sir.
4  Q:  Was it in writing or was it oral?
5  A:  I would suspect it was oral, but I can't tell
6      you.
7  Q:  How common is it for you all, in your five
8      years at Congaree, to compound anything in
9      which there is not a written order?
10 A:  Well, it's not uncommon. I get telephone
11     orders all the time.
12 Q:  But do you then subsequently get it in writing?
13 A:  Not necessarily.
14 Q:  What kind of oral orders do you get for
15     something that you don't get it confirmed in
16     writing?
17 A:  I get them from ... Lexington Urology calls for
18     orders.
19 Q:  And you don't get a written ... you don't ...
20 A:  I may write it down eventually.
21 Q:  But you don't get something written from a
22     physician?
23 MR. ELLIOTT: Object to the form.
24 Q:  Go ahead.
25 A:  Not necessarily.

Page 16

1  Q:  Okay. Are you aware of the provisions of the
2      State Pharmacy Act that requires every
3      prescription to be written?
4  A:  Didn't have a prescription.
5  Q:  Okay. First of all, from the Lexington
6      Urology, are those prescriptions?
7  A:  Not necessarily, if they ask for materials for
8      their office.
9  Q:  Okay. How about for prescriptions for
10     Lexington Urology, do you fill prescriptions
11     for Lexington ...
12 A:  If I have a prescription, I will write it down.
13 Q:  I'm sorry?
14 A:  If it is a prescription for a patient ...
15 Q:  Right.
16 A:  ... I will write it down.
17 Q:  But you are telling me that you may have
18     prescriptions for patients from Lexington
19     Urology ordered and you do not get something
20     written from the physician?
21 A:  No, sir, I'm not telling you that. I'm telling
22     you I may have an order for an office use that
23     is not a prescription.
24 Q:  Well, we'll get to that in a minute. But my
25     question to you is do you have prescription

4  (Pages 13 to 16)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

## Page 17

1    orders for individuals patients from Lexington
2    Urology or anybody else in which there is not
3    a written prescription written by the
4    practitioner?
5  A:  No, sir.
6  Q:  Okay.  You would acknowledge to me that if it's
7    a prescription, it needs to be in writing,
8    doesn't it?
9  A:  Yes, sir.
10 Q:  Okay.  Now, you have told me already that no
11   one, to your knowledge, no other physician, to
12   your knowledge, no other practitioner, has
13   ordered hydrogen peroxide for intravenous use
14   in which you have been involved; is that fair?
15 A:  That's fair.
16 Q:  Now, and you recognize that the use of hydrogen
17   peroxide is not the routine and customary way
18   in which say a condition like multiple
19   sclerosis is treated in the medical community;
20   is that fair?
21 MR. ELLIOTT: Object to the form.
22 A:  I can't answer that.
23 Q:  Well, to your knowledge ...
24 A:  I don't know.
25 Q:  Okay.  Well, you certainly have some

## Page 18

1    information about ... certainly, you fill
2    prescription for patients who have multiple
3    sclerosis, do you not?
4  A:  I can't answer that.  I don't know if I had any
5    patients with multiple sclerosis.
6  Q:  You have never ... well, if you are filling
7    prescriptions for patients, you are supposed to
8    know enough of their medical history to make a
9    judgment about the appropriateness of
10   medications, correct?
11 A:  That would be correct.
12 Q:  And you are telling me your years ...
13 A:  I don't ... I've only been a pharmacist,
14   dispensing pharmacist, a few years, so I don't
15   ...
16 Q:  Five years?
17 A:  Yeah.
18 Q:  And you are telling me you have never had a
19   patient who had multiple sclerosis?
20 A:  Not that I'm aware of.
21 Q:  Okay.  Are you aware as a trained pharmacist
22   there are medications that are appropriate for
23   the use of multiple sclerosis?
24 A:  I'm sure there are.
25 Q:  Do you know any of them?

## Page 19

1  A:  Not offhand.
2  Q:  Okay.  And if you had an order, you would look
3    that up, would you not?
4  A:  Yes, sir.
5  MR. ELLIOTT: Object to the form.
6  Q:  For instance, if somebody came in and wanted
7    Copaxone or Tegretol for multiple sclerosis,
8    you would likely go to professional sources and
9    look up to determine dosage, proper dosage and
10   appropriate use, would you not?
11 A:  Possibly.
12 Q:  Yeah.  If you didn't know about it?
13 A:  If I didn't know about it.
14 Q:  Yes, sir.  Now, you didn't know about hydrogen
15   peroxide.  Tell me the sources you went to to
16   learn about it, other than talking to your
17   colleague.
18 A:  That's all.
19 Q:  Okay.  Did you look at the label for the
20   Spectrum.
21 A:  Yes, sir.
22 Q:  Okay.  What did the label say?
23 A:  It said Hydrogen Peroxide, 35 percent.
24 Q:  Anything else?
25 A:  It has warnings, et cetera on it, corrosive, et

## Page 20

1    cetera.
2  Q:  Okay.  And so it says corrosive?
3  A:  Yes, sir.
4  Q:  What does corrosive mean?
5  A:  It means it can burn the skin.
6  Q:  I believe that means it is toxic to living
7    tissue, isn't that what it means?
8  A:  Could be, yes, sir.
9  Q:  I mean isn't that what corrosive means?
10 A:  Yes, sir.
11 Q:  So you knew it was toxic to living tissue?
12 A:  Yeah, 35 percent.  Yes, sir.
13 Q:  Yes, sir.  Did you check to see if any other
14   level it was toxic to living material?
15 A:  Other levels?
16 Q:  Yes, sir.
17 A:  Experience from the Poison Center says 3
18   percent is not a problem.
19 Q:  Okay.  Well, so you are telling me at 3
20   percent, it's not toxic?
21 A:  No.
22 Q:  That's your experience?
23 A:  That's the way it was treated at the Poison
24   Control Center, yes, sir.
25 Q:  Well, have you ever looked at the ... do you

1116 Blanding St., Suite 1B / Columbia, SC 29201
(803) 252-3445 / (800) 822-0896

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

**Page 21**

```
 1        know what the Material Safety Data Sheet is?
 2   A:   Yes, sir, I do.
 3   Q:   Is that an important piece of information?
 4   A:   Yes, sir.
 5   Q:   Is it generally accurate?
 6   A:   Sometimes.
 7   Q:   Okay. And is it government approved?
 8   A:   The government mandates them.
 9   Q:   Yes. And have you ever looked at the Material
10        Safety Data Sheet for hydrogen peroxide, 35
11        percent?
12   A:   Yes, sir.
13   Q:   And did you look at it before you filled it in
14        this case?
15   A:   I have, yes, sir.
16   Q:   Let's be clear. Before you filled ...
17        compounded this medication, did you go to the
18        Material Safety Data Sheet?
19   A:   I had seen one previously in my other job.
20   Q:   Okay. You had seen ... and did it have any
21        warnings for the injection of hydrogen
22        peroxide?
23   A:   Thirty-five percent says it's corrosive.
24   Q:   Okay. Anything other than it being corrosive,
25        any other either on the label or the Material
```

**Page 22**

```
 1        Safety Data Sheet?
 2   A:   Not that I'm aware of.
 3   Q:   Okay. And so when you went to fill this, you
 4        knew that the 35 percent warned about it being
 5        corrosive, but your impression was it was okay
 6        to ingest it at 3 percent?
 7   MR. ELLIOTT: Object to the form.
 8   Q:   Go ahead and answer.
 9   A:   Well, not straight 3 percent, no, sir. You are
10        saying ingest or inject?
11   Q:   In either way, ingest by intravenously or by
12        swallowing.
13   A:   Ingestion is not a problem, other than it makes
14        you throw up.
15   Q:   Okay. Now, you can ingest something by ...
16        into the veins as well, can you not?
17   A:   Well, I don't consider its ingesting, but ...
18   Q:   What is that?
19   A:   That's an injection.
20   Q:   Okay. Now, did you look at the Material Safety
21        Data Sheet for 3 percent hydrogen peroxide to
22        see whether there were risks associated with
23        it?
24   A:   No, sir.
25   Q:   Have you ever looked at that?
```

**Page 23**

```
 1   A:   I don't think I've ever seen one.
 2   Q:   Okay. Did you make any inquiry about whether
 3        one would be available to you?
 4   A:   No, sir.
 5   Q:   Would it surprise you that it says, do not
 6        ingest?
 7   MR. ELLIOTT: Object to the form.
 8   A:   It wouldn't surprise me.
 9   Q:   Would it surprise you to say that 3 percent
10        indicates that it is toxic to blood?
11   MR. ELLIOTT: Object to the form.
12   A:   I don't know. I haven't seen that.
13   Q:   Okay. Were you aware that Spectrum Chemical
14        also made a 3 percent hydrogen peroxide?
15   A:   No, sir.
16   Q:   That's news to you?
17   A:   I don't know if they make it or not. It
18        wouldn't surprise me if they do.
19   Q:   But you didn't check?
20   A:   No, sir.
21   (PLAINTIFF'S EXHIBIT NUMBER 1 WAS MARKED FOR
22   IDENTIFICATION PURPOSES.)
23   Q:   I hand you Exhibit Number 1. Does this appear
24        to be a hydrogen peroxide for 3 percent from
25        Spectrum Chemical?
```

**Page 24**

```
 1   A:   That's what it says.
 2   Q:   Yes, sir. But you are looking at this for the
 3        first time; is that correct?
 4   A:   Yes, sir.
 5   Q:   Okay. If you would go to the second page of
 6        this document, Exhibit 1, and it's in section
 7        3 called, Hazards Identification. Do you see
 8        that on the first page, Hazards Identification,
 9        and then it says, Continued on Next Page? Go
10        to the first page. I'm sorry. Turn over. You
11        see it says, Hazards Identification?
12   A:   Yes, sir.
13   Q:   Now, go to the second page, the last line
14        there, the substance may be toxic to what?
15   A:   It says may be toxic to blood.
16   Q:   You didn't know that until you just saw that
17        here sitting today; is that fair?
18   A:   That's correct.
19   Q:   Okay. And then if you will go to page 3, under
20        Precautions. It says, Keep locked up. Do not
21        ingest. Do you see that? Number 7.
22   A:   Okay.
23   Q:   Keep locked up. Do not ingest. Do you see
24        that?
25   A:   Uh-huh. Yes, sir.
```

6 (Pages 21 to 24)

CREEL COURT REPORTING, INC.

**Page 25**

1  Q:  And then it says in the next line, if ingested,
2     seek medical advice immediately.  Do you see
3     that?
4  A:  Yes, sir.
5  Q:  Okay.  Were you aware that was on the 3
6     percent?
7  A:  Since I've seen it, no.
8  Q:  I'm sorry.
9  A:  I am aware of it now.
10 Q:  But you were not aware until you just saw that;
11    is that correct?
12 A:  My under ... yes, sir, you are correct.
13 Q:  Okay.  And then if you will go to page 5.
14    Under Toxicological Information.  Do you see
15    that?
16 A:  Yes, sir.
17 Q:  The last lines there under, Chronic Effects on
18    Humans, contains material which may cause
19    damage to the following organs: blood.  Do you
20    see that?
21 A:  I'm sorry, where are you at?
22 Q:  Number 11, under Chronic Effects on Humans.
23 A:  Okay.
24 Q:  Contains material which may cause damage to the
25    following organs: blood.

**Page 26**

1  A:  Uh-huh.
2  Q:  Do you see that?
3  A:  Uh-huh.
4  Q:  You need to say yes or no, sir.
5  A:  Yes, sir.
6  Q:  Okay.  I take it that you were not aware of
7     this either at the time you compounded the
8     medication and provided it to Dr. Shortt; is
9     that fair?
10 A:  I'm not aware of this sheet, no, sir.
11 Q:  And you weren't aware that the 3 percent was
12    toxic to blood and was not to be ingested, were
13    you?
14 A:  But my understanding is 3 percent was not
15    ingested.
16 Q:  We'll get to that in a minute.  I'm asking you
17    what you prepared.
18 A:  Okay.
19 Q   You were not aware that the 3 percent was toxic
20    and was not to be ingested, were you?
21 A:  That's correct.
22 Q:  And you were not aware it could damage blood
23    and other organs, were you?
24 A:  That is correct.
25 Q:  And you did not research whether at any level

**Page 27**

1     it was not toxic, did you?
2  A:  That's correct.
3  Q:  Okay.  Were you aware there was literature,
4     medical literature in numerous journals
5     indicating there had been blood disorders, and
6     air emboli, and death associated with the IV
7     administration of hydrogen peroxide?  Were you
8     aware of that?
9  A:  No, sir.
10 Q:  You did not research to find that out, did you?
11 A:  No, sir.
12 Q:  That's news ... that was news to you?
13 A:  Yes, sir.
14 MR. ELLIOTT: Objection.
15 Q:  I take it you have since learned of that, have
16    you not?
17 A:  I still don't think it's toxic.
18 Q:  Okay.
19 A:  I haven't learned that, no, sir.
20 Q:  Okay.  What you are telling me, notwithstanding
21    what you have ... what might be in the medical
22    literature, you have not read the medical
23    literature, have you?
24 A:  That is correct, sir.
25 Q:  And you have not ... and you had not read the

**Page 28**

1     Material Safety Data Sheet for 3 percent, had
2     you?
3  A:  That's correct.
4  Q:  And you didn't remember in the 35 percent it
5     had these warnings, did you?
6  A:  I glanced over them, but no, I didn't.
7  Q:  Okay.  And you knew that it wasn't FDA
8     approved, but you did not call the FDA to
9     inquire whether it was appropriate to use
10    intravenously, did you?
11 A:  No, sir.
12 Q:  And you did not call Spectrum to ask them
13    whether this product was appropriate to use
14    intravenously, did you?
15 A:  No, sir.
16 Q:  Now, are you familiar with a ... with product
17    by the name of ... a book source called
18    Martindale?  Is that  a pharmacy text you are
19    familiar with?
20 A:  Yes, sir.
21 Q:  I'm sorry?
22 A:  Yes, sir.
23 Q:  Tell me what that is.
24 A:  It's a pharmacy reference.
25 Q:  Is it ... did you use it in your education?

1116 Blanding St., Suite 1B / Columbia, SC 29201
(803) 252-3445 / (800) 822-0896

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 29

1  A:  Very little.
2  Q:  It's available in the libraries and so forth?
3  A:  Yes, sir.
4  Q:  It's a resource material available to
5      pharmacists?
6  A:  Yes, sir.
7  Q:  Do you find it to be reliable?
8  A:  Yes, sir.
9  Q:  Okay.  Is it among those sources of material
10     that you would consider authoritative?
11 A:  Yes, sir.
12 Q:  And even though it's a reliable and
13     authoritative source, did you look at
14     Martindale before you compounded the hydrogen
15     peroxide?
16 A:  No, sir.
17 (PLAINTIFF'S EXHIBIT NUMBER 2 WAS MARKED FOR
18 IDENTIFICATION PURPOSES.)
19 Q:  I'm going to hand you Exhibit Number 2.  And if
20     you will go to the second page there on
21     Hydrogen Peroxide of that exhibit..  Do you
22     see under ... in the center column, Adverse
23     Effects and Precautions?  Do you see where I am
24     there?
25 A:  Yes, sir.

Page 30

1  Q:  And that's for hydrogen peroxide, is it not?
2  A:  Yes, sir.
3  Q:  And it indicates under closed body cavities ...
4      do you see where I am, under Adverse Effects,
5      Closed body cavities?
6  A:  Yes, sir.
7  MR. ELLIOTT: Have you got an extra copy of that?
8  MR. GERGEL: Oh, I'm sorry.  Yes, I do.  Thank you,
9      Mr. Elliott.  I'm sorry.
10 MR. ELLIOTT: Where are you all?  I'm sorry.
11 MR. GERGEL: Center column.
12 MR. ELLIOTT: Third page?
13 MR. GERGEL: It's actually the second page ... third
14     page, I'm sorry.  It is the third page.
15 MR. ELLIOTT: The third page of your exhibit.
16 MR. GERGEL: Yeah.  The third page of the exhibit.
17 MR. ELLIOTT: Thanks.
18 Q:  Under closed body cavities it says, liberation
19     of oxygen during the use of hydrogen peroxide
20     in surgical procedures has resulted in oxygen
21     embolism and local emphysema.  Do you see that?
22 A:  Yes, sir.
23 Q:  Gas embolism has also been reported after
24     accidental ingestion of hydrogen peroxide
25     solution.  Were you aware prior to compounding

Page 31

1      this product in March of 2004, that there was
2      a problem with emboli secondary to the use of
3      hydrogen peroxide?
4  A:  No, sir.
5  Q:  And then if you will look under Intravascular
6      administration.  That's what you prepared this
7      for, is that not correct?  You prepared the
8      hydrogen peroxide for intravascular
9      administration, did you not?
10 A:  That was my understanding, sir.
11 Q:  And then it says there, intravenous
12     administration of hydrogen peroxide solutions
13     is unconventional therapy for AIDS or cancer
14     has resulted in severe acute haemolysis.  Do
15     you see that?
16 A:  Yes, sir.
17 Q:  Were you aware of that at the time you
18     compounded this product?
19 A:  No, sir.  It doesn't give a strength.
20 Q:  Yes, sir.  Does it say at any strength that
21     it's safe?
22 A:  It doesn't give a strength period.
23 Q:  Yes, sir.  But does it identify that at any
24     strength it cannot produce haemolysis?
25 MR. ELLIOTT: Object to the form.

Page 32

1  Q:  Go ahead and answer.
2  A:  No, sir, it doesn't say that.
3  Q:  Okay.  And have you since March 9, 2004,
4      attempted to research this at all?
5  A:  No, sir.
6  Q:  You haven't looked ... done any research
7      whatsoever?
8  A:  No, sir.
9  Q:  Would you today, if somebody asked you to
10     compound hydrogen peroxide for intravenous use,
11     would you prepare it?
12 A:  No, sir.
13 Q:  Why is that?
14 A:  It's not worth it.
15 Q:  What do you mean it's not worth it?
16 A:  It's not worth the time and effort for what
17     money we were paid for it.
18 Q:  Well, is there any risk associated with it?
19 A:  I don't know.
20 Q:  Well, obviously, we've put some materials in
21     front of you.  We've talked about ...
22 A:  If it was given at 3 percent, there may be, but
23     not the way I understand it was used.
24 Q:  Well, have you gone to any independent source
25     to determine if it's safe at any strength?

8  (Pages 29 to 32)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

**Page 33**

1  A:  I have not, no, sir.
2  Q:  Have you gone to the FDA to determine whether
3      the FDA approves it at any strength?
4  A:  No, sir.
5  Q:  Have you gone to Spectrum to see if they
6      recommend it at any ...
7  A:  No, sir.
8  Q:  ... strength?
9  A:  No, sir.
10 Q:  And whether it produces severe acute
11     haemolysis, you're not really in a position to
12     argue with that, are you?
13 A:  You are correct, sir.
14 Q:  And you don't know if it produces severe acute
15     haemolysis at any strength?  You don't even
16     know that, do you?
17 A:  That's correct.
18 Q:  Could be at a very diluted strength it could
19     still produce that?  You recognize that, don't
20     you?
21 A:  I don't believe it does that, but it could.
22 Q:  Yes, sir.  And you are aware there was an
23     autopsy done in this case in which the patient
24     was determined to have DIC?  You are aware of
25     that?

**Page 34**

1  A:  Yes, sir.
2  MR. ELLIOTT: Object to the form.
3  Q:  Okay.  And are you ... you are not trained as
4      a pathologist, are you?
5  A:  No, sir.
6  Q:  And I take it you do not ... you are not in a
7      position to question the conclusions of the
8      forensic pathologist who did Ms. Bibeau's
9      deposition, as to the cause of her death, are
10     you?
11 A:  I can't say yeah or nay.
12 Q:  So it's just outside your expertise, isn't it?
13 A:  But you are aware that the pathologist has
14     asserted that the hydrogen peroxide caused her
15     death?  You are aware of that, are you not?
16 A:  Yes, sir.
17 Q:  And you are not in a position to argue with
18     that, are you?
19 A:  I can't ...
20 MR. ELLIOTT: Object to the form.
21 A:  I can't go one way or the other.
22 Q:  Yes, sir.  And it's certainly consistent with
23     the Martindale entry here, is it not?  That
24     conclusion is consistent with the complications
25     that can occur from intravenous hydrogen

**Page 35**

1      peroxide, isn't that true?
2  A:  I can't draw that conclusion.
3  Q:  Well, we talked here about ... what is
4      haemolysis?
5  A:  It's breakdown of the blood cells.
6  Q:  Yes, sir.  And that's what happened to Ms.
7      Bibeau, wasn't it?
8  A:  Yes, sir.
9  Q:  You recognize that she may well have had the
10     very complication warned of in Martindale,
11     correct?
12 A:  I recognize that several things can cause
13     haemolysis.
14 Q:  Well, my question is you recognize the hydrogen
15     peroxide may have caused it, don't you?
16 A:  That's a possibility.
17 Q:  Yes, sir.  And the truth is you didn't do any
18     research beforehand, such as looking at the
19     Martindale source, or looking at the package
20     insert, or calling the manufacturer, or calling
21     the FDA; isn't that correct?
22 A:  That's correct.
23 Q:  You didn't do anything but ask Buster, correct?
24 A:  That's correct.
25 Q:  Were you aware that Buster had not done any

**Page 36**

1      independent research?
2  A:  I assumed he had.
3  Q:  You were counting on him having done it?
4  A:  He said he had done some reading, et cetera.
5  Q:  But you don't know what he had read, do you?
6  A:  No, sir.
7  Q:  Okay.  And you don't know if he had gone to any
8      professional sources to look at independent
9      information on the use of intravenous hydrogen
10     peroxide?
11 A:  I don't know.
12 Q:  And you didn't ask him at the time, did you?
13 A:  No, sir, not at the time.
14 Q:  Let's go and just attach to your deposition the
15     35 percent Hydrogen Peroxide Material Safety
16     Data Sheet.
17 MR. ELLIOTT:  This will be Exhibit 3?
18 MR. GERGEL:  Yes.
19 (PLAINTIFF'S EXHIBIT NUMBER 3 WAS MARKED FOR
20 IDENTIFICATION PURPOSES.)
21 Q:  And I hand you that.  And if you would go to
22     the second page of Exhibit 3.  And that is, by
23     the way, the hydrogen peroxide, 35 percent; is
24     it not?
25 A:  That is correct.

9  (Pages 33 to 36)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

**Page 37**

1  Q:   That is the Material Safety Data Sheet of the
2       product you utilized as one of your compounding
3       materials, correct?
4  A:   Yes, sir.
5  Q:   And you don't recall at the time actually
6       looking at it before you compounded this
7       product, do you?
8  A:   I have looked over it.
9  Q:   But did you look at it at the time you were
10      compounding it?
11 A:   At the very time when we were compounding it?
12 Q:   Yes, sir.
13 A:   I can't answer that.  I don't know.
14 Q:   You don't remember doing it, do you?
15 A:   I look at these as they come to me.
16 Q:   Yes, sir.  But my question to you is had you in
17      the five years you had been at Congaree looked
18      at the Material Safety Data Sheet for the
19      Spectrum 35 percent?
20 A:   Yes, sir.
21 Q:   Okay.  And so this was available to you and
22      known to you, correct?
23 A:   Yes, sir.
24 Q:   Okay.  And what you had not done is to see at
25      the strength that you had diluted it to, you

---

**Page 38**

1       weren't aware there was also a Material Safety
2       Data Sheet for that, did you?
3  A:   That's correct.
4  Q:   Okay.  At your 35 percent, let's go to page 2.
5       And you can see under ... again, under the
6       Hazards Identification, potential chronic heal
7       effects, it says, the substance may be toxic to
8       blood, correct?
9  A:   Yes, sir.
10 Q:   Just like the 3 percent, correct?
11 A:   Yes, sir.
12 Q:   And what you don't know is even you dilute it
13      more and more, whether it doesn't still have
14      that same effect?  You don't really know that,
15      do you?
16 A:   I don't know that.
17 Q:   You didn't do any research at the time, did
18      you?
19 A:   My experience with Material Safety Data Sheets,
20      they tend to keep the same language no matter
21      what they ...
22 Q:   Well, if you had doubt about it, you certainly
23      had the right to go do further research, didn't
24      you?
25 A:   That's ... yes, sir.

---

**Page 39**

1  Q:   You can't assume it's wrong, can you?
2  A:   No, sir.
3  Q:   And you assumed it was wrong, didn't you?
4  A:   No, sir.
5  Q:   Well, you knew at 35 ... did you know at 35
6       percent it indicated it was toxic to blood?
7  A:   It says here.
8  Q:   Yes, sir.  But did you know it at the time?
9       When you compounded this medication ...
10 A:   I would expect it to be at 35 percent, yes,
11      sir.
12 Q:   And from your ... had you done any research to
13      determine when it quit being toxic to blood?
14 A:   No, sir.
15 Q:   And to your knowledge ... you had no knowledge
16      it wasn't toxic at any level, did you?
17 A:   At my knowledge from the Poison Center is 3
18      percent was not toxic.
19 Q:   But that's not consistent with the Material
20      Safety Data Sheet?
21 A:   Well, that may be.
22 Q:   Okay.  And you don't ... and was the Poison
23      Center involved in the intravenous use of it?
24 A:   No, sir.
25 Q:   Okay.  And directly into the blood stream can

---

**Page 40**

1       be ... can have more toxic effect on blood than
2       swallowing something, can't it?
3  A:   Yes, sir.
4  Q:   Okay.  Did you ever determine intravenously
5       when it quit being toxic, if ever?
6  A:   No, sir.
7  Q:   Did you ever determine when it might not
8       produce air emboli, at what level?
9  A:   No, sir.
10 Q:   You did no independent research of that, did
11      you?
12 A:   No, sir.
13 Q:   And the risk of air emboli and the risk of
14      haemolysis were well-documented in the medical
15      literature and in the pharmacy literature at
16      the time you compounded this medication, wasn't
17      it?
18 MR. ELLIOTT: Object to the form.
19 A:   I can't answer that.
20 Q:   But we already looked at Martindale.  It was in
21      the pharmacy literature, was it not?
22 A:   It didn't give a strength.
23 Q:   I understand.  But the warning as to its risks
24      without addressing strength was in the pharmacy
25      literature, wasn't it?

---

10  (Pages 37 to 40)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

Page 41

1  A:   You are correct.
2  Q:   And it was also in the medical literature,
3       wasn't it?
4  MR. ELLIOTT: Object to the form.
5  A:   I don't know.
6  Q:   Because you never looked, correct?
7  A:   No, sir.
8  Q:   Notwithstanding the fact that it was available
9       to you, you didn't look at it, did you?
10 A:   That's correct.
11 Q:   And you were guessing that at some lesser
12      strength it wouldn't be toxic to blood, weren't
13      you?
14 A:   I was using professional judgment, sir.
15 Q:   And what was that professional judgment based
16      on?
17 A:   Poison Control Center.
18 Q:   But that was swallowing. How about IVing?
19 A:   Any route at the time it did not appear to be.
20      My data there was through Micromedics.
21 Q:   Now, what's Micromedics?
22 A:   It's a computer database for Poison Control
23      Center use.
24 Q:   And they recommend the use of hydrogen peroxide
25      intravenously?

---

Page 42

1  MR. ELLIOTT: Objection.
2  A:   I didn't say that.
3  Q:   What do they say?
4  A:   They just tell the toxicities of it.  My
5       readings and my recollection is that 3 ...
6       hydrogen peroxide ... hydrogen peroxide is not
7       considered toxic.
8  Q:   It's not considered toxic?
9  A:   From our use there, sir.
10 Q:   And but did that include intravenous use?
11 A:   No, sir.
12 Q:   Did you make any determination of whether it
13      was safe at any ...
14 A:   No, sir.
15 Q:   ... strength? Let me finish the question.  Did
16      you make a determination at any strength
17      whether it was safe intravenously?
18 A:   No, sir.
19 Q:   You knew the FDA had not approved it for
20      intravenous use though, didn't you?
21 A:   I didn't know that.
22 Q:   You didn't ... but you had no indication it was
23      approved?
24 A:   I didn't check.  No, sir.
25 Q:   And the Material Safety Data Sheet certainly

---

Page 43

1       didn't provide for it to be used intravenously,
2       did it?  It wasn't an indicated use, was it?
3  A:   No, sir.
4  Q:   And you didn't think it was FDA approved, did
5       you?  You weren't operating on that assumption,
6       were you?
7  A:   No, sir.
8  Q:   You knew it wasn't FDA approved, didn't you?
9  A:   I don't know.  I don't know if it's
10      commercially available.
11 Q:   Well, you told me earlier, to your knowledge,
12      it was not commercially available, correct?
13 A:   That's to my knowledge, yes, sir.
14 Q:   Okay.  And to your knowledge, it was not FDA
15      approved, correct?
16 A:   To my knowledge.
17 Q:   Yes, sir.  And even though it wasn't
18      commercially available and not FDA approved for
19      intravenous use, you made no inquiry to the FDA
20      about the safety of this, did you?
21 A:   I did not.
22 Q:   And is the FDA a source for information for you
23      as a pharmacist?
24 A:   Not necessarily.
25 Q:   Can be, can it not?

---

Page 44

1  A:   Possibly, yes, sir.
2  Q:   They have a website, do they not?
3  A:   Yes, sir.
4  Q:   Okay.  And do they ... and there are phone
5       numbers you can call, correct?
6  A:   I expect there are.
7  Q:   And Spectrum has phone numbers on its Material
8       Safety Data Sheet to call, does it not?
9  A:   Yes, sir.
10 Q:   Okay.  So you had sources of potential
11      information for you, did you not?
12 A:   Yes, sir.
13 Q:   You could have gone to Martindale and done the
14      research yourself, could you not have?
15 A:   I suspect I could.
16 Q:   Okay.  Now, did you talk to Dr. Shortt about
17      the safety and efficacy of hydrogen peroxide?
18 A:   No, sir.
19 Q:   You never had a discussion with him about it?
20 A:   No, sir.
21 Q:   And the order came in orally, not even in
22      writing?
23 A:   I can't answer that.
24 Q:   Well, you never saw a written order?
25 A:   Well, they write notes that we want this,

11  (Pages 41 to 44)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

**Page 45**

1      Katherine ... Kathleen would bring them over.
2  Q:  Well, I've asked for in discovery from Congaree
3      any written orders for hydrogen peroxide and
4      I've been told that it was all oral and that
5      was also the testimony of Mr. Phillips.  Do you
6      have any information contrary to that?
7  A:  I'm telling you I don't know.  She's
8      occasionally written us notes of something she
9      needed for the office, but it would be disposed
10     of.
11 Q:  But she isn't a physician, correct?
12 A:  She is an agent of Dr. Shortt.
13 Q:  Right.  And is she authorized to write
14     prescriptions?
15 A:  Yes, sir.
16 Q:  Okay.  She's authorized to do that for him?
17 A:  Yes, sir.
18 Q:  Without his approval?
19 A:  Well, as his agent.
20 Q:  You think a nurse in an office can write a
21     prescription without ... and sign for it
22     without a physician's signature?
23 A:  I didn't say that.
24 Q:  Okay.
25 A:  I said if they act as the doctor's agent, they

**Page 46**

1      have the right to write a prescription.
2  Q:  And how do they do that?  If they are the
3      doctor's agent, who signs it?
4  A:  Well, the doctor would still sign it.
5  Q:  Okay.  And to your knowledge, did you ever see
6      ... sitting here today, do you ever recall if
7      there was ever an order from Dr. Shortt for a
8      ... for hydrogen peroxide that was in writing?
9  A:  No, sir, I don't recall.
10 Q:  Okay.  Let's keep on the 35 percent here if we
11     could just for a moment.  If you would go to
12     page 4.  Under 7, Handling and Storage, do not
13     ingest.  If ingested, seek medical advice
14     immediately.  That was on that 35 percent as
15     well, wasn't it?
16 A:  This is 35 percent.
17 Q:  Yes, sir.  That was on the 35 percent as we had
18     looked earlier at the 3 percent?
19 A:  Yes, sir.
20 Q:  And then if you will go to page 5.  Under
21     Toxicological Information, it indicates it may
22     cause damage to organs, including blood,
23     correct?
24 A:  Yes, sir.
25 Q:  now, did you at anytime ever see, from

**Page 47**

1      Spectrum, any materials that indicated that at
2      any level of dilution hydrogen peroxide was
3      safe for intravenous use?
4  A:  No, sir.
5  Q:  Have you seen any independent information from
6      the government or from the manufacturer,
7      indicating that hydrogen peroxide was
8      appropriate for intravenous use?
9  A:  No, sir.
10 Q:  Now, you indicated you were the pharmacist who
11     compounded the hydrogen peroxide on March 9,
12     2004, correct?
13 A:  My technician or myself.
14 Q:  Yes, sir.  If it was the technician, she was
15     doing it under your direction ...
16 A:  Yes.
17 Q:  ... and control, correct?
18 A:  Yes, sir.
19 Q:  And you understand that you have to exercise
20     your own professional judgment and discretion
21     and you can't rely on someone else's as a
22     pharmacist; isn't that correct?
23 A:  yes, sir.
24 Q:  You can't say just because Buster said it was
25     okay, it's okay.  You hold a license, don't

**Page 48**

1      you?
2  A:  Yes, sir.
3  Q:  And you have to perform the duties of a
4      pharmacist in terms of operating under the
5      State Pharmacy Act; isn't that correct?
6  A:  Yes, sir.
7  (PLAINTIFF'S EXHIBIT NUMBER 4 WAS MARKED FOR
8  IDENTIFICATION PURPOSES.)
9  Q:  Okay.  Now, let's look at Exhibit Number 4, if
10     we could, please, sir.  And explain to me what
11     I'm looking at here.
12 A:  It's a pharmacy label.
13 Q:  And this is prepared by you or your technician
14     under your supervision?
15 A:  Yes, sir.
16 Q:  And it indicates the name of the pharmacy, it's
17     address, and a DEA number to its right; is that
18     correct?
19 A:  Yes, sir.
20 Q:  And then it says ... there's a phone number and
21     then below the phone number it says, Original
22     Rx.
23 A:  Uh-huh.
24 Q:  What does Rx mean?
25 A:  Rx means prescription.

12  (Pages 45 to 48)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 49

1  Q:   Okay.  So it's telling us on the label prepared
2       by Congaree that the original prescription was
3       August 7, 2003; is that correct?
4  A:   The order, yes, sir.
5  Q:   Well, it doesn't say original order, it says
6       original prescription.
7  A:   We don't have a label that says order, but this
8       is just a common label used in the pharmacy.
9  Q:   Well, you don't have to use this form, you
10      could use ... you could use your own form,
11      could you not?
12 A:   This is convenient, so we can bill it.
13 Q    I'm ... you know, you understand that one of
14      your duties is for your label to be accurate;
15      isn't that one of your duties?
16 A:   The label is accurate.
17 Q    Okay.  Was there ever a prescription?
18 A:   No, sir.
19 Q:   You are sitting here today and telling me never
20      was there a prescription for hydrogen peroxide
21      intravenous ...
22 A:   No, sir.
23 Q:   ... from Dr. Shortt or anybody else, correct?
24 A:   That's correct.
25 Q:   And what you are telling me when it says

Page 50

1       original prescription, August 7, 2003, to your
2       knowledge, there never was a prescription,
3       correct?
4  A:   That's correct, no prescription.
5  Q:   And when it says previous, there was never a
6       previous prescription?
7  A:   Not a prescription.
8  Q:   okay.  Now, was hydrogen peroxide the type of
9       medication in which you would want, if you were
10      going to administer it intravenously, you would
11      want that under medical supervision?
12 A:   Yes, sir.
13 Q:   Why is that?
14 A:   It's a risk for everything.
15 Q:   Yes, sir.  And it would be the kind of product
16      that as a ... because of the risk of toxicity
17      ... is that one of the risks you would worry
18      about?
19 A:   Just anytime an IV is being done, it should be
20      done under supervision.
21 Q:   so anytime you are preparing any product for
22      intravenous use, your opinion is it needs to be
23      under medical supervision because of risk?
24 A:   Yes, sir.
25 Q:   Okay.  And are you aware that the federal

Page 51

1       statute controlling the dispensing of drugs
2       provides, requires, that any medication
3       requiring to be done under medical supervision
4       must be by a prescription?  Are you aware of
5       that?
6  A:   No, sir.
7  Q:   Is that news to you sitting here today?
8  A:   Yes, sir.
9  Q:   Okay.  So you weren't aware you were required
10      to have this as a prescription medicine under
11      federal law?
12 MR. ELLIOTT: Object to the form.
13 Q:   Go ahead and answer.
14 A:   I'm not aware of that.
15 Q:   That is something you have learned here,
16      sitting here today, correct?
17 MR. ELLIOTT: Object to the form.
18 Q:   Go ahead and answer.
19 A:   If what you say is true.
20 Q:   And if, in fact, the federal law requires it to
21      be a prescription drug, you broke the law by
22      providing it without a prescription; is that
23      fair?
24 MR. ELLIOTT: Object to the form.
25 A:   No, sir.

Page 52

1  Q:   Well, listen to my question.
2  A:   It's an order, it's not a prescription.
3  Q:   Right.  I'm saying to you.
4  A:   I don't know the law on the federal laws, so I
5       can't answer that.
6  Q:   But assume for a minute that the federal law
7       requires that because it's an IV medication
8       requiring medical supervision, requires to be
9       a prescription, if that is in fact the law ...
10      assume for purposes of this that that is
11      correct, then you broke the law because it
12      wasn't a prescription; is that fair?
13 MR. ELLIOTT: Object to the form.
14 A:   No, sir.  I didn't dispense this to any person.
15 Q:   Well, you delivered this product, this
16      compounded product, without a prescription,
17      correct?
18 A:   That's correct.
19 Q:   And you knew it was going to be used
20      intravenously, didn't you?
21 A:   That's one of the ways I understand I to be
22      used, yes.
23 Q:   And you knew it was a drug, didn't you?
24 A:   Yes, sir.
25 Q:   Okay.  And you knew that Dr. Shortt intended to

13  (Pages 49 to 52)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 53

1    use it intravenously for his patients?  You
2    knew that, didn't you?
3  A:  Yes, sir.
4  Q:  But you didn't have a prescription for it,
5    correct?
6  A:  That's correct.
7  Q:  Now, it goes onto say, it says, CPD-H202.  What
8    does CPD stand for?
9  A:  Compound.
10  Q:  Okay.  So it's a compounded medication?
11  A:  Yes, sir.
12  Q:  And it's not ... you explained to me this
13    compounded medication, H202, 3 percent, #180
14    INJ.  What does INJ mean?
15  A:  Injection.
16  Q:  And what does the 180 mean?
17  A:  Number of milliliters.
18  Q:  Okay.  That product as described, compounded
19    hydrogen peroxide, 3 percent, #180 injection,
20    that, to your knowledge, was not commercially
21    available on March 9, 2004, correct?
22  A:  That's correct.
23  Q:  You compounded a product that was not
24    commercially available, correct?
25  A:  That's correct.

Page 54

1  Q:  And then it identifies who the manufacturer of
2    this product is, does it not?
3  A:  It identifies who made it, yes, sir.
4  Q:  Well, what does Mfg stand for?
5  A:  I guess manufacturer.
6  Q:  Okay.  To your knowledge, was Congaree Pharmacy
7    licensed as a manufacturer in South Carolina?
8  A:  No, sir, we are not manufacturer.
9  Q:  Well, what does the label say?
10  A:  That's what the ... the label says Mfg.
11  Q:  Okay.  And you told me that meant manufacturer.
12  A:  Well.
13  Q:  And was the ... was Congaree Pharmacy licensed
14    under federal law as a manufacturer?
15  A:  No, sir.
16  Q:  Has this establishment been listed with the
17    Health and Human Services Secretary as a
18    manufacturer?
19  A:  No, sir.
20  Q:  Had the drug H202, 3 percent, #180 injection,
21    been listed with the Secretary of HHS as a drug
22    you were producing?
23  A:  No, sir.
24  Q:  Are you aware of the labeling requirements
25    under federal law for non prescription

Page 55

1    medications?
2  A:  I think so.
3  Q:  Okay.  You know this is a non ... you are
4    telling me this is a non prescription
5    medication, correct?
6  A:  I'm telling you this is not a prescription.
7  Q:  Yes, sir.  I believe a prescription ... I'm
8    saying this is a non prescription rug, isn't
9    it?
10  A:  Well, I guess if that's what you want to call
11    it.
12  Q:  Yes, sir.
13  A:  It's used as a prescription drug in his office.
14    Well, let me back up.  There is not a
15    prescription.  This is a product that we
16    compounded for Dr. Shortt's office.
17  Q:  So it's a ... you're delivering it as a non
18    prescription drug, correct?
19  A:  I'm not sure how to answer that.
20  Q:  Well, yes, sir.  You have told me either
21    something is a prescription or it's not a
22    prescription.  Was there a prescription here?
23  A:  There was not a prescription here.
24  Q:  So humor me on this question.  This was
25    delivered without a prescription, correct?

Page 56

1  A:  Yes, sir.
2  Q:  And it's a drug, we've established that?
3  A:  Yes, sir.
4  Q:  It's a non prescription drug, isn't it?
5  A:  If you wish to call it that, sir.
6  Q:  Okay.  Now, are you aware of the FDA
7    requirements for non prescription drugs for
8    labeling?
9  A:  That's for OTC.
10  Q:  I'm sorry?
11  A:  That's for over-the-counter.
12  Q:  Oh, you think it doesn't ... you think you can
13    compound things, non prescription, and just
14    because it's not over-the-counter, you don't
15    have to label it?
16  A:  Because over-the-counter, you are selling it to
17    the public.
18  Q:  Yes, sir.  Is it your understanding that you
19    don't have to label a non prescription
20    medication so long as you are not selling it
21    over the counter; is that your understanding of
22    the law?
23  A:  No, sir.
24  Q:  Okay.  We've got ... we've established a non
25    prescription medication, and what are the

14  (Pages 53 to 56)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 57

1    federal labeling requirements for non
2    prescription medications that are delivered or
3    sold?
4  MR. ELLIOTT: Object to the form.
5  Q:   What is your understanding of that?
6  MR. ELLIOTT: Same objection.
7  A:   I'm not sure if I can give you all of it.
8  Q:   Well, tell me what you know.
9  A:   The name of the product and who made the
10    product.
11  Q:   What else?
12  A:   Six point labeling and I'm drawing a blank.
13  Q:   Well, do you have to say the contents of it?
14  A:   The contents of it, yes, and ...
15  Q:   You have to tell the directions of how to use
16    it?
17  A:   Yes, sir.
18  Q:   Okay.  And you have to provide all warnings or
19    risks, correct?
20  A:   Yes, sir.
21  Q:   Okay.  What else?
22  A:   I can't recall anything else.
23  Q:   Well, let's go through those.  Are the
24    directions for use on the label?
25  A:   Yes, sir.

Page 58

1  Q:   What does it say?
2  A:   For clinic use.
3  Q:   But does it tell you how, the directions on how
4    you would administer, the regimen?
5  A:   No, sir.
6  Q:   And that's required under federal labeling,
7    requires you to describe how it's supposed to
8    be administered; isn't that required?
9  A:   Not in this instance, not in my opinion.
10  Q:   Yes, sir.  But we were talking about the FDA
11    labeling requirements.  You are supposed to
12    have directions on how to use it, correct?  Is
13    that correct?
14  A:   I assume it is, sir.
15  Q:   Yes, sir.  But no directions on use is
16    described on this label, is it?
17  A:   It says, For Clinic Use.
18  Q:   Other than that, there's no determination of
19    duration, strength, manner of use, is there?
20  A:   That is correct.
21  Q:   Okay.  And then you are supposed to disclose
22    the risk.  Is there any disclosure of the risk
23    on this label?
24  A:   No, sir.
25  Q:   On anything you prepared, did you disclose the

Page 59

1    risk of this product?
2  A:   I assume the label on the bottle.
3  Q:   Assume the label on what ...
4  A:   I don't know.  I would have to look at the
5    label on the hydrogen peroxide bottle.
6  Q:   You're talking about the one you produced?
7  A:   Yes, sir.
8  Q:   Okay.
9  (PLAINTIFF'S EXHIBIT NUMBER 5 WAS MARKED FOR
10  IDENTIFICATION PURPOSES.)
11  Q    I'm going to hand you Exhibit 5, which was
12    provided by Dr. Shortt to the Richland County
13    Coroners Office shortly after Ms. Bibeau's
14    death, and was represented by Dr. Shortt to the
15    coroner to be the bottle utilized that was
16    administered to Ms. Bibeau.  Do you have any
17    reason to question that?
18  A:   No, sir.
19  Q:   At any point there on that bottle label, is
20    there any description of the risks associated
21    with its administration?
22  A:   No, sir.
23  Q:   Is there any directions for use?
24  A:   No, sir.
25  Q:   Under the FDA labeling requirements, this does

Page 60

1    not meet those requirements, does it?
2  A:   It does not.
3  (PLAINTIFF'S EXHIBIT NUMBER 6 WAS MARKED FOR
4  IDENTIFICATION PURPOSES.)
5  Q:   For purposes of this exhibit, I have Hydrogen
6    Peroxide 30 Percent.  I happen to have the
7    label.  I'm told the same is for 35 percent,
8    but I don't have that with me.  So I'm going to
9    hand you Exhibit 6, with that caveat.  And this
10    appears to be the label from Spectrum, does it
11    not?
12  A:   Yes.
13  Q:   And it says ... what's the first thing it says
14    on that label in bold letters?
15  A:   Danger.
16  Q:   And the 35 percent also has the same label,
17    does it not?
18  A:   Yes, sir.
19  Q:   And then it identifies it as corrosive, does it
20    not?
21  A:   Yes, sir.
22  Q:   And if you will go to the second page of it, it
23    says, for manufacturing or laboratory use only.
24    Read and understand the label and the Material
25    Safety Data Sheet prior to use.  Is that

15  (Pages 57 to 60)

Page 61

1  correct?
2  A:  Yes, sir.
3  Q:  You did not read and understand the Material
4  Safety Data Sheet prior to your using it on
5  March 9, 2004, did you?
6  A:  I did, sir.
7  Q:  Well, you told me you weren't aware of the
8  hydrogen peroxide ... you weren't aware ...
9  A:  I read the label.
10 MR. ELLIOTT: Let him finish.  Let him finish his
11 question.
12 Q:  Were you aware of the toxicity to the blood?
13 MR. ELLIOTT: Object to the form.
14 A:  No, sir.
15 Q:  Okay.  So that was in the Material Safety Data
16 Sheet, wasn't it?
17 A:  Yes, sir.
18 Q:  So you didn't really read it very closely, did
19 you?
20 MR. ELLIOTT: Object to the form.
21 A:  Not as close as you think.
22 Q:  Yes, sir.  It says to read and understand the
23 label.
24 A:  Yes, sir.
25 Q:  You didn't understand the risk to organs and to

Page 62

1  blood, did you?
2  A:  I did, yes, sir.
3  Q:  Okay.
4  A:  Of 35 percent, yes, sir.
5  Q:  And did you make any inquiry whether it applied
6  at more diluted strengths?
7  A:  No, sir.
8  Q:  Okay.  Now, we've got here the label that's on
9  the product you compounded.  Let's contrast it
10 with the labels that we have here.  I believe
11 if we ... so I can refer to the correct numbers
12 here.  I believe Exhibits 5 and 4, represent
13 the labels prepared by you for the hydrogen
14 peroxide on March 9, 2004; is that fair?
15 A:  Yes.
16 Q:  Exhibits 5 and 4?
17 A:  Yes, sir.
18 Q:  Okay.  And those labels, contrasted to Exhibit
19 6, which is the Spectrum label on the hydrogen
20 peroxide, it's pretty different, isn't it?
21 A:  Yes, sir.
22 Q:  And it doesn't ... as we went through it, it
23 doesn't give directions for use, correct?
24 A:  Yes, sir.
25 Q:  Your 4 and 5 do not give directions for use, do

Page 63

1  they?
2  A:  No, sir.
3  Q:  And they do not disclose risks, do they?
4  A:  No, sir.
5  Q:  And the label discloses the manufacturer to be
6  Congaree, correct?
7  A:  Yes, sir.
8  Q:  Now, are you aware of the Good Compounding
9  Practices that are put out by the National
10 Association of Boards of Pharmacists?
11 A:  Yes, sir.
12 Q:  Okay.  Tell me about what that ... what those
13 Good Compounding Practices are.  What does that
14 document reflect?
15 A:  Well, just I'm not real sure, other than it
16 gives proper techniques, practices for
17 compounding drugs.
18 Q:  And the Good Compounding Practices reflect the
19 standard of care for pharmacy, do they not?
20 A:  Yes, sir.
21 Q:  Okay.
22 (PLAINTIFF'S EXHIBIT NUMBER 7 WAS MARKED FOR
23 IDENTIFICATION PURPOSES.)
24 Q:  Let me hand you Exhibit 7, Good Compounding
25 Practices, and let's look at the definition

Page 64

1  given for compounding on the first page.  Do
2  you see where I am there?
3  A:  Yes.
4  Q:  It says, the preparation, mixing, assembling,
5  packaging, or labeling of a drug or device (1)
6  as a result of a practitioner's prescription
7  drug order or initiative based on the
8  practitioner/patient/pharmacist relationship in
9  the course of professional practice, that's one
10 way to do compounding, correct?
11 A:  Yes, sir.
12 Q:  And the other way is for the purpose or
13 incident to research teaching and chemical
14 analysis, correct?
15 A:  Yes, sir.
16 Q:  Now, this was not for research, teaching or
17 chemical analysis, was it, on March 9, 2004?
18 A:  No, sir.
19 Q:  Were you aware that Dr. Shortt had told his
20 patients that this was an experimental drug?
21 A:  No, sir.
22 Q:  So you didn't even inquire to him that he was
23 engaging in experimental treatments, did you?
24 A:  I didn't know he considered it that, sir.
25 Q:  Okay.  But you never asked him, did you?

16 (Pages 61 to 64)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 65

1  A:  No, sir.
2  Q:  You had never ... to your recollection, had
3      never heard of anybody doing it before, but you
4      didn't ask the physician about the treatment,
5      did you?
6  A:  No, I did not talk to Dr. Shortt.
7  Q:  But you knew it was sort of unconventional, did
8      you not?
9  A:  Yes, sir.
10 Q:  And it was, to your knowledge, unique?  You had
11     never heard of it before, correct?
12 A:  Correct.
13 Q:  And you knew that Dr. Shortt was not ... that
14     this treatment was not the standard routine and
15     customary practices in the medical community,
16     to your knowledge, correct?
17 MR. ELLIOTT: Object to the form.
18 A:  Yes, sir.
19 Q:  Okay.  Now, you see on ... so we are down here
20     to the definition of compounding under Good
21     Compounding Practices. It says, as a result of
22     a practitioner's prescription drug order or
23     initiative.  Was there a practitioner's
24     prescription, drug order or initiative?
25 A:  There was an order, yes, sir.

Page 66

1  Q:  It was an oral order though?
2  A:  Yes, sir.
3  Q:  And you are aware under state law a
4      prescription has to be in writing, correct?
5  A:  That's a prescription, not an order.
6  Q:  Okay.  But it says prescription drug orders, is
7      the term here?
8  A:  Yeah.
9  Q:  It has to be a ... did you have a prescription
10     drug order?
11 A:  I had an oral prescription drug ... an order
12     oral ... excuse me, an oral order.
13 Q:  An oral order that wasn't a prescription?
14 A:  I don't consider it a prescription.  It wasn't
15     for a patient.
16 Q:  We'll get into that.  Based on a
17     practitioner/patient/pharmacist relationship,
18     you are telling me that didn't exist?  There
19     was not a practitioner/patient/pharmacist
20     relationship; is that right?
21 A:  There was a practitioner/patient relationship
22     and a practitioner/pharmacist relationship.
23 Q:  But there was not a
24     practitioner/patient/pharmacist relationship,
25     correct?

Page 67

1  MR. ELLIOTT: Object to the form.  I think he just
2      answered it.
3  Q:  Go ahead and answer.  That's what you are
4      telling me?
5  A:  I'm telling you ... I told you that there was
6      a practitioner/patient relationship and a
7      pharmacist/practitioner relationship.  We did
8      not know the patients.
9  Q:  I'm looking at the definition here.  You see it
10     in front of you.
11     Practitioner/patient/pharmacist, a triangle
12     order relationship.
13 A:  Uh-huh.
14 Q:  You are telling me there was not the triangular
15     relationship; is that correct?
16 A:  Not for her, no, sir.
17 Q:  Not for Ms. Bibeau, correct?
18 A:  Correct.
19 Q:  So you compounded this product and you didn't
20     have a prescription drug order and you didn't
21     have the practitioner/patient/pharmacist
22     relationship, correct?
23 A:  That is correct.
24 Q:  Okay.  And you were compounding a product that
25     was not commercially available, correct?

Page 68

1  A:  Correct.
2  Q:  Now, under this definition, you wouldn't fall
3      into this definition for compounding under the
4      Good Compounding Practices, would you?
5  A:  I think we do.
6  Q:  Well, is it based upon ... is your prescription
7      drug order initiative based upon the
8      practitioner/patient/pharmacist relationship?
9  A:  It's based on the practitioner/pharmacist
10     relationship.
11 Q:  Yes, sir.  I'm asking you ... take it literally
12     to what it says.
13 A:  Okay.  Then, no, sir.
14 Q:  So under the Good Compounding Practices, you
15     did not meet the requirements for compounding,
16     did you?
17 A:  Not under this one, no, sir.
18 Q:  And this one being Exhibit Number ...
19 MR. HOWARD: Seven.
20 Q:  ... 7; is that correct?
21 A:  That's correct, sir.
22 Q:  Okay.  Now, do you know whether the Good
23     Compounding Practices are actually consistent
24     with state law?
25 A:  No, sir I don't know that.

17  (Pages 65 to 68)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

**Page 69**

1   Q:   Okay.
2   MR. GERGEL: Gentlemen, I have one of these if you
3       all want to share this.
4   MR. ELLIOTT:  Is that the statute?
5   MR. GERGEL: The statute.  I think you all have
6       probably got it here.
7   (PLAINTIFF'S EXHIBIT NUMBER 8 WAS MARKED FOR
8   IDENTIFICATION PURPOSES.)
9   Q:   I'm going to hand you Exhibit Number 8, which
10      is 40-43-86 from the State Pharmacy Act.  I
11      take it you are familiar with the State
12      Pharmacy Act?
13  A:   Yes, sir.
14  Q:   Okay.  And you are charged as a pharmacist to
15      being familiar with that act, are you not?
16  A:   Yes, sir.
17  Q:   And I'm referring you to (CC) under that
18      relating to compounding.  Are you familiar with
19      that section?
20  A:   Yes, sir.
21  Q:   Okay.  And you see under )(2) on page 20
22      there, )(2) ... let's make sure we are in the
23      right place.  Are you there?  Are you there,
24      Mr. Dawn?
25  A:   Yes, sir.

**Page 70**

1   Q:   Okay.  Under )(2), the following are the
2       minimum current good compounding practices for
3       the preparation of medications.  Do you see
4       where I am, sir?
5   A:   Yes, sir.
6   Q:   And it says under (a) pharmacists engaged in
7       the compounding of drugs shall operate in
8       conformance with applicable laws regulating the
9       practice of pharmacy.  You understand that,
10      don't you?
11  A:   Yes, sir.
12  Q:   And then it authorizes in (b) based on the
13      existence of a pharmacist/patient/practitioner
14      relationship and the presentation of a valid
15      prescription, or in anticipation of
16      prescription medication orders based on
17      routine, regularly observed prescribing
18      patterns, pharmacists may compound, for an
19      individual patient medications that are
20      commercially available in the market place.  Do
21      you see that?
22  A:   Yes, sir.
23  Q:   Okay.  First of all, you are telling me that
24      triangular relationship between
25      pharmacist/patient/practitioner is not present,

**Page 71**

1       correct?
2   A:   That's correct.
3   Q:   In regard to Ms. Bibeau, correct?
4   A:   That's correct.
5   Q:   You did not have a valid prescription, correct?
6   A:   Not for Ms. Bibeau.
7   Q:   And the hydrogen peroxide, 3 percent, for
8       intravenous use, was not commercially available
9       in the market place, correct?
10  A:   That's correct.
11  Q:   Under this authorization for compounding, you
12      don't meet any of those three requirements, do
13      you?
14  A:   No, sir.
15  Q:   Then if you will go to the next page, under
16      (f), under (2)(f) the compounding of drugs in
17      anticipation of receiving prescriptions without
18      a historical basis or the distribution of
19      compounded products without a
20      patient/practitioner/pharmacist relationship is
21      considered what?
22  A:   It says manufacturing.
23  Q:   Yes, sir.  So were you aware until you just
24      read that that if you distributed compounded
25      products and you didn't have the triangular

**Page 72**

1       relationship with patient, practitioner and
2       pharmacist, that that was considered
3       manufacturing?
4   A:   No, sir.
5   Q:   That's news to you?
6   A:   Well, there are other sections here that cover
7       that.
8   Q:   Well, you are assuming they cover that?  You
9       think there's an ...
10  A:   There's a section that says we may compound for
11      a doctor's office.
12  Q:   But does that exclude your duty to have the
13      triangular relationship, even though you are
14      compounding for the doctor's office?
15  A:   Yes, sir.
16  Q:   You think that excludes that?
17  A:   That particular case, we are allowed to
18      compound for a doctor's office.
19  Q:   Even though you don't have the triangular
20      relationship?
21  A:   That's correct.
22  Q:   Okay.  That's your understanding?
23  A:   Yes, sir.
24  Q:   And you don't have a prescription?
25  A:   That's correct.

1116 Blanding St., Suite 1B / Columbia, SC 29201
(803) 252-3445 / (800) 822-0896

Page 73

1  Q:  Are you aware that when you don't have a
2      prescription you must meet all the branding
3      requirements required  under the FDA for non
4      prescription medications?
5  A:  I don't.
6  Q:  That's news to you?
7  A:  Yes, sir.
8  Q:  You can see sitting here today, Mr. Dawn, by
9      your reaction, you can understand that's a
10     potential problem because the exceptions for
11     pharmacists are for prescriptions, aren't they?
12     The labeling requirements for pharmacists are
13     for prescription drugs, correct?
14 A:  Yes, sir.
15 Q:  And if you don't have a prescription drug, you
16     fall right into the requirements under federal
17     law for labeling, don't you?
18 MR. ELLIOTT: Object to the form.
19 Q:  Don't you, Mr. Dawn?
20 MR. ELLIOTT: Same objection.
21 A:  I don't understand.
22 Q:  Well, do you understand that as a pharmacist,
23     so long as you have a prescription, you don't
24     have to meet the federal labeling requirements?
25     You know that, don't you?

Page 74

1  A:  Yes, sir.
2  Q:  But if you don't have a prescription, you have
3      a duty to meet the labeling requirements, don't
4      you?
5  A:  I don't ... I don't think so.
6  Q:  But you don't know, do you?
7  A:  No, sir.
8  Q:  In fact, until I just raised it with you, you
9      never even thought about it, did you?
10 A:  That's correct, sir.
11 Q:  And you weren't aware that federal law required
12     that if a drug required medical supervision,
13     you had to have a prescription?  You didn't
14 know that either, did you?
15 MR. ELLIOTT: Object to the form.
16 A:  No.  From what you are saying, no, sir.
17 Q:  Is it your assumption that so long as Dr.
18     Shortt asked you to compound anything, whether
19     it was commercially available or not
20     commercially available, whether it was FDA
21     approved or not FDA approved, whether it was
22     safe or unsafe, as long as he asked you for it
23     for his office use, you were free to compound
24     it and deliver it; is that your understanding?
25 A:  That we could do that, yes, sir.

Page 75

1  Q:  So let's just take a hypothetical situation.
2      Let's assume Dr. Shortt reads that there's a
3      ... that a clinical trial is going on in
4      Romania on some drug.  It's not approved in the
5      United States and they are doing clinical
6      trials and he gets the ingredients for that
7      drug, and he brings it to you.  You can
8      compound it, even though it's not approved by
9      the FDA ...
10 A:  Yes, sir.
11 Q:  ... and he can sell it out of his office to his
12     patients even though the FDA does not authorize
13     that?
14 A:  I can't answer that.
15 Q:  Well ...
16 A:  I can't answer what he ...
17 Q:  Are you as a pharmacist allowed to ...
18 A:  I'm allowed to compound for him.
19 Q:  Even if it's not FDA approved?
20 A:  Yes, sir.
21 Q:  How about if it is FDA prohibited?
22 A:  I would say we probably couldn't, but I don't
23     know.
24 Q:  Well, why?  What about this law?  If it says
25     here that you can compound it for his office,

Page 76

1      why can't you compound something that's
2      illegal?
3  A:  Because it's illegal.
4  Q:  Okay.  Well, that's interesting.  Now, are you
5      able to compound medications ... now, a drug
6      that is not approved by the FDA, is it legal to
7      sell that in the United States?
8  A:  I'm sorry, would you repeat that?
9  Q:  If the FDA ... if there's a drug somebody wants
10     to sell ...
11 A:  Uh-huh.
12 Q:  ... manufacture a drug and it's not FDA
13     approved and there's not a new drug application
14     in which there are approved clinical trials,
15     can a manufacturer sell a drug?
16 A:  I believe they can.
17 Q:  You think they can sell without FDA approval?
18 MR. ELLIOTT: Object to the form.
19 Q:  Go ahead and answer.
20 A:  My understanding, there are drugs being sold
21     without FDA approval, but that doesn't make it
22     right.
23 Q:  Well, I'm not talking ... I'm talking about
24     legally here.  I'm try to talk ... I'm trying
25     to talk to you about the regulation of drugs.

19  (Pages 73 to 76)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 77

1    You are a pharmacist. You are a part of this
2    network of the production of drugs in America,
3    correct?
4  A:   Right.
5  Q:   And you understand that you've got to obey both
6    federal law and state law, don't you?
7  A:   Yes, sir.
8  Q:   And you understand that federal law trumps all
9    other laws, doesn't it?
10 A:   I'm not sure.
11 Q:   You don't know about that? Have you ever heard
12   of the Civil War? That's the way that issue
13   was settled. Is it your ... but you have not
14   really looked into what the federal law
15   provides for non prescription drugs, have you?
16 A:   No, sir.
17 Q:   And you don't know about the labeling
18   requirements, correct?
19 A:   Well, I used to.
20 Q:   Okay. But you don't know now?
21 A:   No, sir.
22 Q:   You didn't know in March 9, 2004?
23 A:   I guess not.
24 Q:   Yes, sir. And you don't know anything about
25   the duty ... if you are going to compound a

Page 78

1    mediation that's not approved by the FDA, what
2    you have to do to go through? You don't know
3    anything about that, do you?
4  MR. ELLIOTT: Object to the form.
5  A:   No, sir.
6  Q:   You don't know about submitting the list of
7    such compounded drugs to the Secretary of HHS
8    ...
9  A:   No, sir.
10 Q:   ... for approval? You don't know that, do you?
11 A:   No, sir.
12 Q:   You didn't know there were all this whole
13   network of federal regulations relating to
14   this, did you?
15 A:   No, sir.
16 MR. ELLIOTT: We've been going at it for about an
17   hour. Are you ready for a break?
18 MR. GERGEL: If you need a break, I'm glad to do it.
19   Yes, sir. Obviously, Mr. Dawn, while you are
20   at break, you are not allowed to consult with
21   your lawyer about anything substantive.
22        (OFF THE RECORD.)
23 Q:   Mr. Dawn, you had mentioned earlier that
24   hydrogen peroxide was something you all were
25   aware of at the Poison Center; is that correct?

Page 79

1  A:   Yes, sir.
2  Q:   That was primarily from swallowing, correct?
3  A:   Yes, sir.
4  Q:   And was hydrogen peroxide considered a poison?
5  A:   No, not at that strength, sir.
6  Q:   What strength?
7  A:   Three percent.
8  Q:   It was not considered a poison, but the Poison
9    Center doesn't address the risk of intravenous
10   medications, does it?
11 A:   That's correct, sir.
12 Q:   Okay. So what you may have learned from the
13   Poison Center may have something to do with
14   swallowing it, but nothing to do with at what
15   levels would be safe for IV ingestion, correct?
16 A:   Yes, sir.
17 Q:   And you understand that are certain risks
18   associated with direct IV use, correct?
19 A:   Yes, sir.
20 Q:   That's why you told me earlier that all IV
21   medications should be under medical
22   supervision, correct?
23 A:   Yes, sir.
24 Q:   Okay. And those risks are the risks of
25   toxicity, complications, that type of thing,

Page 80

1    correct?
2  A:   Yes, sir.
3  Q:   Now, we talked earlier about that definition of
4    Good Compounding Practices or the definition of
5    compounding. Do you remember that?
6  A:   Yes, sir.
7  Q:   And you acknowledge under that definition that
8    it appears that you had not met those
9    requirements. I'm now going to handle you
10   definition under South Carolina law.
11 (PLAINTIFF'S EXHIBIT NUMBER 9 WAS MARKED FOR
12 IDENTIFICATION PURPOSES.)
13 Q:   This is 40-43-30 and it is Exhibit Number 9.
14   And if you will see number (7) there, there's
15   a definition for compounding; is there not?
16 A:   Yes, sir.
17 Q:   And it defines it as it means the preparation,
18   propagation, conversion, or processing of a
19   drug or device, and you did that, did you not?
20 A:   Yes, sir.
21 Q:   On March 9, 2004, the conversion you did and
22   the dilution and so forth met that requirement,
23   did it not?
24 A:   Yes, sir.
25 Q:   Either directly or indirectly, by extraction

20  (Pages 77 to 80)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 81

1    from substances or natural original or
2    independently by means of chemical or
3    biological synthesis, or the preparation,
4    mixing, assembling, packaging, or labeling of
5    a drug or device. You did that, didn't you?
6    A:    Yes, sir.
7    Q:    As the result of a practitioner's drug order or
8    initiative based on a
9    practitioner/patient/pharmacist relationship in
10   the course of professional practice. You
11   didn't meet that requirement, did you?
12   A:    Yes, sir.
13   Q:    You did not, did you?
14   A:    Oh, no, sir.
15   Q:    You did not meet the definition because you
16   didn't have the triangular relationship between
17   practitioner, patient and pharmacist, correct?
18   A:    Well, I believe that we had a relationship and
19   it was the patient/practitioner and the
20   pharmacist/practitioner.
21   Q:    Yes, sir. But the triangular relationship, you
22   did not have, did you?
23   A:    No, sir. We did not have it.
24   Q:    And to be clear, you did not, as the
25   pharmacist, did not have the relationship with

Page 82

1    the patient, correct?
2    A:    That's correct.
3    Q:    So under this definition and state law, you did
4    not meet the requirements for compounding, did
5    you?
6    MR. ELLIOTT: Object to the form.
7    Q:    Go ahead and answer.
8    A:    Yes, sir.
9    Q:    You did or did not?
10   A:    Did not. I did not.
11   Q:    You did not, did you?
12   A:    No, sir.
13   Q:    Now, if you are not authorized under state law
14   to compound because you don't have the
15   triangular relationship ... we've looked at the
16   definition here. We've looked at the Good
17   Compounding Practices. Where is your authority
18   to compound just for Dr. Shortt without having
19   the patient involved?
20   A:    We have a section that says we can compound for
21   office use.
22   Q:    But isn't compounding already defined under
23   state law?
24   A:    There's other ... there are several
25   definitions.

Page 83

1    Q:    Okay. There's another definition for
2    compounding?
3    A:    Yes, sir.
4    Q:    Where is that?
5    A:    I'd have to find it in here, but there's a
6    section that says that we can compound for ...
7    Q:    Office use?
8    A:    ... office use.
9    Q:    Yes, sir. If you will go to the exhibit we had
10   before that, I think I know what you are
11   referring to, and if you will go the ... where
12   we were looking at before. It would be page
13   21, if you are using that page number in there.
14   Right there (indicating). You see where it
15   says page 21 right there?
16   A:    Yes, sir.
17   Q:    If you will go to that. And I believe you are
18   referring to the fact on (e) pharmacists may
19   not offer compounded medications to other
20   pharmacies for resale, however, pharmacists may
21   compound products based on an order from a
22   practitioner for use by practitioners for
23   patient use in institutional or office
24   settings; is that correct?
25   A:    Yes, sir.

Page 84

1    Q:    Now, but it's compounding is what you are
2    doing, isn't it?
3    A:    Yes, sir.
4    Q:    And doesn't compounding have a definition under
5    state law?
6    A:    That's the one definition.
7    Q:    Well, yes, sir.
8    A:    I'm just ...
9    Q:    The only place ...
10   A:    Okay. This is what we were going by.
11   Q:    Yes, sir. But my point to you is there's only
12   one place where compounding is defined and
13   that's under the earlier section, the section
14   we just cited, isn't it?
15   A:    Yes, sir.
16   Q:    You didn't meet that requirement, did you?
17   A:    No, sir.
18   Q:    And if you will go right below (e), where we
19   were just reading, you go to (f), it makes it
20   very clear that you must have that triangular
21   relationship with the patient, the practitioner
22   and the pharmacist, or you are considered a
23   manufacturer; isn't that true?
24   A:    I don't believe that to be true, but ...
25   Q:    That's what it says, isn't it?

21 (Pages 81 to 84)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 85

1  A:  That's what it says.
2  Q:  And I take it until you sat here today, you
3      weren't aware of these other provisions in the
4      statute requiring the triangular relationship
5      and having it be manufacturing if you're not
6      ... if you don't have that relationship?
7  A:  No, sir.  I still believe that compounding can
8      be done for office use and I believe it can be
9      done using the triangular relationship.
10 Q:  With or without it?
11 A:  With and then I think there are two separate
12     situations.
13 Q:  Okay.  Without the triangular relationship, can
14     you compound under state law?
15 A:  That's my opinion that you can, yes, sir.
16 Q:  Notwithstanding the definition of compounding,
17     which does seem to require it, does it not?
18 A:  Yes, sir.
19 Q:  Okay.  You are interpreting one sentence there
20     to allow you to do the compounding even though
21     you don't have the triangular relationship is
22     your interpretation?
23 A:  Yes, sir.
24 Q:  You certainly can compound for a doctor's use
25     and know the doctor's patient's name, can't

Page 86

1      you?  You could do that?
2  A:  Yes, sir.
3  Q:  I mean you could have ... you can prepare
4      compound for office use and know the names of
5      the patients?
6  A:  Not necessarily.
7  Q:  But you could, couldn't you?
8  A:  Possibly, yes, sir.
9  Q:  Yes, sir.  Let's take Ms. Bibeau.  On the day
10     in question, March 9, she's in the office.  You
11     understand that, do you not?
12 A:  Dr. Shortt's office?
13 Q:  Yes.
14 A:  Yes, I assume she was.
15 Q:  Okay.  If you wanted to dispense to her, you
16     could have gotten her name, could you not have?
17 A:  I suspect I could.
18 Q:  Yes, sir.  And if you were going to determine
19     whether the hydrogen peroxide was appropriate
20     for her, you could have gotten some medical
21     history from her, could you not have?
22 A:  I could have, I guess.
23 Q:  And if there was counseling or warnings to her,
24     you could have counseled her, couldn't you?
25 A:  If it was a prescription for her.

Page 87

1  Q:  Yes, sir.  But I guess my point to you is it's
2      certainly compatible with you compounding for
3      Dr. Shortt for his office use to also know the
4      names of the patients he's going to deliver it
5      to, that's nothing wrong with that, is there?
6  A:  It may be difficult to do.
7  Q:  But in this case, it would not have been, would
8      it?
9  A:  I don't know.  I didn't know if he was going to
10     use it that day or not.
11 Q:  Okay.  But you could have asked him, couldn't
12     you?
13 A:  Somebody could have, yes, sir.
14 Q:  Yes, sir.  You could have ... for instance, if
15     you wanted to meet the requirements of a
16     pharmacist for a prescription, you could have
17     insisted on knowing the name of the patient,
18     number one, couldn't you?
19 A:  That's possible, yes, sir.
20 Q:  Yes, sir.  And you could have asked the
21     patient's ... gotten the patient's medical
22     history, correct?
23 A:  I don't think that was required.
24 Q:  But you could have gotten ... for a
25     prescription, you are supposed to know whether

Page 88

1      ...
2  A:  Yes, sir.
3  Q:  ... the medication is appropriate.  You could
4      have gotten that information, couldn't you?
5  A:  if we had a prescription, yes, sir.
6  Q:  And you could have made an independent
7      determination about whether it was safe and
8      appropriate, correct?
9  A:  We could have done that, yes, sir.
10 Q:  And you could have counseled the patient and
11     insisted on counseling the patient, couldn't
12     you?
13 A:  If there was a prescription.
14 Q:  Yes, sir.  All of that could have been done in
15     this setting because literally Dr. Shortt's
16     office is next door, correct?
17 A:  It is, yes, sir.
18 Q:  Yes, sir.  So you interpreted the law as not
19     requiring that, correct?
20 A:  That's correct.
21 Q:  But you weren't aware of these federal laws
22     that presented other problems for you?
23 A:  Yes, sir.
24 MR. ELLIOTT: Object to the form.
25 Q:  Go ahead and answer.

22  (Pages 85 to 88)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

Page 89

1  MR. ELLIOTT: Object to the form.
2  Q:   I couldn't hear your answer.
3  A:   I said yes, sir.
4  Q:   Yes. And you learned ... you have learned of
5       these federal laws sitting here today; is that
6       fair?
7  A:   Yes, sir.
8  Q:   You did not counsel Ms. Bibeau, did you?
9  A:   No, sir.
10 Q:   You did not review the regimen Dr. Shortt was
11      planning and approve it, did you?
12 A:   No, sir.
13 Q:   You did not determine the risks or side effects
14      of the medication he was proposing, did you?
15 A:   No, sir.
16 Q:   You did not properly label the medication, did
17      you?
18 MR. ELLIOTT: Object to the form.
19 A:   I believe we did, but ...
20 Q:   Well, if federal law requires ...
21 A:   According to federal law, I did not.
22 Q:   Yes, sir. Have you ever heard of misbranding
23      a drug? Have you ever heard that term?
24 A:   Yes, sir.
25 Q:   What does it mean?

Page 90

1  A:   It means you are labeling a drug with a
2       different name or content, or whatever.
3  Q:   Were you aware under federal law that if a drug
4       should be a prescription drug and you dispense
5       it without a prescription, that that's
6       misbranding?
7  A:   No, sir, I wasn't aware of that.
8  Q:   You weren't aware of that. Were you aware if
9       a drug doesn't have the proper warnings, that
10      that's misbranding?
11 A:   No, sir.
12 Q:   Were you aware if it doesn't have directions as
13      to use, it's misbranding?
14 A:   That's ... it depends on the situation.
15 Q:   We already established there weren't any
16      directions for the use of this drug, correct?
17 A:   That's correct.
18 Q:   And what I am asking you, are you aware that if
19      there are not directions for the use for a
20      drug, that is a non prescription drug, that
21      that's misbranding. Are you aware of that?
22 A:   Yes, sir.
23 Q:   Okay. This was a misbranded drug, wasn't it?
24 A:   I don't believe it to be, sir.
25 Q:   Well, where are the directions for its use?

Page 91

1  A:   I don't believe it meets those criteria.
2  Q:   In what way does it not meet it?
3  A:   Because it was a drug order for an office use.
4  Q:   But you think that's ... you have told me a
5       hundred times it's not a prescription drug,
6       correct?
7  A:   Right. No, it's not a prescription for an
8       individual.
9  Q:   Yes, sir. There's no prescription drug order,
10      correct?
11 A:   For an individual.
12 Q:   Yes, sir. There's no prescription, is there?
13 A:   For an individual.
14 Q:   Yes, sir.
15 A:   Yes, sir.
16 Q:   And your ... it's basically a request for a
17      bulk product, is it not?
18 A:   No, sir.
19 Q:   Well, you are telling me ... is it an
20      individual patient medication?
21 A:   No, sir. It's for office use.
22 Q:   Yes, sir.
23 A:   It may be used for several patients.
24 Q:   And was it in a vial?
25 A:   Yes, sir.

Page 92

1  Q:   Okay. But it was ... the label did not contain
2       any warnings as to risk, did it?
3  A:   No, sir.
4  Q:   And you didn't provide in writing or by any
5       other means warnings, did you?
6  A:   No, sir.
7  Q:   And if the federal law requires you to provide
8       that, you broke the law, didn't you?
9  A:   Yes.
10 MR. ELLIOTT: Object to the form.
11 COURT REPORTER: What was your answer?
12 MR. DAWN: Yes, sir.
13 Q:   Mr. Dawn, Mr. Elliott has every right to object
14      and what we might let him do is let him object
15      and then let you answer because I think it's
16      creating a little bit of confusion for both me
17      and for the court reporter.
18 A:   Sorry.
19 Q:   Are you aware that a misbranded drug is not
20      supposed to be delivered or sold? Are you
21      aware of that?
22 A:   I would say they should not be.
23 Q:   Yes, sir. And whether this is a misbranded
24      drug, you're not really sure, are you?
25 A:   My believe it's not, but ...

23  (Pages 89 to 92)

CREEL COURT REPORTING, INC.

GEORGE DAWN (8/2/2005)

---

**Page 93**

1  Q:  You recognize that if there were certain
2      warning requirements, you didn't provide them,
3      correct?
4  A:  That's correct.
5  Q:  And if there was required to have directions
6      for use, you didn't provide those, correct?
7  A:  Correct.
8  Q:  Now, whether this particular drug you
9      compounded was safe in the dosage you
10     compounded, you didn't really investigate, did
11     you?
12 A:  Other than speaking with Buster and discussing
13 it with him.
14 Q:  Right. Other than that, you made no
15     independent determination that the medication
16     was safe, correct?
17 A:  That's correct.
18 Q:  And you didn't provide for a particular dosage
19     level, so you didn't really know directly what
20     regimen Dr. Shortt was actually planning, did
21     you?
22 A:  That's correct.
23 Q:  And you knew that there was some potential risk
24     associated with the intravenous administration
25     of any drug?

---

**Page 94**

1  A:  Yes, sir.
2  Q:  Correct?
3  A:  Yes, sir.
4  Q:  And you knew enough to say certainly at some
5      level the intravenous use may be risky,
6      correct?
7  A:  Yes, sir.
8  Q:  And you knew enough to say I wouldn't give this
9      if it didn't have medical supervision, correct?
10     I mean you were counting on the medical
11     supervision, correct?
12 A:  Yes, sir.
13 Q:  But you didn't really know whether ... what the
14     regimen was by Dr. Shortt and whether it was
15     really safe or not, did you?
16 A:  I knew a little bit about the regimen, just
17     there was a small amount used.
18 Q:  But how much and whether that was risky or not,
19     you really didn't know, did you?
20 A:  It was my opinion that it wasn't risky.
21 Q:  But you didn't know that really because you had
22     not done any independent work on that, had you?
23 A:  That is correct.
24 Q:  It was kind of a guess it wasn't risky at some
25     level?

---

**Page 95**

1  A:  It was a good professional judgment.
2  Q:  Yeah. But it was a guess, wasn't it?
3  MR. ELLIOTT: Object to the form.
4  A:  Professional judgment. I don't consider it a
5      guess.
6  Q:  Well, your professional judgment was based upon
7      talking to Buster?
8  A:  And just good common sense.
9  Q:  Common sense told you that it was safe at some
10     level?
11 A:  Yes, sir.
12 Q:  But you didn't independently research this to
13     determine whether that hunch ...
14 A:  No, sir.
15 Q:  ... was correct or not, did you?
16 MR. ELLIOTT: Object to the form.
17 A:  You are correct, sir.
18 Q:  And what you are calling professional judgment
19     was a hunch on your part based on your
20     experience; is that fair?
21 A:  Yes, sir.
22 Q:  But whether there was a ... you did not provide
23     yourself a scientific basis for that hunch, did
24     you?
25 A:  I did not research it, no, sir.

---

**Page 96**

1  Q:  To your knowledge, Congaree Pharmacy is not an
2      establishment registered with the FDA to
3      compound drugs, is it?
4  A:  It is not registered with the FDA to
5      manufacture, no, sir.
6  Q:  And to compound drugs which are not
7      prescriptions, correct?
8  A:  They are not registered with the FDA ...
9  Q:  Yes, sir.
10 A:  ... if that's what you ...
11 Q:  I'm trying to make it clear.
12 A:  If that's what you are asking.
13 Q:  Yes, sir. You understand that if you have a
14     prescription drug order, you don't have to meet
15     the labeling requirements of the FDA. You
16     understand that, don't you?
17 A:  Yes, sir.
18 Q:  But if you don't have a prescription, you
19     understand that there are federal requirements
20     for labeling, don't you?
21 A:  Yes, sir.
22 Q:  And for being registered as an establishment to
23     compound drugs. You understand that, don't
24     you?
25 A:  Yes, sir.

24  (Pages 93 to 96)